IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 101,724

STATE OF KANSAS,
*Appellee*,

v.

GARY W. KLEYPAS,
*Appellant*.

SYLLABUS BY THE COURT

1.

The doctrine of res judicata does not apply to a second appeal within the same case—that is, to an appeal from proceedings occurring on remand from a prior appeal.

2.

Under the law of the case doctrine, when a second appeal is brought in the same case, the first decision is the settled law of the case on all questions involved in the first appeal, and reconsideration will not normally be given to such questions.

3.

The doctrine of the law of the case is not an inexorable command, nor is it a constitutional requirement. Rather, the law of the case doctrine states a discretionary policy which expresses the practice of the courts generally to refuse to reopen a matter already decided, without limiting their power to do so.

4.

Courts generally recognize only three exceptions that allow changing the law of the case. These apply when (1) a subsequent trial produces substantially different evidence, (2) a controlling authority has made a contrary decision regarding the law applicable to the issues, or (3) the prior decision was clearly erroneous and would work an injustice.

5.

If a party can meet a law of the case exception, the party need not also show an exceptional circumstance.

6.

Under the Fourth Amendment to the United States Constitution, a search warrant must particularly describe the place to be searched and the persons or things to be seized. The fact that a warrant application or an affidavit in support of the application adequately described the place and the persons or things to be seized does not save the warrant from its facial invalidity.

7.

Where a warrant is so facially deficient that it fails to particularize the place to be searched or the things to be seized, executing officers cannot reasonably presume it to be valid, and a court should not admit into evidence the seized items under the good-faith exception recognized in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984).

8.

To invoke the exception to the law of the case doctrine that allows reconsideration of a clearly erroneous decision, it must be plain that the prior decision was in error and results in manifest injustice. To determine if manifest injustice would require reversal of a criminal conviction, an appellate court must apply K.S.A. 2015 Supp. 60-261 and K.S.A. 60-2105. Under those statutes, a court must determine whether an error affects substantial rights, meaning whether it will or did affect the outcome. The degree of certainty by which the court must be persuaded will vary depending on whether the error implicates a right guaranteed by the United States Constitution. If it does, a Kansas court must be persuaded beyond a reasonable doubt that there was no impact on the outcome, *i.e.*, there is no reasonable possibility that the error contributed to the outcome. If a right guaranteed by the United States Constitution is not implicated, a Kansas court must be persuaded that there is no reasonable probability that the error will or did affect the outcome.

9.

Two convictions—one for capital murder based upon the intentional and premeditated killing of a victim in the commission of, or subsequent to, the attempted rape of the same victim, and the other for the attempted rape of the victim—are improperly multiplicitous and violate a defendant's right to be free from double jeopardy.

10.

K.S.A. 2015 Supp. 21-6619(b) mandates that the Kansas Supreme Court shall consider any errors asserted in the review and appeal. The statute creates a special exception to the general rule that an appellate court will not consider an issue raised for the first time on appeal—*i.e.*, not raised in the district court—in death penalty cases.

3

11.

The penalty phase of a capital case is effectively a trial on the issue of punishment; rules applying to the conduct of a trial apply, except where special rules relating to capital cases have been adopted. In general, the traditional rubric for considering a motion for mistrial applies to such a motion made during the penalty phase of a death penalty proceeding.

12.

Under K.S.A. 22-3423(1)(c), a district court may order a mistrial if there is prejudicial conduct, in or outside the courtroom, that makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution. In making this determination, the district court must engage in a two-step process: First, it must determine if there is a fundamental failure in the proceeding; if so, second, the district court must determine whether it is possible to continue the trial without an injustice.

13.

The standard of review and the ultimate question that must be answered with regard to whether error in the penalty phase of a capital trial was harmless is whether the court is able to find beyond a reasonable doubt that the error did not affect the weighing of the aggravating and mitigating circumstances—that is, that there is no reasonable possibility the error affected the jury's weighing of the aggravating and mitigating circumstances and the death sentence verdict.

4

14.

The judicial system serves the fundamental purpose of resolving disputes in a civilized and orderly fashion. Aggressive physical conduct in the courtroom undermines this purpose and potentially denies a defendant a fair trial and may result in a mistrial.

15.

Before granting a mistrial, district courts should consider whether any damage caused by a fundamental failure in the proceedings can be or was removed or mitigated by admonition, instruction, or other curative action.

16.

A district court does not abuse its discretion when it denies a mistrial after a courtroom spectator attacks the defendant if the district court takes immediate action by removing the jurors from the courtroom, carefully questions the jurors regarding whether they can continue to be impartial, and instructs them to disregard the incident and not let it influence their deliberations. Generally, we presume juries follow a court's instructions, and a defendant must come forward with some evidence to overcome the presumption.

17.

In evaluating whether an injustice occurred as the result of an improper prosecutorial comment on a defendant's silence or failure to testify, appellate courts consider whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the defendant to testify.

18.

A district court does not abuse its discretion in denying a motion for mistrial after a prosecutor uses the phrase, "If the defendant testified," in a question to a witness when the phrase is merely an introductory clause rather than the focal point of the prosecutor's question to the witness, does not give rise to any adverse inference regarding the defendant's decision not to testify, is uttered only once, is immediately corrected, and the district court mitigates any potential prejudice by instructing the jury to draw no adverse inference from the defendant's decision not to testify.

19.

Any error in the admission of evidence that had not been the subject of a proper notice from the State to a criminal defendant in the penalty phase of a death penalty case is harmless error when no prejudice results from the lack of notice and the evidence has no reasonable possibility of affecting the jury's weighing of aggravating and mitigating circumstances.

20.

A criminal defendant does not have a liberty interest in having a jury instructed in accord with an overruled interpretation of a provision of law.

21.

Under the so-called mandate rule, a district court considering a case on remand is generally bound by the law of the case as set out in an appellate decision.

22.

Where a court departs from a mandate, it commits error. However, if the error occurs because the district court obeys new law, the error will generally be considered harmless because it would be futile for the appellate court to reverse the district court and at the same time direct the district court to render the same judgment again after the appellate court has itself applied the new law and altered its mandate.

23.

When reviewing an allegation of error relating to jury instructions, an appellate court must first determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record. In general terms, to be legally appropriate an instruction must always fairly and accurately state the applicable law. As to factual appropriateness, courts examine whether the instruction is supported by the particular facts of the case at bar. If error is found, the reviewing court must then conduct a reversibility inquiry. The nature of the reversibility inquiry depends both on the type of error and whether an objection had been lodged with the district court. If a party requested a jury instruction not given by the district court or objected before the district court to an instruction that was given, an appellate court tests reversibility under the harmless error paradigm set out in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). If a party failed to request an instruction or to object to an instruction that was given, the appellate court must assess whether there was clear error, *i.e.*, whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal.

7

24.

Under *Boyde v. California*, 494 U.S. 370, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990), when a claim is made in the penalty phase of a death penalty case that jury instructions impermissibly restrict a jury's consideration of evidence relevant to mitigating factors and, therefore, violate the Eighth Amendment to the United States Constitution, the proper inquiry for legal appropriateness is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. This test is not a harmless error test. Rather it is the test for determining, in the first instance, whether an instructional error occurred.

25.

A district court did not commit error by failing to list mercy as a mitigator relied on by a capital defendant when the defendant failed to establish a reasonable likelihood that the jury was misled to believe the defendant was not asking it to consider mercy.

26.

A district court does not err in instructing a jury in a death penalty proceeding that the determination of what are mitigating circumstances is for the jurors to decide under the facts and circumstances of the case.

27.

A prosecutor in a death penalty proceeding does not commit error by arguing to the jury that a defendant does not deserve mercy as long as the prosecutor does not tell the jury it cannot consider mercy.

28.

A prosecutor's questions must be relevant and supported by a good-faith basis for believing the asserted matter to be true.

29.

A defendant may collaterally attack prior convictions used for sentence enhancement only when there had been a violation of the right to have counsel appointed—that is, a violation of rights recognized in *Gideon v. Wainwright,* 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963).

30.

The Eighth Amendment to the United States Constitution does not categorically prohibit the execution of offenders who are severely mentally ill at the time of their crimes.

31.

In Kansas, challenges asserting that a punishment is categorically disproportionate have been limited to term-of-years sentences.

32.

The use and extent of rebuttal and surrebuttal rests in the sound discretion of the district court, and its ruling will not be reversed unless the discretion has been abused to a party's prejudice.

33.

Rebuttal evidence is that which contradicts evidence introduced by an opposing party. It may tend to corroborate evidence of a party who first presented evidence on the particular issue, or it may refute or deny some affirmative fact which an opposing party has attempted to prove. It may be used to explain, repel, counteract, or disprove testimony or facts introduced by or on behalf of the adverse party. Such evidence includes not only testimony which contradicts witnesses on the opposite side, but also corroborates previous testimony.

34.

The heinous, atrocious, or cruel aggravating factor that may be considered in death penalty proceedings under K.S.A. 2015 Supp. 21-6624 does not violate the Eighth and Fourteenth Amendments to the United States Constitution by being unduly vague or broad.

35.

Cumulative trial errors, when considered collectively, may require reversal of the defendant's conviction when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial.

36.

While K.S.A. 2015 Supp. 21-6619(b) compels the Kansas Supreme Court's review of all issues briefed on appeal, it does not require that the court treat the record other than as it is presented. The party alleging error bears the burden of demonstrating error.

10

37.

The standard for determining whether cumulative error infected the penalty phase of a death penalty proceeding is whether an appellate court is able to find that the total cumulative effect of the errors, viewed in the light of the record as a whole, had no reasonable possibility of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. The overwhelming nature of the evidence is a factor to be considered, but its impact is limited. The question before the court is not what effect the error might generally be expected to have upon a reasonable jury but, rather, what effect it had upon the actual sentencing determination in the case on review.

Appeal from Crawford District Court; DONALD R. NOLAND, judge. Opinion filed October 21, 2016. Affirmed in part, reversed in part, vacated in part, and remanded with directions.

*Meryl B. Carver-Allmond*, of Capital Appellate Defender Office, argued the cause, and *Sarah Ellen Johnson* and *Rebecca E. Woodman*, of the same office, were with her on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: In previous proceedings, a jury convicted Gary W. Kleypas of capital murder, aggravated burglary, and attempted rape and determined that Kleypas should be sentenced to death. Subsequently, the district court imposed the death sentence for the capital murder conviction, as well as time in prison for the other convictions. Kleypas appealed from his convictions and sentences, and in *State v. Kleypas*, 272 Kan. 894, 40 P.3d 139 (2001) (*Kleypas I*), *cert. denied* 537 U.S. 834 (2002), *abrogated in part by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), this court

affirmed his convictions but found reversible error relating to his capital sentence and ordered a new sentencing proceeding. On remand, a second jury determined that Kleypas should be sentenced to the death penalty. The district court subsequently imposed that sentence for the capital murder conviction and prison sentences for the aggravated burglary and attempted rape convictions.

Now, on appeal from the remand proceedings, Kleypas raises six issues regarding his guilt and argues we must reverse his capital murder and attempted rape convictions. We decline to address four of his arguments because this court's decision in *Kleypas I* stands as the law of the case on those issues. However, we consider the two other guilt-phase issues because they fall under exceptions to the law of the case doctrine; under these exceptions, a court may alter a prior decision made in the same case if a party establishes that the prior decision was clearly erroneous or that new controlling authority applies.

In one of these two issues, Kleypas argues a post-*Kleypas I* decision by the United States Supreme Court requires us to reexamine our holding that the district court did not err in denying Kleypas' motion to suppress certain evidence. Kleypas succeeds in establishing error—the evidence should have been suppressed. Nevertheless, we hold the error was harmless and does not require us to reverse Kleypas' convictions.

As to the other guilt-phase issue, we hold that post-*Kleypas I* decisions of this court require us to reverse Kleypas' conviction for attempted rape because it is multiplicitous with his capital murder conviction; this also means his sentence for attempted rape must be vacated. Because the attempted rape sentence was the controlling sentence under the Kansas Sentencing Guidelines Act (KSGA), K.S.A. 21-4701 *et seq.*

12

(Furse), Kleypas must be resentenced on the remaining conviction governed by Kansas' sentencing guidelines—his conviction for aggravated burglary.

In addition to his guilt-phase arguments, Kleypas raises 14 issues relating to the capital-offense sentencing proceedings that occurred after we remanded this case following our *Kleypas I* decision. We hold that none of these 14 issues requires us to reverse that sentence. We have reordered some of those issues for analysis. Specifically, we hold:

- The district court did not abuse its discretion when it denied Kleypas' motion for mistrial, in which Kleypas claims the jury could not be fair and impartial after it saw a courtroom spectator attack him (Issue 7);

- The district court did not abuse its discretion when it denied Kleypas' motion for mistrial that was based on a prosecutor beginning a question with the phrase, "If the defendant testified" (Issue 8);

- Any error in the admission of a Kansas Bureau of Investigation (KBI) agent's testimony concerning test results obtained by other agents was harmless (Issue 9);

- The district court's failure to follow the mandate of *Kleypas I* amounted to harmless error (Issue 10);

- The district court did not commit error when it decided not to list "mercy" as one of the mitigators asserted by Kleypas (Issue 11);

- The district court did not commit error by instructing the jury it could determine what constituted a mitigating circumstance under the facts of the case (Issue 12);

- Neither the prosecutor's closing argument regarding mercy nor his cross-examination of a defense expert resulted in reversible error (Issue 13);

- The district court did not err in refusing to consider Kleypas' collateral attack on his 1977 Missouri conviction (Issue 14);

- The Eighth Amendment to the United States Constitution does not categorically prohibit execution of offenders who were severely mentally ill at the time of their crime (Issue 15);

- Kleypas fails to establish the basis for proportionality review under § 9 of the Kansas Constitution Bill of Rights (Issue 16);

- The district court did not err in admitting rebuttal testimony of the State's expert (Issue 17);

- The heinous, atrocious, and cruel aggravating factor that may be considered in death penalty proceedings under K.S.A. 2015 Supp. 21-6624 is not vague or overbroad (Issue 18);

- Kleypas has not established that the district court erred in empaneling a new jury on remand (Issue 19); and

- Cumulative error does not require reversal of Kleypas' capital murder conviction or death sentence (Issue 20).

We therefore affirm Kleypas' capital murder conviction and his death sentence, but we reverse his attempted rape conviction as multiplicitous, vacate his sentence for attempted rape, and remand for resentencing on the other sentencing guideline conviction of aggravated burglary.

FACTUAL AND PROCEDURAL BACKGROUND

In *Kleypas I*, 272 Kan. at 909-14, this court extensively discussed the criminal acts that led to Kleypas' convictions for the capital murder of C.W., the aggravated burglary of her apartment, and the attempt to rape her. Highly summarized, in March 1996, C.W.'s body was discovered in her apartment where she had died after suffering seven stab wounds to her heart, a lacerated liver, a dilated anus, bruising all over her body, a fractured jaw, and multiple other injuries—some of which indicated sex crimes had occurred.

Suspicion for C.W.'s murder immediately fell on Kleypas, who lived near C.W.'s apartment, because C.W.'s caller ID had logged Kleypas' phone number at 1:48 on the morning of the murder. Once apprehended by law enforcement officers, Kleypas confessed to burglarizing C.W.'s apartment and then raping and murdering her. He told officers he had forced his way into C.W.'s apartment and had digitally penetrated her

15

vagina. Kleypas admitted he had strangled C.W. before stabbing her repeatedly in the chest. Kleypas also admitted he had burglarized C.W.'s apartment and had made obscene phone calls to her in the days before the murder.

After trial, the jury convicted Kleypas of capital murder under K.S.A. 21-3439(a)(4), attempted rape, and aggravated burglary. See K.S.A. 21-3439(a)(4) (defining capital murder as the "intentional and premeditated killing of the victim of one of the following crimes in the commission of, or subsequent to, such crime: Rape, as defined in K.S.A. 21-3502 and amendments thereto, . . . or any attempt thereof, as defined in K.S.A. 21-3301 and amendments thereto"). Kleypas appealed. This court affirmed Kleypas' convictions. But it held that an error in the jury instructions regarding sentencing required it to vacate Kleypas' death penalty sentence. 272 Kan. at 908. Kleypas sought a petition for certiorari, which the United States Supreme Court denied. *Kleypas v. Kansas*, 537 U.S. 834 (2002). This court then issued a mandate vacating Kleypas' death sentence and remanding the case to the district court with instructions to conduct a new sentencing proceeding.

During the remand proceedings, the State again sought the death penalty. The district court instructed the jury it could reach one of two verdicts: (a) It could impose a sentence of death by unanimously finding beyond a reasonable doubt that there were one or more aggravating circumstances and those aggravating circumstances were not outweighed by any mitigating circumstances found to exist; or (b) it could state that it was unable to reach a unanimous verdict sentencing the defendant to death. The State asked the jurors, as part of their weighing process, to consider three aggravating circumstances: (1) Kleypas had been previously convicted of a felony in which he had inflicted great bodily harm, disfigurement, or death on another; (2) Kleypas had murdered

16

C.W. in order to avoid or prevent a lawful arrest or prosecution; and (3) Kleypas had murdered C.W. in an especially heinous, atrocious, or cruel manner.

To support the first aggravator, the State presented evidence regarding Kleypas' conviction for the 1977 murder of a Missouri woman. Kleypas had served time in a Missouri prison as a result of that conviction but had been paroled; he was still on parole at the time of C.W.'s death.

In support of the second and third aggravating circumstances, the State played Kleypas' videotaped interview with law enforcement in which he detailed the murder of C.W. and the events surrounding it. We summarized the interview in our prior decision, stating:

"Kleypas said he first attempted to enter [C.W.'s] apartment through the front window. He had taken the screen off and the window broke. He took the screen to a trash can in the alley and then went to the front door. When Kleypas rang the bell the first time, C.W. peered out and called out for Mike, her fiancé. She said she knew it was Mike and said he should stop horsing around. She went back inside and Kleypas rang the bell again. When she answered, he forced himself inside. He said he might have slapped C.W. and that they ran into the couch in the living room. He forced her into the bedroom and made her undress. Kleypas used socks to bind C.W. He attempted intercourse but was unable to obtain an erection. He said he penetrated her vaginally with his fingers. He also admitted that he had been watching C.W. and her roommate and had been making obscene telephone calls to them.

"After he put his fingers into her vagina, Kleypas allowed C.W. to dress. She asked him to leave and said she would give him a head start. At some point, C.W. said she recognized him as the man who lived in the green house down the street. After he

17

unplugged the telephone from the wall, there was a struggle because C.W. did not want her hands bound.

"When C.W. became free of the chair, Kleypas tried to strangle her with his hands but that did not work. He took a piece of clothing and stuffed it into her mouth. When that was not successful, Kleypas found the knife and stabbed her repeatedly in the chest. He then took the engagement ring from her finger and some of the contents from her purse and left the apartment. Kleypas said he later disposed of some of the clothing he wore that night and other items by dropping them into a dumpster at a Springfield car wash, but he was uncertain what happened to the ring and it was never found.

"Kleypas told the officers that after the murder he returned to his apartment, took a shower, and waited for stores to open before writing checks and leaving town. Kleypas also admitted taking [C.W.'s roommate's] camera. He said that he wanted to plead guilty and spend the rest of his life in prison." *Kleypas*, 272 Kan. at 913-14.

The capital sentencing jury also heard testimony regarding the discovery of C.W.'s body, a 911 call, a search of Kleypas' apartment, and other investigatory details. In addition, the coroner detailed the wounds and injuries that led to C.W.'s "far from . . . instant death." The autopsy showed a widely dilated anus, which suggested C.W. had been sodomized by some object, a lacerated liver, seven stab wounds to the heart that nearly penetrated C.W.'s body, a broken jaw, significant bruising all over her body, and a wound over her right eye caused by a sharp object.

In defense, Kleypas presented evidence of four mitigating circumstances: (1) Kleypas had a chronic mental illness and chronic maladjustment that had led to behavioral control problems throughout his life; (2) Kleypas' mental status at the time of the crime was severely deteriorated; (3) when medicated, Kleypas' mental status dramatically improved; and (4) Kleypas' family had suffered a great deal and putting him

18

to death would cause them additional suffering. To support these mitigating circumstances, Kleypas called several witnesses, including a mitigation specialist who was a clinical and forensic psychologist; a clinical child psychologist; a psychologist who had researched factors that cause a risk of violence; a physician who had performed two brain scans on Kleypas; Kleypas' mother; and two individuals who had supervised Kleypas when he had been incarcerated in a Missouri prison.

As to the first circumstance regarding Kleypas' chronic mental illness, two psychologists testified to Kleypas' abusive and difficult childhood. Yolanda Jackson, a clinical child psychologist, characterized Kleypas' childhood as lacking quality attachment and explained her opinion that Kleypas' parents had been more focused on their own needs than those of their children. In addition, Jackson testified that Kleypas lacked supervision and monitoring as a child and was not allowed to express his emotions, leading to internalized shame and embarrassment. Dr. Marilyn Hutchinson, the mitigation specialist and clinical and forensic psychologist, reported that Kleypas' alcohol- and prescription drug-dependent father was prone to rage and to inflict abuse. When Kleypas was 15 or 16 years of age, his father stopped talking to him, even when they were in the same room. This continued for several years. Both psychologists felt this environment led to Kleypas' alcohol and drug abuse.

Hutchinson, who had evaluated Kleypas in 2002 and 2004, described him as severely disturbed with a history of chronic mental illness and maladjustment that caused behavioral control problems, an adult child of an alcoholic, a survivor of abuse and trauma, and a type-two alcoholic. She described a number of diagnoses by various doctors and psychologists starting in 1977. Cumulatively, these records showed a history of dissociation, psychotic and paranoid thoughts, schizophrenic activity, alcohol and drug

19

abuse, sexual perversion, and a significant personality disorder. Hutchinson diagnosed a number of significant mental illnesses affecting Kleypas, including psychosis, alcohol and drug abuse, sexual perversion, and a personality disorder. She indicated some of these illnesses were currently in remission or under control. She explained that she based her opinions on several factors, which included Kleypas' genetic predisposition for mental illness, long-term drug abuse, extremely low serotonin and dopamine levels, history of improvement when treated with drugs for schizophrenia, past mental illness diagnoses, and her own testing.

Hutchinson also addressed the second mitigator. She characterized Kleypas' mental state at the time of the crime as being negatively affected by major depression with psychosis and agitation; paraphilia including very disturbed sexual ideas; a personality disorder not otherwise specified; traits of narcissism, avoidance, and dependency; a schizotypal personality; and antisocial behavior.

As background for this mitigator, Hutchinson described Kleypas' life after his release from a Missouri prison in 1992. Although he did well at first, by the time of C.W.'s murder on March 30, 1996, he had a failed relationship and his drug use and voyeuristic activity had increased. Hutchinson testified that several stressors influenced Kleypas, which included being in a deteriorating personal relationship, being on the verge of getting kicked out of school, being fired from multiple jobs, having economic problems, and being at risk of losing his housing because one of his roommates had complained that Kleypas screamed and yelled for no reason. Hutchinson also indicated that Kleypas needed to be on prescription medication at the time of the murder but was not.

Hutchinson cited evidence indicating Kleypas had become delusional around the end of March 1996. She testified that a number of people who saw him around this time, including his attorney, reported he was disturbed. Shortly after the crime, he was having hallucinations in his jail cell; she suspected these might have been attributable to drugs but noted the hallucinations persisted for days. She testified "there was something very disturbed in his processing at that time."

In addition, Hutchinson explained the global assessment of functioning, or GAF, scores she had assigned to Kleypas. She described the GAF as a DSM-IV diagnostic axis that scores the level of a person's functioning on a scale ranging from 1 to 100. She assigned Kleypas a GAF score of 25 during the weeks before C.W.'s murder. She explained this meant Kleypas' communication and judgment were seriously impaired. Hutchinson lowered Kleypas' GAF score to 1 on the night of the murder because of the persistent risk of danger he posed to himself or others. She testified that Kleypas had an "enormous list" of deficits against him and very few positives to help him.

The third mitigating circumstance—that Kleypas' mental state vastly improved and stabilized when he was properly medicated and in a controlled environment such as prison—was supported by Hutchinson's summary of Kleypas' health records, which spanned the periods before, during, and after his incarceration in Missouri. In addition, Dr. David Preston, a physician in nuclear medicine who had performed two brain scans on Kleypas, testified to a marked improvement between a scan he performed in 1997 and a scan performed in 2008. His opinion was that cocaine and amphetamines were probably responsible for the earlier results and that, once Kleypas had been "locked up," his brain had a chance to recover. Also, clinical and forensic psychologist Mark Cunningham testified that Kleypas would not be a risk for violence in prison. Finally, two witnesses

21

who had supervised Kleypas' job performance while on prison work duty in Missouri verified he functioned responsibly in that setting.

Hutchinson's testimony also supported the fourth mitigator, as she believed it would be very hard on Kleypas' family if he were put to death. In addition, Kleypas' mother testified she did not think she could survive Kleypas being executed. Expressing sympathy for C.W. and her family, Kleypas' mother asked that her son be locked up for the rest of his life. She also expressed her anger with the Missouri prison system and Kleypas' parole officer because of their failure to treat or help with Kleypas' drug and alcohol problems.

In rebuttal to the evidence presented by the defense, the State presented the testimony of Dr. William Logan, a forensic psychiatrist who had worked with prisoners and had been involved in Kleypas' case since 1996. Logan told the jury that he had reviewed trial testimony from Kleypas' Missouri trial and the *Kleypas I* trial, all prior psychiatric evaluations of Kleypas, and Missouri Department of Corrections records. Logan also interviewed Kleypas' former girlfriend and viewed the videotape of Kleypas' confession, but he had not interviewed Kleypas.

When asked his opinion about Kleypas' mental state when he murdered C.W., Logan testified that Kleypas had been in control of his behavior, although he acknowledged Kleypas' deteriorating mental state during the period between his release from the Missouri prison and C.W.'s murder. Logan explained that Kleypas had done well when first paroled. But by 1996, Kleypas had relapsed, leading to substance abuse. Logan testified that by mid-March 1996, there were failures in multiple areas of Kleypas' life.

22

Logan thought an additional trigger occurred the evening of C.W.'s murder when a former girlfriend called Kleypas and asked for his help in getting her out of an abusive relationship. Kleypas made a play to get her back, but she turned him down. Under the influence of alcohol, Kleypas then acted out his sexual obsession on C.W. while she was helpless and, although widely different in age, similar in her helplessness to the victim of Kleypas' 1977 Missouri murder.

Logan testified Kleypas did not randomly choose his victim when he murdered the Missouri woman or C.W.; rather, he targeted both. Logan described C.W. as someone Kleypas had "shown an interest" in over time, as demonstrated by his acts of burglarizing her apartment and harassing her with phone calls of a sexual nature. The prosecutor asked Logan how Kleypas' prior interest in C.W. impacted Logan's opinion about Kleypas' mental state at the time of the murder. Logan responded that Kleypas had not experienced any hallucinations or voices telling him to kill C.W. that night. Rather, "like most sex offenders," he had a sexual attraction to her.

Logan disagreed with Hutchinson's assessment that Kleypas had a GAF score of 1 on the day of the crime. According to Logan, if Kleypas' GAF had been that low, he would have been delusional and disoriented—the kind of person police bring into the emergency room ranting and raving. In contrast, Logan testified that Kleypas committed the crimes in a very organized manner and took several cautionary steps in an attempt to prevent apprehension. These actions, rather than demonstrating delusional or impulsive behavior, showed that Kleypas acted purposefully. Logan conceded, however, that Kleypas demonstrated a lack of control by acting on his sexual obsession.

After hearing this and other evidence, the jury unanimously sentenced Kleypas to death. On the verdict form, the jury indicated it "unanimously [found] beyond a reasonable doubt that the following aggravating circumstance(s) have been established by the evidence and are not outweighed by any mitigating circumstances found to exist": (1) The defendant was previously convicted of a felony in which the defendant inflicted great bodily harm, disfigurement, dismemberment, or death on another; (2) the defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution; and (3) the defendant committed the crime in an especially heinous, atrocious, or cruel manner.

The district court subsequently imposed a death sentence for the capital murder conviction. The district court also sentenced Kleypas to 69 months' imprisonment on the attempted rape, the primary crime of conviction for his two sentencing guidelines convictions, and 34 months' imprisonment on the aggravated burglary. The district court ordered the aggravated burglary sentence to run consecutive to the attempted rape sentence, and both guidelines sentences were imposed to run consecutive to the capital murder sentence.

We will set out additional factual and procedural background as necessary to the analysis of Kleypas' various complaints of error.

ANALYSIS OF GUILT-PHASE ISSUES

As previously noted, Kleypas raises six issues relating to the guilt phase of the *Kleypas I* trial, even though the remand proceedings dealt solely with the penalty—rather than the guilt—phase of the proceedings. In response to Kleypas' arguments, the State

24

asserts our review is precluded by either the doctrine of res judicata or the doctrine of the law of the case. We begin our discussion with an analysis of these doctrines and a determination of their potential impact on Kleypas' guilt-phase claims.

A. *The Doctrine of Res Judicata Does Not Preclude Kleypas' Arguments.*

"The doctrine of res judicata provides that 'where an appeal is taken from the sentence imposed and/or a conviction, the judgment of the reviewing court is res judicata as to all issues actually raised, and those issues that could have been presented, but were not presented, are deemed waived.'" *State v. Kingsley*, 299 Kan. 896, 901, 326 P.3d 1083 (2014) (quoting *State v. Neer*, 247 Kan. 137, 140-41, 795 P.2d 362 [1990]). In order for res judicata to apply, four elements must be met:  (1) a second action must raise the same claim; (2) the second action must involve the same parties; (3) the second action must involve claims that were or could have been raised; and (4) the first action must have resulted in a final judgment on the merits. *Kingsley*, 299 Kan. at 901.

The parties focus their arguments on the fourth element, which requires there to have been a prior final judgment on the merits. In doing so, they extensively discuss the meaning of "final judgment." The State, pointing to the procedural history of this case, asserts Kleypas' convictions became final once the United States Supreme Court denied his certiorari petition. In response, Kleypas argues judgment cannot be final until all direct appeals have been exhausted.

Both the State and Kleypas cite cases interpreting the meaning of "final judgment" as applied in three general categories:  (1) The United States Supreme Court's jurisdiction over final judgments in cases appealed from state courts, (2) a criminal defendant's ability

25

to collaterally attack a conviction or sentence after final judgment has been entered, and (3) the retroactive effect of a change in the law announced in one case on other cases not yet final. The context of these cases presents the question in a framework different from the one we face and thus these cases are distinguishable. We will discuss each category in turn.

As to the first category regarding the United States Supreme Court's jurisdiction, that Court has explained its jurisdictional authority does not depend on the absolute finality of all aspects of a state court's judgment. Instead, the Court can exercise jurisdiction if (1) "the *federal issue* would not be mooted or otherwise affected by the proceedings yet to be had because those proceedings have little substance, their outcome is certain, or they are wholly unrelated to the federal question" or (2) "the *federal issue* would be mooted if the petitioner or appellant seeking to bring the action here prevailed on the merits in the later state-court proceedings, but there is nevertheless sufficient justification for immediate review of the federal question finally determined in the state courts." (Emphases added.) *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 478-79, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975). Here, however, application of the doctrine of res judicata does not depend on the finality of a federal issue but on the finality of the judgment under Kansas law. Consequently, we find no guidance in this line of cases.

The two other categories of cases deal with collateral attacks on a judgment or the effect of a judgment on an entirely different case. Here, we are dealing with a direct appeal, not a collateral attack, and the same, not a separate, proceeding. To apply such holdings in this case would require us to ignore a fundamental principle of Kansas law regarding the doctrine of res judicata:  The res judicata doctrine only applies when "*a*

*second cause of action* is filed in order to attempt to relitigate issues between the same parties." (Emphasis added.) *State v. Collier*, 263 Kan. 629, 633, 952 P.2d 1326 (1998).

When considering the distinction between collateral attacks and second appeals in the same case, we must keep in mind that Kansas law defines a criminal judgment as consisting of a conviction *and* a sentence. See *State v. Hall*, 298 Kan. 978, 985-86, 319 P.3d 506 (2014) ("'[J]udgment in a criminal case becomes effective, and the time period for appeal starts running, when the defendant's sentence is pronounced from the bench,'" and "no appeal may be taken until judgment is final."); see also K.S.A. 2015 Supp. 22-3601(a) ("Any appeal permitted to be taken from a district court's final judgment in a criminal case shall be taken to the court of appeals, except in those cases reviewable by law in the district court or in which a direct appeal to the supreme court is required."); K.S.A. 2015 Supp. 21-6619(a) ("[a] judgment of conviction resulting in a sentence of death" is subject to automatic appeal to supreme court).

In order to meet the res judicata doctrine's finality requirement, the State suggests a different rule should apply in capital cases—a rule where the conviction is severed from the sentence for purposes of judgment and res judicata finality. The State cites two cases, both of which apply California law, in support of this suggestion. See *Phillips v. Vasquez*, 56 F.3d 1030, 1033 (9th Cir. 1995) (after California Supreme Court affirmed convictions but vacated death penalty sentence, federal court accepted jurisdiction over a habeas corpus action relating to a conviction even though state sentencing proceedings had not been completed because under California caselaw the "guilt phase of this case is final"); *People v. Kemp*, 10 Cal. 3d 611, 614, 111 Cal. Rptr. 562, 517 P.2d 826 (1974) (holding that in death penalty cases, the "issue of guilt remains final during the retrial of the

penalty issue and during all appellate proceedings reviewing the trial court's decision on that issue").

We note that neither of these cases discusses the doctrine of res judicata. Rather, the court announced the rule without explaining its doctrinal basis. The court-made preclusive rule established in these cases and the seminal case of *People v. Deere*, 53 Cal. 3d 705, 713, 280 Cal. Rptr. 424, 808 P.2d 1181 (1991), does not fit with Kansas law for several reasons.

First, to sever a Kansas conviction from the sentence for purposes of res judicata finality could result in confusion, piecemeal litigation, potentially incongruent outcomes, and judicial inefficiency. In part, this results from the time limitation for filing a K.S.A. 60-1507 proceeding. Arguably, under those provisions, if we were to treat a conviction as final even though the sentence has not yet been determined by a remand sentencing jury, a defendant seeking to collaterally attack a conviction would have to file the separate proceeding or risk being time barred even though sentencing had not been finalized. See K.S.A. 60-1507(f) ("[1] Any action under this section must be brought within one year of: [i] The final order of the last appellate court in this state to exercise jurisdiction on a direct appeal or the termination of such appellate jurisdiction; or [ii] the denial of a petition for writ of certiorari to the United States supreme court or issuance of such court's final order following granting such petition.").

Thus, under the State's proposed rule, the parties could end up litigating the sentencing proceeding while disputing, in a separate proceeding, the validity of the conviction for which sentence would be imposed. The possibility of this fragmented and potentially incongruous litigation—or at least the uncertainty of whether a defendant

28

would have to initiate this fragmented litigation in order to comply with K.S.A. 60-1507(f)'s time requirements—counsels against pronouncing one part of a capital judgment (the conviction) as final when another part of the judgment (the sentencing) remains in litigation.

Second, the provisions of K.S.A. 2015 Supp. 21-6619(a) require this court to consider "[a] judgment of conviction resulting in a sentence of death" and 21-6619(b) requires review of "the question of sentence as well as any errors asserted in the review and appeal." This language suggests that in a death penalty case we should not sever the two components of the judgment. As we clarified in *State v. Cheever*, 304 Kan. 866, 903, 375 P.3d 979 (2016) (*Cheever II*), "certain guilt-phase errors . . . could be of such a nature that they impact the sentencing determination when the same jury decides both guilt and sentence" and, therefore, must be examined as part of the sentencing-phase analysis. While, as here, two separate juries might be involved, that may not always be the circumstance. Therefore, a steadfast rule of finality would be contrary to Kansas law, especially in light of the language of K.S.A. 2015 Supp. 21-6619.

Consequently, we hold that the doctrine of res judicata does not apply in this second appeal within the same case.

B. *The Law of the Case Doctrine Does Not Necessarily Foreclose All of Kleypas' Issues.*

Nevertheless, the law of the case doctrine may preclude review of the issues raised by Kleypas. Under the law of the case doctrine, "[w]hen a second appeal is brought to this court in the same case, the first decision is the settled law of the case on all questions involved in the first appeal, and reconsideration will not normally be given to such

29

questions." *Collier*, 263 Kan. 629, Syl. ¶ 3. The doctrine shares many of the attributes of res judicata:  It has preclusive effect; promotes finality of judgments, consistency, and efficiency of the judicial process; avoids relitigation of issues; and assures obedience of lower courts to the decisions of appellate courts. See *Venters v. Sellers*, 293 Kan. 87, 99, 261 P.3d 538 (2011); *Collier*, 263 Kan. at 631, 633-34.

Significant differences exist between the two doctrines, however. First, the law of the case doctrine applies to a second appeal in the same case and the res judicata doctrine applies when a party collaterally attacks a judgment or brings a second action arising from the same facts or circumstances against one (or more) of the original parties. *Collier*, 263 Kan. at 633. Second, where res judicata "'settles the rights of the parties once judgment is final,'" the law of the case "'settles the law to be applied in determining the rights of the parties.'" 263 Kan. at 634.

Nevertheless, "'[t]he doctrine of the law of the case is not an inexorable command,'" nor is it a constitutional requirement. *Collier*, 263 Kan. at 631. Rather, the law of the case doctrine states "'a discretionary policy which expresses the practice of the courts generally to refuse to reopen a matter already decided, without limiting their power to do so.'" 263 Kan. at 631.

In an early Kansas case recognizing the law of the case doctrine, this court observed the need for the discretionary power to reconsider a prior ruling, stating:  "If an erroneous decision has been made, it ought to be corrected speedily, especially when it can be done before the litigation in which the error has been committed has terminated finally." *Railway Co. v. Merrill*, 65 Kan. 436, 451, 70 P. 358 (1902); see *Hudson v. Riley*, 114 Kan. 332, 335, 219 P. 499 (1923) ("If there was error in the ruling it is competent for

the court to correct it, and especially where it can be done before the litigation in which it occurred has been finally terminated."); *Henry v. Railway Co.*, 83 Kan. 104, 108-09, 109 P. 1005 (1910) (errors should be corrected before final judgment).

Nevertheless, with a nod toward the benefits of finality, courts have limited their discretion and generally recognize only three exceptions that allow changing the law of the case. These exceptions apply when (1) a subsequent trial produces substantially different evidence, (2) a controlling authority has made a contrary decision regarding the law applicable to the issues, or (3) the prior decision was clearly erroneous and would work a manifest injustice. 18B Wright, Miller, & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4478, pp. 670-72 (2002); see *Collier*, 263 Kan. at 633 (citing federal case for explanation of doctrine as applied in Kansas).

In support of his first issue, which challenges an evidentiary ruling during his guilt-phase trial, Kleypas relies on the third exception—that is, "the law of the case rule is not inflexibly applied to require a court to blindly reiterate a ruling that is clearly erroneous." *Collier*, 263 Kan. at 632. In support of his second issue, Kleypas argues under the second exception that a change in law requires this court to vacate his attempted rape conviction. Kleypas does not identify any law of the case exception for issues 3 through 6. We discuss the exceptions Kleypas relies on more fully below.

ISSUE 1: THE ADMISSION OF EVIDENCE SEIZED FROM KLEYPAS' APARTMENT DOES NOT REQUIRE REVERSAL OF HIS CONVICTIONS.

In Kleypas' first issue, he argues much of the evidence seized during a search of his apartment should have been suppressed during his guilt-phase trial for reasons discussed in the United States Supreme Court's decision in *Groh v. Ramirez*, 540 U.S.

31

551, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004), which was decided approximately 2 years after this case had been remanded to the district court for the new sentencing proceeding. This issue arises because the search warrant authorizing the search of Kleypas' apartment failed to meet the constitutional requirement of "particularly describing . . . the persons or things to be seized." U.S. Const. amend. IV; see Kan. Const. Bill of Rights, § 15; see also *Groh*, 540 U.S. at 560 (explaining that the constitutional requirement that warrants describe the things to be seized assures that a magistrate has found probable cause to search for and seize the listed items). In fact, someone left completely blank that portion of the warrant where space had been left to describe the items.

Kleypas raised this issue during the district court proceedings and again on appeal. In *Kleypas I*, this court found the detail in the affidavit that supported the warrant application cured the warrant defect and that the district court had not erred in denying Kleypas' request to suppress the evidence. 272 Kan. at 930. Kleypas now argues that *Groh* brings that ruling into question.

In our analysis of this issue, we must consider (1) some additional facts, (2) the State's arguments regarding why this issue should not be reconsidered, (3) *Groh*'s impact on the prior rulings in this case, and (4) if it was error to admit the evidence, whether reversible error occurred.

### 1.1. *Additional Facts*

In the *Kleypas I* trial proceedings, the district court had agreed with Kleypas that the warrant and subsequent search were invalid because the warrant failed to list the

items to be seized. Nevertheless, the district court decided the State could admit into evidence any of the seized items that had been listed in the affidavit that had accompanied the warrant application. In making these rulings, the district court relied heavily on the testimony of the KBI agents who had led the team executing the warrant. In the district court's assessment, this testimony established that the search team had exercised good faith.

One of these agents indicated he had noticed the warrant failed to include a list of items. Consequently, before executing the warrant, the agent had called the local law enforcement officer who had applied for the warrant and asked the officer to bring the affidavit that had been presented to the magistrate as support for the warrant. Once the KBI agent had the affidavit, he saw that it had specifically identified the items to be seized. Although the warrant had not contained any language incorporating the affidavit, the KBI agent, after conferring with another agent, had decided the warrant and affidavit, taken together, authorized a valid search of the apartment. At the suppression hearing, the other agent had testified that both of them had been "aware that there is some case law that establishes that if you read the warrant and the affidavit, that taken in the totality of the circumstances, that would be sufficient." The lead KBI agent had briefed the other agents and officers on the search team regarding the items listed in the affidavit.

The district court had disagreed with the legal conclusions of the KBI agents regarding the ability of the affidavit to cure the warrant's deficiency. The district court had explained: "If the warrant fails to state with particularity the things to be seized, reference to the affidavit is appropriate only when the warrant contains specific incorporation by reference language." And the warrant in this case had not included language that incorporated the affidavit. Nevertheless, the district court had continued its

analysis to determine the potential application of the exception to the exclusionary rule recognized in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984).

In *Leon*, the United States Supreme Court held that evidence obtained in violation of the Fourth Amendment need not be excluded from the prosecution's case if it was obtained by officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid. 468 U.S. at 922. The Supreme Court recognized some limitations on the exception because "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued," including circumstances where the warrant so lacks specificity that officers could not determine the place to be searched or the items to be seized. 468 U.S. at 922-23; see *State v. Hoeck*, 284 Kan. 441, 448-53, 163 P.3d 252 (2007) (discussing *Leon*).

Applying *Leon* to the facts of this case, the district court had concluded that the officers "objectively and reasonably" relied on the affidavit and therefore the evidence described in the affidavit should not be subject to exclusion. The court suppressed any item not listed in the affidavit.

In *Kleypas I*, this court affirmed the district court's decision to allow the admission of the evidence but did so for reasons different from those given by the district court. Relying on *State v. LeFort,* 248 Kan. 332, 806 P.2d 986 (1991), and *State v. Dye,* 250 Kan. 287, 826 P.2d 500 (1992), the *Kleypas I* court explained, in part:

> "[W]here the affidavit contains a particularized description of the items to be seized; the affiant and the affidavit are both present at the scene of the execution of the search

34

warrant, even if the affiant is not the person executing the search warrant; and the officers executing the search warrant are briefed as to the items listed in the affidavit, the description in the affidavit cures a deficiency in the description of the search warrant. The warrant was, therefore, valid, and the trial court erred in finding otherwise." *State v. Kleypas*, 272 Kan. 894, 930, 40 P.3d 139 (2001) (*Kleypas I*), *cert. denied* 537 U.S. 834 (2002), *abrogated in part by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006).

Following the *Kleypas I* decision and the remand to the district court for resentencing proceedings, the United States Supreme Court decided *Groh*. Kleypas cited *Groh* to the district court during the remand proceedings in a motion that sought the suppression of any item seized under the warrant. In support of that motion, Kleypas noted that *Groh* (1) held a search warrant that fails to identify the items to be seized is invalid and (2) suggested the *Leon* good-faith exception could not apply because officers would not have objectively and reasonably relied on the warrant. The district court agreed and suppressed all evidence seized from Kleypas' apartment.

Kleypas, of course, does not complain of that ruling on appeal, and the State has not cross-appealed that ruling. But Kleypas asks us to reverse his convictions because the evidence had been improperly admitted in the *Kleypas I* trial and considered by the jury in convicting him. He argues that both this court's *Kleypas I* ruling on this point and the district court's ruling before the first trial must be deemed clearly erroneous in light of *Groh*. We first consider whether our review of his argument is precluded.

### 1.2. *State's Preclusion Arguments*

Largely sidestepping Kleypas' reliance on the clearly erroneous exception to the law of the case doctrine, the State suggests we should not consider the effect of *Groh* on our prior ruling because: (a) Kleypas has failed to present an exceptional circumstance and (b) *Groh* does not reflect a change in the law.

### 1.2(a). *State's Exceptional Circumstance Argument*

For support of the argument that Kleypas has failed to establish the existence of an exceptional circumstance warranting reconsideration of this court's prior ruling, the State cites *State v. Kelly*, 291 Kan. 868, 248 P.3d 1282 (2011), and *Rowland v. State*, 289 Kan. 1076, 219 P.3d 1212 (2009). In *Kelly*, we held that "[a]bsent a showing of exceptional circumstances, the court can dismiss a second or successive [K.S.A. 60-1507] motion as an abuse of remedy." 291 Kan. at 872. And in *Rowland*, we held that "a K.S.A. 60-1507 motion cannot serve as a vehicle to raise an issue that should have been raised on direct appeal, unless the movant demonstrates exceptional circumstances excusing earlier failure to bring the issue before the court." 289 Kan. at 1087.

Both of these cases relate to collateral attacks *after* final judgment has been entered as opposed to an appeal *before* final judgment, such as we have in this case. As we have discussed, in the context of a second appeal before entry of final judgment, longstanding Kansas precedent indicates a court should correct errors while the parties are still before it if an exception to the law of the case doctrine applies. See *Hudson*, 114 Kan. at 335; *Henry*, 83 Kan. at 108; *Merrill*, 65 Kan. at 451. We reject the State's invitation to graft an exceptional circumstances requirement to the law of the case

doctrine. Hence, if Kleypas can meet a law of the case exception, he need not also show an exceptional circumstance.

### 1.2(b). *Controlling Exception*

The State also argues that other courts have concluded *Groh* does not represent a change in the law and should not be applied under the second law of the case exception. The State assumes that a change in controlling authority is required under the second exception; however, a clarification of controlling authority can also suffice. See, *e.g.*, *United States v. Harris*, 531 F.3d 507, 513 (7th Cir. 2008) (doctrine "'authorizes such reconsideration [of a previous ruling in the same litigation] if there is a compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous'"). In his brief, Kleypas identifies both the new, controlling law exception and the clearly erroneous exception. These are generally recognized as separate exceptions. See 18B Wright, Miller, & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4478, pp. 670-72 (2002).

Logically, the two exceptions overlap—a change or clarification in the controlling law may mean a nonfinal decision is clearly erroneous. Whether there is overlap depends on the retroactive effect of controlling caselaw. In turn, the retroactive effect of controlling authority depends on whether the new authority is being applied before or after final judgment. Compare *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987) ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past."), and *Gaudina v. State*, 278 Kan. 103, 106, 92 P.3d 574 (2004) (Kansas follows

"the same rule for finality [for purposes of the retroactive applicability of a new rule] set forth in *Griffith*."), with *Teague v. Lane*, 489 U.S. 288, 310-13, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) (constitutional rules of criminal procedure will not apply retroactively to cases on collateral review, unless: [1] the new rule places "'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe'"; or [2] the new rule establishes a watershed rule of criminal procedure that "implicate[s] the fundamental fairness of the trial," without which "the likelihood of an accurate conviction is seriously diminished").

The principal case on which the State relies, *Baranski v. United States*, 515 F.3d 857 (8th Cir. 2008), arose when a prisoner sought habeas corpus relief from a final judgment. As a collateral attack on a federal conviction, the *Teague* rule applied. See *Baranski*, 515 F.3d at 861 (citing *Teague*, 489 U.S. 288). In contrast, the rule in *Griffith* would apply in this appeal because Kleypas' judgment is not yet final. The other case cited by the State, *United States v. Hamilton*, 591 F.3d 1017, 1026 (8th Cir. 2010), involved a direct appeal and did not have a law of the case question before it; it merely included law of the case language from *Baranski* as part of its discussion of that decision.

Moreover, the new, controlling law exception discussed in *Baranski* and the clearly erroneous exception relied upon by Kleypas are not necessarily duplicative. A decision may be clearly erroneous even if there has not been a change in the law. For example, in *Merrill*, 65 Kan. at 451, this court reconsidered its prior ruling not because of new authority, but because "the rule of the former case is shattered by the pressing weight of opposing authority, and that reason is against it." Most, if not all of the opposing authority had been decided before the prior decision. And it was not controlling authority but persuasive authority from other states and England. 65 Kan. at 439-50. In other

38

words, Kleypas need not show that the new authority establishes a change in the law, merely that the new authority illustrates the clear error of the prior decision. For this reason alone, we do not find the State's argument particularly persuasive.

Furthermore, in both *Baranski* and *Hamilton*, the Eighth Circuit Court of Appeals distinguished *Groh* from the facts of the case. In contrast, this case arises on similar facts to *Groh*, and some additional discussion of *Groh* explains the distinction between it and the Eighth Circuit cases as well as the similarity between it and this case.

1.3.  Groh'*s Impact*

In *Groh*, law enforcement officers conducted a search authorized by a deficient warrant. In the space on the *Groh* warrant where there should have been a description of the items that could be seized under the magistrate's order, the warrant instead described the place to be searched. In contrast, in this case, the portion of the warrant where the items were to be described was completely blank; a different part of the warrant described the place to be searched. Practically speaking, the differences between the *Groh* warrant and the warrant in this case are of no importance—neither warrant described the items to be seized.

Given the deficiency in the *Groh* warrant, the Supreme Court held:

> "The warrant was plainly invalid. The Fourth Amendment states unambiguously that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and *the persons or things to be seized.*' (Emphasis added.) The warrant in this case complied with the first three of these requirements:  It was based on probable cause and supported by a sworn affidavit, and it

described particularly the place of the search. On the fourth requirement, however, the warrant failed altogether. . . .

"The fact that the *application* adequately described the 'things to be seized' does not save the *warrant* from its facial invalidity. The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." 540 U.S. at 557.

The Court did qualify its holding, however, leaving open the possibility a warrant could be valid if it incorporated a supporting application or affidavit *and* that document accompanied the warrant. 540 U.S. at 557-58. But the *Groh* warrant, like the warrant in this case, did not incorporate the affidavit or application.

The *Groh* majority rejected a point made by Justice Clarence Thomas in dissent that echoes this court's reasoning in *Kleypas I*. Justice Thomas had pointed out that the officer who had applied for and obtained the *Groh* warrant had briefed the search team; had provided the team a copy of the search warrant application, the supporting affidavit, and the warrant; and had reviewed with the team the specific items listed in the affidavit. 540 U.S. at 576. (Thomas, J., dissenting). Despite these circumstances, which are markedly similar to those in this case, the majority noted the warrant "did not incorporate other documents by reference, nor did either the affidavit or the application (which had been placed under seal) accompany the warrant." 540 U.S. at 558. This meant, in the *Groh* majority's view, the warrant was "so obviously deficient that we must regard the search as 'warrantless' within the meaning of our case law." 540 U.S. at 558.

In *Baranski* and *Hamilton*, the two cases cited by the State, the warrants did include incorporation language. In *Baranski*, the Eighth Circuit noted it had "previously distinguished *Groh* from a situation like the one here where an incorporated document

40

provided "'the necessary particularity for [the] warrant'" required under the Fourth Amendment." 515 F.3d at 861 (quoting *United States v. Gamboa*, 439 F.3d 796, 807 [8th Cir.], *cert. denied* 549 U.S. 1042 [2006]). This meant "*Groh* does not represent a change in law that would affect Baranski's case." 515 F.3d at 861. Later, in *Hamilton*, the other decision cited by the State, the Eighth Circuit described the warrant in that case as containing language of incorporation, which was not "as defective as the warrants in *Groh*" but "not as clear as that contained in *Baranski*." *Hamilton*, 591 F.3d at 1027.

In contrast, the facts of this case parallel those of *Groh*, and *Groh* instructs that the mere presence of the affidavit at Kleypas' apartment when it was searched did not satisfy the Fourth Amendment because the warrant did not specifically incorporate the affidavit. This does not end our inquiry, however, because the district court's rationale foreshadowed this portion of the *Groh* decision; this means the district court correctly determined the warrant was invalid. But we still must consider whether the district court's decision to admit the evidence despite the constitutional violation was erroneous. As we have discussed, the district court based its ruling on the *Leon* good-faith exception. The *Groh* court indirectly provided guidance on how to apply that exception to the facts of this case, although *Groh* was a civil action for damages caused by the illegal search as opposed to a criminal action like the one we now consider

In *Groh v. Ramirez*, 540 U.S. 551, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004), the lead officer of the search team argued he was entitled to qualified immunity from civil liability despite the unconstitutionality of the search. In addressing this argument, the Court noted the similarity between the civil standard for determining qualified immunity and the standard for determining whether a law enforcement officer's conduct falls within the good-faith exception to the exclusionary rule that applies in criminal cases. 540 U.S.

41

at 565 n.8 ("'[T]he same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer.'").

Viewing the objective reasonableness standard through the lens of the Fourth Amendment's warrant particularity requirement, the United States Supreme Court concluded "no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid." 540 U.S. at 563. Moreover, without a valid warrant to authorize the search, "[n]o reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional." 540 U.S. at 564. Driving the point home, the Court concluded the facts presented a situation where a warrant was so "'facially deficient—*i.e.,* in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.' *Leon,* 468 U.S. at 923." *Groh*, 540 U.S. at 565.

Thus, while *Groh* did not rule directly on the applicability of the good-faith exception to the exclusionary rule, its rationale, which the Court applied to facts similar to those in this case, suggests the good-faith exception would not apply here and suppression of the evidence would be an appropriate remedy. This also means the law of the case doctrine does not preclude review of Kleypas' guilt-phase claim because this court refuses to apply the law of the case when "fully satisfied that the rule of the former case is shattered by the pressing weight of opposing authority." *Railway Co. v. Merrill*, 65 Kan. 436, 451, 70 P. 358 (1902).

That does not mean, however, that Kleypas is entitled to a reversal of his convictions. Rather, we must determine whether the error in admitting the evidence was harmless and, only if it was not, will we reverse his convictions.

1.4. *Harmless Error*

Neither party discusses the meaning of "clearly erroneous" as used in *Collier* or other cases applying the law of the case doctrine. In the context of jury instruction claims, the phrase "clearly erroneous" has "changed from a determination of whether the instruction was patently erroneous to a determination of whether the instruction was clearly prejudicial." *State v. Williams*, 295 Kan. 506, 512-14, 286 P.3d 195 (2012) (recognizing that, "[o]ver time, this court's description and application of 'clearly erroneous' has been fluid"); see K.S.A. 22-3414(3) (no party may assign as error giving or failure to give instruction unless party objects unless giving or failure to give instruction is clearly erroneous). In the jury instruction context, this shift has resulted from preservation requirements and the appellate jurisdictional limitations contained in K.S.A. 22-3414(3). See *Williams*, 295 Kan. at 515 (failure to object to instruction presents jurisdictional bar to appellate review unless claim alleges instruction clearly erroneous).

The same statutory jurisdictional restrictions applicable to instructional claims do not exist in the context of a law of the case exception. In those cases, courts follow a traditional two-step process of (1) determining whether "clear" error occurred and (2) assessing the prejudicial impact of the error.

Regarding the first step, several decisions discuss what is meant by "clear" error. In one of the earliest Kansas cases, *C. B. U. P. Rld. Co. v. Shoup*, 28 Kan. 394, 395-96, 1882 WL 1053 (1882), this court explained that "unless it is plain that a serious error has been committed, such decision should be adhered to" and, thus, where "it is not clear to us that the prior decision was wrong" the court will "adhere to that decision." Later cases, simply examined whether the ruling was patently or palpably erroneous. See, *e.g.*, *Speer v. Dighton Grain, Inc.*, 229 Kan. 272, 279, 624 P.2d 952 (1981) ("patently"); *State v. Hutchison*, 228 Kan. 279, 285, 615 P.2d 138 (1980) ("palpably"); *Henry v. Railway Co.*, 83 Kan. 104, Syl. ¶ 1, 109 P. 1005 (1910) ("palpably"); see also Black's Law Dictionary 659 (10th ed. 2014) (defining "clear error" as an action or decision "that appears to a reviewing court to have been unquestionably erroneous").

Even though clear error occurred, it may not warrant reversal because prejudice affecting a litigant's substantial rights is required before an appellate court will reverse a conviction. See K.S.A. 2015 Supp. 60-261 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); K.S.A. 60-2105 ("The appellate court shall disregard all mere technical errors and irregularities which do not affirmatively appear to have prejudicially affected the substantial rights of the party complaining."); see also *Arizona v. California*, 460 U.S. 605, 618 n.8, 103 S. Ct. 1382, 75 L. Ed. 2d 318 (1983) ("Under law of the case doctrine, as now most commonly understood, it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice."); *Laffey v. Northwest Airlines, Inc.*, 642 F.2d 578, 585 (D.C. Cir. 1980) (law of the case doctrine prevents reconsideration of a decision unless error and injustice coincide).

We explained the burden imposed by K.S.A. 2015 Supp. 60-261 and K.S.A. 60-2105 in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012), by stating:

> "[W]e conclude that before a Kansas court can declare an error harmless it must determine the error did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome. The degree of certainty by which the court must be persuaded that the error did not affect the outcome of the trial will vary depending on whether the error implicates a right guaranteed by the United States Constitution. If it does, a Kansas court must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict. If a right guaranteed by the United States Constitution is not implicated, a Kansas court must be persuaded that there is no reasonable probability that the error will or did affect the outcome of the trial." 292 Kan. at 565.

See, *e.g.*, *State v. Carr*, 300 Kan. 1, 211, 331 P.3d 544 (2014), *rev'd and remanded* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016) (applying *Ward* harmless-error paradigm in capital case).

Under this rubric, we must first determine the level of certainty under which we consider the impact of the error on the jury's verdict. This defective warrant issue arises under the Fourth Amendment to the United States Constitution, which means we must apply the constitutional harmless error standard defined in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Under that standard, we must be convinced beyond a reasonable doubt that the error complained of did not affect the outcome of the trial in light of the entire record—that is, that there is no reasonable possibility the error affected the jury's verdict of guilt. *Ward*, 292 Kan. at 569.

Kleypas, in arguing that the introduction of evidence seized from his apartment requires us to reverse his convictions, points to a shower curtain collected from his apartment. A blood stain on the curtain matched C.W.'s DNA. In addition to the curtain leading to forensic evidence, Kleypas notes that Logan, the State's expert witness, used the presence of the DNA on the curtain to rebut Kleypas' defense theory that he had confabulated his confession.

Certainly, the DNA testing of the blood on the shower curtain tied Kleypas to the crimes. Yet, even if the shower curtain and the accompanying DNA testing had not been admitted at trial, we have no doubt the jury would have convicted Kleypas based on the other overwhelming evidence against him. Other physical evidence tied Kleypas to the crimes, including serological and DNA evidence obtained from the crime scene and C.W.'s body; records showing Kleypas had called C.W.'s apartment just before the murder; and Kleypas' possession of a camera taken from C.W.'s apartment. Most of the details of the crime came to light as a result of Kleypas' confession. And Logan pointed to the many details in Kleypas' confession that had been confirmed by physical and other evidence to support his opinion that Kleypas was able to recite details of the crime because he was the crime perpetrator, not a false confessor. Even without the DNA obtained from the shower curtain, Logan's point would have stood.

In light of the overwhelming nature of the evidence of Kleypas' guilt, we have no reasonable doubt that a jury would have convicted Kleypas even if it had not heard or seen evidence of the shower curtain, the DNA testing of the stain on the shower curtain, or Logan's testimony regarding the physical evidence seized from Kleypas' apartment which confirmed the confession. Therefore, we reject Kleypas' first argument.

46

ISSUE 2:  AN INTERVENING CHANGE IN THE LAW REQUIRES REVERSAL OF KLEYPAS'
ATTEMPTED RAPE CONVICTION.

In his second guilt-phase issue, Kleypas argues his conviction for attempted rape is multiplicitous with his conviction for capital murder. See K.S.A. 21-3439(a)(4) (defining capital murder as the "intentional and premeditated killing of the victim of one of the following crimes in the commission of, or subsequent to, such crime:  Rape . . . or any attempt thereof"). For support, Kleypas cites *State v. Appleby*, 289 Kan. 1017, 1033, 221 P.3d 525 (2009), in which we held two convictions—one for capital murder based upon the intentional and premeditated killing of a victim in the commission of (or subsequent to) the attempted rape of the same victim, and the other for the attempted rape of the victim—"are improperly multiplicitous and violate [the defendant's] right to be free from double jeopardy."

Kleypas did not raise this multiplicity issue in *State v. Kleypas*, 272 Kan. 894, 952, 40 P.3d 139 (2001) (*Kleypas I*), *cert. denied* 537 U.S. 834 (2002), *abrogated in part by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). Therefore, we are not considering whether a *Kleypas I* issue was decided in error. Rather, the law of the case question is whether the intervening caselaw of *Appleby* applies to Kleypas' appeal. Before we reach that question, however, the State argues the issue is not properly preserved for this court's consideration.

We readily agree with the State that Kleypas did not present this issue to the district court. However, we have allowed defendants to raise multiplicity issues for the first time on appeal. See, *e.g.*, *Carr*, 300 Kan. at 163-64 (considering a multiplicity claim for the first time on appeal in order to serve the ends of justice and prevent a denial of

47

fundamental rights); *State v. Harris*, 284 Kan. 560, 569, 162 P.3d 28 (2007) (same); *State v. Nguyen*, 285 Kan. 418, 433, 172 P.3d 1165 (2007) (same).

Furthermore, the legislature has mandated through K.S.A. 2015 Supp. 21-6619(b) that this court "shall consider . . . any errors asserted in the review and appeal." In *Kleypas I*, this court interpreted a nearly identical predecessor statute (K.S.A. 21-4627[b]) and held the provision was a directive that required consideration of all claims raised in a death penalty appeal without regard to whether the claims were properly preserved. 272 Kan. at 952. In this way, the statute created a special exception to the general rule that an appellate court will not consider an issue raised for the first time on appeal, *i.e.*, not raised in the district court. See *Kleypas I*, 272 Kan. at 952.

The State disagrees with the *Kleypas I* interpretation of K.S.A. 21-4627(b). In making its preservation argument, the State does not address this court's longstanding precedent interpreting the legislature's use of the words, "any errors asserted in the review and appeal," in other statutes to require review of unpreserved error—specifically, Kansas' previous death penalty provision and also a statute relating to crimes committed before 1994 in which a hard-40 sentence had been imposed. The *Kleypas I* court's interpretation of the K.S.A. 21-4627(b) provision continues the historical reading of these words and the historical approach in death penalty cases. See, *e.g.*, *State v. White*, 263 Kan. 283, 306, 950 P.2d 1316 (1997) (K.S.A. 1993 Supp. 21-4627[2], which governed hard-40 cases that occurred before 1994, "requires a court to 'consider . . . *any* errors asserted in the review and appeal, ' even if the error has nothing to do with the sentence imposed"); *State v. Bornholdt*, 261 Kan. 644, 651, 932 P.2d 964 (1997) (holding that K.S.A. 1993 Supp. 21-4627's requirement that the court review any error asserted on appeal supersedes the general contemporaneous objection rule), *disapproved on other*

48

*grounds by State v. Marsh*, 278 Kan. 520, 532, 102 P.3d 445 (2004); *State v. Collier*, 259 Kan. 346, Syl. ¶ 1, 913 P.2d 597 (1996) ("In an appeal in a case in which the hard 40 sentence was imposed, even if the defendant fails to raise objections in the trial court to the issues raised on appeal, we will consider and reach each issue raised because of the specific statutory direction in K.S.A. 1993 Supp. 21-4627."); *State v. Hickock & Smith*, 188 Kan. 473, 480, 363 P.2d 541 (1961) (explaining that even though several claims raised on appeal under a prior death penalty statute were not properly preserved, "in accord with its fixed policy in appeals involving capital punishment . . . , this court will examine all claims advanced by counsel with meticulous care for the purpose of determining whether they disclose any possible error prejudicial to the rights of the defendants"); *State v. Lammers*, 171 Kan. 668, 672, 237 P.2d 410 (1951) (considering an appellate claim despite the defendant's failure to raise the issue below because "[t]his is a case where capital punishment has been assessed . . . and on that account we have concluded to examine the question with meticulous care").

*Kleypas I* merely adopted the same approach and applied it to our current death penalty statute, and this court has continued to do so. See, *e.g.*, *State v. Cheever*, 304 Kan. 866, Syl. ¶ 6, 375 P.3d 979 (2016) (*Cheever II*) ("K.S.A. 2015 Supp. 21-6619[b] imposes a mandatory exception in death penalty appeals to various statutes, rules, and prudential practices barring consideration of unpreserved issues."); *State v. Robinson*, 303 Kan. 11, Syl. ¶ 44, 363 P.3d 875 (2015) ("The failure to lodge a contemporaneous objection to the admission of evidence typically forecloses subsequent challenge on appeal. However, in capital murder appeals, K.S.A. 21-4627[b], recodified as K.S.A. 2014 Supp. 21-6619[b], compels review of any issue raised in defendant's brief, even if not preserved below."), *disapproved of on other grounds by Cheever II*, 304 Kan. at 902; *Carr*, 300 Kan. at 16 ("[B]ecause this is a death penalty case, this court is empowered to

49

notice and discuss unassigned potential errors under K.S.A. 2013 Supp. 21-6619[b]); *State v. Cheever*, 295 Kan. 229, 241, 284 P.3d 1007 (2012) (*Cheever I*) (K.S.A. 21-4627[b] "mandates that we consider any errors the parties raise on appeal, whether preserved for review or not."), *vacated and remanded on other grounds* 571 U.S. ___, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013).

This long line of cases presents a formidable wall of precedent for the State to overcome. See *State v. Spencer Gifts, LLC*, 304 Kan. 755, 766, 374 P.3d 680 (2016) ("Certainly, we do not lightly disapprove of precedent. The doctrine of stare decisis 'instructs that points of law established by a court are generally followed by the same court and courts of lower rank in later cases in which the same legal issue is raised.'"). In attempting to do so, the State makes statutory interpretation and waiver arguments.

In the State's statutory interpretation argument, it suggests that, when read as a whole, K.S.A. 2015 Supp. 21-6619 means we are to consider only those issues properly preserved under general rules of appellate procedure. The State points to subsection (a) of the statute, which states: "A judgment of conviction resulting in a sentence of death shall be subject to automatic review by and appeal to the supreme court of Kansas in the manner provided by the applicable statutes and rules of the supreme court governing appellate procedure."

We do not find the State's argument persuasive. Under our rules regarding statutory interpretation, we

> "must first attempt to ascertain legislative intent through the statutory language enacted,
> giving common words their ordinary meanings. [Citation omitted.] When a statute is
> plain and unambiguous, an appellate court does not speculate as to the legislative intent

50

behind it and will not read into the statute something not readily found in it. Where there is no ambiguity, the court need not resort to statutory construction. *Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history or other background considerations to construe the legislature's intent*. [Citation omitted.]" (Emphasis added.) *State v. Urban*, 291 Kan. 214, 216, 239 P.3d 837 (2010).

The plain language of K.S.A. 2015 Supp. 21-6619 does not lead us to the conclusion urged by the State. The words in subsection (a) indicate it relates to the procedures for bringing an appeal. To the extent the statute ambiguously layers limiting procedural rules on top of the words of subsection (b), it conflicts with the unqualified language of subsection (b) that directs this court—by using the word "shall"—to "consider . . . any errors asserted in the review and appeal." As we have said when construing a different statute: "Simply put, 'any' means 'any.'" *Sierra Club v. Moser*, 298 Kan. 22, 53, 310 P.3d 360 (2013).

Even if we thought the statute was ambiguous, several rules of construction suggest the legislature intended the meaning we have previously described. First, legislatures are presumed to be familiar with court precedent and to expect that its enactments will be interpreted accordingly. See *United States v. Wells*, 519 U.S. 482, 495, 117 S. Ct. 921, 137 L. Ed. 2d 107 (1997). Second, "'identical words or terms used in different statutes on a specific subject are [ordinarily] interpreted to have the same meaning in the absence of anything in the context to indicate that a different meaning was intended.'" *Callaway v. City of Overland Park*, 211 Kan. 646, 652, 508 P.2d 902 (1973) (quoting *Williams v. Board of Education*, 198 Kan. 115, 124-25, 422 P.2d 874 [1967]). Third, "[t]he historical background and changes made in a statute are to be considered by the court in determining legislative intent for the purpose of statutory construction."

51

*Callaway*, 211 Kan. at 650. These rules combine to persuade us the Kansas Legislature intended us to continue our historical interpretation of this language and our forgiving approach to preservation in the context of death penalty appeals.

We thus reject the State's statutory interpretation argument. We now turn to the State's argument that Kleypas waived his multiplicity argument by failing to raise it in his first trial or first appeal and by failing to raise it before the district court on remand.

In support, the State cites *State v. Neer*, 247 Kan. 137, 795 P.2d 362 (1990), which involved a motion to modify a sentence brought after a direct appeal was final. In that decision, we held: "[T]hose issues that could have been presented [on appeal], but were not presented, are deemed waived. Where a defendant's claim has not been raised at trial or on direct appeal, such a default prevents the defendant from raising the claim in a second appeal or a collateral proceeding." 247 Kan. at 140-41. But, as we have discussed, Kleypas' direct appeal is not yet final and he raises the issue on direct appeal; we thus hesitate to apply *Neer*.

Perhaps anticipating our hesitation, the State argues the waiver rule refers to the finality of a *conviction* as opposed to the finality of a *case*. For example, in *Gaudina v. State*, 278 Kan. 103, 106, 92 P.3d 574 (2004), we noted that Kansas follows "the same rule for finality [for purposes of the retroactive applicability of a new rule] set forth in *Griffith v. Kentucky*, 479 U.S. 314, [328, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987)]." We then explained that *Griffith* had defined "final" as "'a *case* in which a *judgment of conviction* has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.' 479 U.S. at 321 n.6." (Emphases added.) *Gaudina*, 278 Kan. at 106. In turn, the *Griffith* footnote defined

52

"*convictions* that were final." (Emphasis added.) *Griffith*, 479 U.S. at 321 & n.6. And in *State v. Berry*, 292 Kan. 493, 514, 254 P.3d 1276 (2011), we used similar language, stating: "A *conviction* is generally not final until: (1) the judgment of conviction is rendered; (2) the availability of an appeal is exhausted; and (3) the time for any rehearing or final review has passed." (Emphasis added.)

The State overreads this language by removing it from the context of the issues being addressed in these cases. As we determined earlier in this decision, a conviction is not final until final judgment on both the conviction and the sentence has been entered on direct appeal. We are not willing to sever the conviction from the sentence for purposes of determining finality. Because a final judgment had not been entered, Kleypas' conviction was not yet final when *Appleby* was decided. And, as we have discussed, "'a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final.'" *Gaudina*, 278 Kan. at 106 (quoting *Griffith*, 479 U.S. at 328).

Finally, the State cites *State v. Edwards*, 260 Kan. 95, 98, 917 P.2d 1322 (1996), for the general rule that, preservation issues aside, a party waives an issue by failing to brief it or argue it on appeal. Neither *Edwards* nor, as far as we have found, any of the legion of cases stating the same general rule relate to the situation here, where a party brings a second appeal after a limited retrial. Nor do they deal with application of K.S.A. 2015 Supp. 21-6619(b), which "requires us to 'consider . . . any errors asserted' in a death penalty case." *Carr*, 300 Kan. at 164. We applied this provision in *Carr*, 300 Kan. at 163-64, to determine a multiplicity issue could be raised for the first time on appeal. We perceive no reason the same analysis would not apply to an issue not argued in the first death penalty appeal.

53

We, therefore, reject the State's arguments and hold that Kleypas' multiplicity argument can be considered. In response to Kleypas' arguments on the merits and his citation to *Appleby*, the State presents no arguments as to why *Appleby* does not control the outcome in this case. Indeed, *Appleby* is directly on point. For the reasons stated in *Appleby*, Kleypas' conviction for attempted rape must be reversed and his sentence on that count vacated. See 289 Kan. at 1033.

In addition, because the attempted rape conviction served as the primary crime to establish the base sentence under the Kansas Sentencing Guidelines Act, Kleypas' sentence for aggravated burglary must also be vacated and this case remanded for resentencing on that count. See K.S.A. 21-4720(b)(2) (Furse) (requiring sentencing judge to establish a base sentence for the primary crime, which is the crime with the highest crime severity ranking, and prohibiting use of off-grid crime as the primary crime); K.S.A. 2015 Supp. 21-6819(b)(5) (directing remand when reversing conviction designated as the primary crime); Kansas Sentencing Guidelines Desk Reference Manual 2015, 95 (same); see also *State v. Montgomery*, 34 Kan. App. 2d 511, 514-17, 120 P.3d 1151 (2005) (discussing retroactive effect of remand requirement).

ISSUES 3 THROUGH 6:  WE DECLINE TO REVISIT OUR *KLEYPAS I* RULINGS ON THE REMAINING GUILT-PHASE ISSUES.

In issues three through six, Kleypas argues he is entitled to have his convictions reversed because the district court denied his constitutional right to present a complete defense when it precluded him from meaningfully questioning his expert about whether he had confabulated his statement to police; the district court erred in failing to suppress his statements to law enforcement officers; the district court erred in failing to suppress

the State's evidence regarding DNA testing by the Federal Bureau of Investigation (FBI); and the district court abused its discretion and violated his Eighth and Fourteenth Amendment rights when it found him competent to stand trial.

In his brief, Kleypas sets out these four issues under the heading "Preserved Issues" and then "acknowledges that this Court's prior decision forecloses those issues under [the] 'law of the case' doctrine." Kleypas does not make any new arguments, cite any new authority for our consideration, or assert a law of the case exception. In light of his concession that the law of the case doctrine would ordinarily preclude our review, and given that he presents us with no argument regarding why our prior holdings were incorrect, we decline to revisit these issues and reaffirm our previous holdings. See *State v. Kleypas*, 272 Kan. 894, 916-23, 40 P.3d 139 (2001) (*Kleypas I*) (constitutional right to present a complete defense), *cert. denied* 537 U.S. 834 (2002), *abrogated in part by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006); 272 Kan. at 923-25 (suppression of statements to law enforcement); 272 Kan. at 933-37 (suppression of DNA evidence); 272 Kan. at 984-90 (competency to stand trial).

CONCLUSION OF GUILT-PHASE ISSUES

We affirm Kleypas' convictions for capital murder and aggravated burglary. We reverse his conviction for attempted rape and vacate the sentence on that count, as we must under *Appleby*. Also, because the attempted rape sentence served as the base sentence for the on-grid offenses, we vacate his other guidelines sentence and remand for resentencing on the aggravated burglary conviction.

55

We now turn to the issues Kleypas raises regarding his remand sentencing proceedings.

Issue 7: The District Court Did Not Err in Denying a Mistrial Based on a Spectator's Courtroom Behavior.

In Kleypas' first sentencing issue, he claims the district court committed reversible error when it denied his motion for mistrial, which he brought after being attacked by a courtroom spectator. In analyzing this issue, we need to consider some additional facts, discuss the analytical framework and standard of review for this issue, and apply those standards to determine whether the district court committed error in ruling that a fundamental failure in the proceeding had occurred but that the trial could proceed without injustice.

7.1. *The Courtroom Incident*

A courtroom spectator attacked Kleypas during the remand sentencing proceedings. The record reflects the following details of what happened:

"THE COURT:  Stop him. Ladies and gentlemen, ladies and gentlemen, go into the jury room quickly. We are in recess. Counsel, come back into chambers.

"(A recess was taken, after which the following proceedings were had in chambers.)

56

"THE COURT: Counsel, we are in chambers. Present would be all attorneys of record and Mr. Kleypas in person. We took an immediate recess because the victim's father Mr. [W.]—we took an immediate recess because Mr. [W.] the victim's father attacked Mr. Kleypas just a few moments ago in the courtroom in front of the jury. The Court declared an immediate recess, put the jury in the jury room. Prepared to listen to comments."

Kleypas himself immediately replied, "Overlook it." Despite Kleypas' statement, his attorneys moved for a mistrial. During the chambers discussion, one of Kleypas' attorneys indicated: "Mr. [W.] attacked the defendant, kicked him, all in the presence of the jury." That attorney also said: "I saw the jury file back into the jury room. I heard some of them I think sobbing, some of the jurors." Another of his attorneys recounted:

"[A]t the end of the 911 dispatch tape, the family was moving out of the courtroom but got up and Mr. [W.] looked over at Gary and we were sitting right next to each other. I tried to hold him back but I'm not—talking about Mr. [W.], I was in between the two of them, and eventually went down."

One of the defense attorneys characterized the event as "one of the most startling things I've seen in practicing law for twenty-six years." He told the court:

"I don't know how he can get a fair trial now. . . . I don't know how these folks can be fair based on seeing the victim's father physically attack, grab, try to grab–I think he got to Mr. Kleypas. I saw him kick Mr. Kleypas. I'm sure the jury did."

At one point, the court added, "Well, I did see Mr. [W.] come beyond the bar. He actually did make contact with Mr. Kleypas and they did fall to the floor in a struggle. That's when I ordered the jury to go into the jury room."

The prosecutor requested that the court "tell the jury that that won't be tolerated or whatever admonishment the Court wants to give and to continue on." The prosecutor also suggested that C.W.'s father be banished from the courtroom.

The court chose to go forward with the sentencing proceedings.

"THE COURT: All right. I'm going to proceed as follows. I'm going to respectfully deny the request for mistrial. I will instruct the jury that this conduct is—is obviously inappropriate. Mr. [W.]'s attack upon Mr. Kleypas was not in any sense provoked by the State. I think in—it could possibly even be detrimental to the State for the jury to see it. This may elicit sympathy on the—on behalf of the defendant by the jury, I don't know, but I don't think the fact that Mr. [W.] attacked Mr. Kleypas necessarily should automatically lead to a mistrial.

"I am going to ban Mr. [W.] from the courtroom for the duration of the hearing."

The court also stated:

"[L]et me emphasize that I will explain to the jury that this action shall not be considered against the State, against the defendant. It was an unfortunate circumstance. It should not have occurred.

"Now, having said that, do you want me to also ask the jury if because of this any of them feel they cannot be fair and impartial[?]"

Counsel for Kleypas stated simply, "Yes." Counsel for the State agreed and added: "I would point out it is probably obvious who that was but I don't think [the jurors] have—or officially know who he was." The district court made clear that no names

58

would be used in the admonishment, and it also instructed the State to have law enforcement present and ready to intervene should something else happen. The State indicated that it would "put KBI at the end of each row."

While the district court and attorneys were discussing what had occurred in the courtroom, they could hear noise in the hallway. An officer then interrupted the chambers conference and said, "[W]e don't need [the victim's fiancé] back in here." The officer later explained that the victim's fiancé "made a scene outside the courtroom. All the banging that we heard after he went out, I don't know what he did, but the—I think the KBI and the FBI went out and got control of him." After hearing from the officer about the fiancé's conduct, the district judge also banned him from the courtroom except for the purpose of his testimony.

Upon returning to the courtroom, the district court addressed the jury, saying:

"THE COURT: Ladies and gentlemen, I have a few comments I want [t]o direct towards you. What you just observed was obviously very inappropriate and it has no place in a Court of law in the United States. My apologies to you for what you observed. I ask that in no way, shape or form that you consider this in your deliberations. Do you all understand that?

"(Positive response).

"THE COURT: This is not to be held against the defendant. It is not to be held against the State and it is an unfortunate incident and has absolutely no place in your deliberations. This does not [a]ffect your ability to be fair and impartial; is that correct?

"(Positive response).

59

"THE COURT:  I'm not trying to put words in your mouth. If I could see by a show of hands is there anybody here that because of this incident feels that they could be –that they could not be fair and impartial, please raise your hand.

"(No response).

"THE COURT:  And do you all understand that and, by the way, for the record, I see no hands. Do you all understand this has—as far as your deliberations are concerned, this never occurred; do you all understand that?

"(Positive response).

"THE COURT:  Okay. And, for the record, I'm looking at the jury and they are all shaking their head in the affirmative. So we all are agreed, put this out of your mind and it has no place. Do we all understand that?

"(Positive response).

"THE COURT:  There have been two individuals banished from the courtroom throughout the duration of this trial as a result of the incident so you need not be concerned about this sort of matter again.

"Anyway, thank you for your response to the Court's inquiries and I think we are ready for the State's next witness."

Once court reconvened, witnesses, including C.W.'s fiancé, testified without further incident.

7.2. *Analytical Framework and Standard of Review*

We note at the outset that the penalty phase of a capital case is effectively a trial on the issue of punishment; rules applying to the conduct of a trial apply, except where special rules relating to capital cases have been adopted. Although there are some special considerations we will discuss, in general, our traditional rubric for considering a motion for mistrial can be applied to such a motion brought during a penalty proceeding.

At each step of our analysis of a district court's ruling on a motion for mistrial, we apply an abuse of discretion standard. In general, a district court abuses its discretion when its ruling is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Our rubric begins with the statutory provision regarding mistrial. Under K.S.A. 22-3423(1)(c), a district court may order a mistrial if there is "[p]rejudicial conduct, in or outside the courtroom, [that] makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." In making this determination, the district court must engage in a two-step process: First, it must determine if there is a "fundamental failure" in the proceeding; if so, second, the district court must determine "whether it is possible to continue the trial without an 'injustice.'" *Ward*, 292 Kan. at 550.

To determine whether a fundamental failure resulted in an injustice, a district court must apply K.S.A. 2015 Supp. 60-261 and K.S.A. 60-2105. *Ward*, 292 Kan. at 564-65. Both statutes require us to consider whether an error affects "substantial rights." K.S.A. 2015 Supp. 60-261 ("At every stage of the proceeding, the court must disregard all errors

61

and defects that do not affect any party's substantial rights."); K.S.A. 60-2105 ("The appellate court shall disregard all mere technical errors and irregularities which do not affirmatively appear to have prejudicially affected the substantial rights of the party complaining."). This means the court must determine whether the fundamental failure was harmless. We explained the harmless error paradigm in *Ward*:

> "[B]efore a Kansas court can declare an error harmless it must determine the error did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome. The degree of certainty by which the court must be persuaded that the error did not affect the outcome of the trial will vary depending on whether the error implicates a right guaranteed by the United States Constitution. If it does, a Kansas court must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict. If a right guaranteed by the United States Constitution is not implicated, a Kansas court must be persuaded that there is no reasonable probability that the error will or did affect the outcome of the trial." 292 Kan. at 565.

We further explained that the constitutional harmless error standard reflected the United States Supreme Court's holding in the seminal case of *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). There, the Court held that the "beneficiary of a constitutional error . . . [must] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. at 24.

In penalty-phase appeals, our traditional harmless error and clearly erroneous standards can apply to our reversibility inquiry. See *Clemons v. Mississippi*, 494 U.S. 738, 753, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990) (approving use of *Chapman* harmless error analysis when analyzing trial errors that occurred during the penalty phase of capital murder trials); *Satterwhite v. Texas*, 486 U.S. 249, 258, 108 S. Ct. 1792,

100 L. Ed. 2d 284 (1988) (same). But, as this court noted in *Kleypas I*, the *Clemons* Court also stated:

> "Nothing in this opinion is intended to convey the impression that state appellate courts are required to or necessarily should engage in reweighing or harmless-error analysis when errors have occurred in a capital sentencing proceeding. Our holding is only that such procedures are constitutionally permissible. In some situations, a state appellate court may conclude that peculiarities in a case make appellate reweighing or harmless-error analysis extremely speculative or impossible. We have previously noted that appellate courts may face certain difficulties in determining sentencing questions in the first instance." *Clemons*, 494 U.S. at 754.

Nevertheless, the *Kleypas I* court chose to apply a harmless error standard to a claim of prosecutorial misconduct during the penalty phase. It stated:

> "[T]he standard of review and the ultimate question that must be answered with regard to whether [error] in the penalty phase of a capital trial was harmless is whether the court is able to find beyond a reasonable doubt that the [error], viewed in the light of the record as a whole, had little, if any, likelihood of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances." *Kleypas I*, 272 Kan. at 1087-88.

After *Kleypas I*, we have carried this "little, if any, likelihood of changing the jury's ultimate conclusion" language forward in discussing the application of harmless error to other types of errors occurring during the penalty phase of capital cases. *E.g.*, *State v. Cheever*, 304 Kan. 866, 898, 902, 375 P.3d 979 (2016) (*Cheever II*) (cumulative error); *State v. Robinson,* 303 Kan. 11, 307, 363 P.3d 875 (2015) (prosecutorial misconduct), *disapproved of by Cheever II*, 304 Kan. 866; *State v. Carr*, 300 Kan. 1,

Syl. ¶ 59, 331 P.3d 544 (2014) (stating that the "little, if any, likelihood" standard applies to all penalty-phase errors), *rev'd and remanded on other grounds* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016). The parties do not suggest any reason to deviate when faced with review of a motion for mistrial.

Even so, the wording of the harmless error standard used in *Kleypas I*—"little, if any, likelihood of changing the jury's ultimate conclusion"—differs from the wording used in *Ward* for errors involving constitutional rights—that is, harmless beyond a reasonable doubt, meaning "there is no reasonable possibility that the error contributed to the verdict." *Kleypas I*, 272 Kan. at 1087; *Ward*, 292 Kan. at 565. In *Ward*, we noted that the "little, if any, likelihood" language appeared in many Kansas cases, and we extensively discussed the history of the use of the standard. We even noted that the standard had been used in *Kleypas I*, and we relied on language in the *Kleypas I* decision to help determine the source and meaning of the language:

> "[B]ecause the ['little, if any, likelihood' and the 'harmless beyond a reasonable doubt'] wording is different, periodically a question has arisen as to whether there is a difference between the standard Kansas applies and the *Chapman* standard. On each occasion when this court has addressed this question, we have always concluded the 'little, if any, likelihood' standard is essentially the same standard as the one adopted in *Chapman*. For example, in [*Kleypas I*], we explained that, although the language is 'somewhat different' from that used in *Chapman*, the 'standard is essentially the same.' See also *State v. Brown*, 280 Kan. 65, 76, 118 P.3d 1273 (2005) (citing *Kleypas* [*I*] for recognition that Kansas' standard, although different from *Chapman*, was essentially the same). Similarly, in *State v. Cosby*, 285 Kan. 230, 169 P.3d 1128 (2007), we reiterated that our use of "'little, if any, likelihood of changing the result of the trial"' is equivalent to *Chapman*'s "'willingness to declare a belief that it was harmless beyond a reasonable doubt."' *Cosby*, 285 Kan. at 252. The basis for our repeated conclusion that there is no difference between the standards is

64

explained, in part, by examining the source of the 'little, if any, likelihood' phrase and discussing the analysis in *Chapman* in more detail.

"The source of the 'little, if any, likelihood' language is *Chapman* itself. However, the phrase is not found in the part of the opinion in which the United States Supreme Court established the federal constitutional harmless error standard." *Ward*, 292 Kan. at 559-60.

We went on to explain that, while the *Chapman* Court had referred to the "little, if any, likelihood" standard in the context of a historical discussion of harmless error, it had also noted that this historical standard did not distinguish between federal constitutional errors and errors of state law or federal statutes and rules. *Chapman*, 386 U.S. at 22. The *Chapman* Court ultimately adopted a standard which would make that distinction and, in doing so, adopted a core test—the effect of the error on the outcome. It then defined the federal constitutional standard as "requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict," a standard it equated with determining "'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" 386 U.S. at 24 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86-87, 84 S. Ct. 229, 11 L. Ed. 2d 171 [1963]).

In *Ward*, this court noted this discussion in *Chapman* and this court's previous view that the phrase "little, if any, likelihood" conveyed the same level of certainty as the phrase "no reasonable possibility." This led to the conclusion Kansas should use the wording adopted in *Chapman* for the constitutional error standard in order to avoid confusion. *Ward*, 292 Kan. at 566. Subsequently, we have abandoned the "little, if any, likelihood" language in all cases except death penalty proceedings.

65

We discuss this history to explain that in using the "little, if any, likelihood" language in our past cases we intended to apply the constitutional harmless error standard of *Chapman*. Also, we want to explain we do not intend to establish a different standard from *Kleypas I* when we use *Chapman/Ward* language or cite to Kansas cases using the *Chapman/Ward* language. Finally, to avoid this confusion in future cases, we abandon the "little, if any, likelihood" language and will use the language from *Ward* and, where applicable, *Chapman* when discussing harmless error in the penalty phase of capital murder cases.

Some other considerations unique to death penalty cases warrant discussion.

First, the *Kleypas I* court explained that in the penalty phase of a capital trial the focus on the effect of an error on the outcome would require examining the "likelihood [or, in *Chapman* terms, reasonable possibility] of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances." *State v. Kleypas*, 272 Kan. 894, 1087-88, 40 P.3d 139 (2001) (*Kleypas I*), *cert. denied* 537 U.S. 834 (2002), *abrogated in part by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006).

Second, the *Kleypas I* court discussed the unique challenges of applying this standard in the penalty phase of a death penalty case. As the United States Supreme Court noted in *Satterwhite*, "the evaluation of the consequences of an error in the sentencing phase of a capital case may be more difficult because of the discretion that is given to the sentencer." 486 U.S. at 258. The *Kleypas I* court expounded on the difficulty:

> "'In contrast [to the guilt phase, in which the factfinder must reach a decision as
> to whether certain facts exist], the sentencer in a capital case must first find whether

66

certain facts exist and then apply a value judgment to those facts. The judge or jury in the penalty phase must decide whether the evidence is convincing that an aggravating circumstance exists and whether any mitigating circumstances exist. These assessments by the judge or jury are essentially comparable to the factfinder's task in the guilt phase in deciding if the elements of the crime exist. The sentencer, however, is asked to do more. The sentencer is asked to take the facts found—the aggravating and mitigating circumstances—and balance them against each other. The balancing is virtually unguided. The sentencer must make a value judgment whether one group of facts (aggravating circumstances) is greater, the same as, or less than another group of facts (the mitigating circumstances).'" 272 Kan. at 1086 (quoting Carter, *Harmless Error in the Penalty Phase of a Capital Case:  A Doctrine Misunderstood and Misapplied,* 28 Ga. L. Rev. 125, 148-49 [1993]).

The *Kleypas I* court recognized caselaw allowing appellate courts to consider overwhelming evidence of guilt when applying the *Chapman* test. *Kleypas I*, 272 Kan. at 1086 (citing *Harrington v. California*, 395 U.S. 250, 89 S. Ct. 1726, 23 L. Ed. 2d 284 [1969]). The *Kleypas I* court concluded that appellate courts could apply the *Chapman* test to review penalty-phase errors if the court finds that the evidence in favor of the existence of the aggravating circumstances and the evidence that these aggravating circumstances outweigh the mitigating circumstances is so overwhelming that the error had "little or no likelihood of changing" (or no reasonable possibility of changing) the jury's verdict. 272 Kan. at 1086-87.

The *Kleypas I* court discussed one additional challenge:

"It must be noted that in Kansas, the jury is not required to reveal what mitigating circumstances it found to exist. See K.S.A. 21-4624(e) (requiring the jury to designate in writing the aggravating circumstances it found to exist, but not requiring the same for the mitigating circumstances). Thus, application of the 'overwhelming evidence test' as a

component of the *Chapman* harmless error analysis assumes that all of the mitigating circumstances claimed by the defendant exist." 272 Kan. at 1087.

Finally, the *Kleypas I* court noted:

"Also, in making the determination as to whether an error was harmless, it is important to recognize that the question for the reviewing court is not what effect the constitutional error might generally be expected to have upon a reasonable jury but, rather, what effect it had upon the actual verdict in the case at hand. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993). 'The inquiry, in other words, is not whether, in a trial that occurred without the error, a [verdict for death] would surely have been rendered, but whether the [death verdict] actually rendered in this trial was surely unattributable to the error.' 508 U.S. at 279." 272 Kan. at 1088.

Kleypas asks us to add another consideration to this mix. He maintains that the heightened reliability requirements of the Eighth and Fourteenth Amendments apply to the decision whether to grant or deny a motion for mistrial in a capital case. Kleypas cites *State v. Marsh,* 278 Kan. 520, 525, 102 P.3d 445 (2004), *overruled on other grounds by Kansas v. Marsh,* 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), *vacated in part* 282 Kan. 38, 144 P.3d 48 (2006), and its reference to *Beck v. Alabama,* 447 U.S. 625, 637-38, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980).

This court has, in several cases, noted that issues in a death penalty review are subject to a heightened reliability standard. See, *e.g.*, *Carr*, 300 Kan. at 284 (recognizing need for heightened reliability); *State v. Scott*, 286 Kan. 54, 76, 183 P.3d 801 (2008) (same); *State v. Green*, 283 Kan. 531, 545, 153 P.3d 1216 (2007) ("[I]n the context of a capital sentence, this court has required a heightened degree of reliability."); *Marsh*, 278 Kan. at 525 ("[T]here is a heightened scrutiny of trial proceedings in a capital case.");

*Kleypas I*, 272 Kan. at 1036 (observing "heightened reliability requirements" apply to capital sentencing under federal and state constitutions).

A sentence of death is different from any other punishment, and accordingly there is an increased need for reliability in the determination that death is the appropriate sentence. See *Beck*, 447 U.S. at 637-38 (recognizing that a death sentence is a "'different kind of punishment from any other which may be imposed in this country . . . in both its severity and its finality'" [quoting *Gardner v. Florida*, 430 U.S. 349, 357-58, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977)]; court has duty to set aside procedures that undermine the reliability of the jury's determination).

Nonetheless, with the exception of *Boyde v. California*, 494 U.S. 370, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990), and its standard for review of penalty-phase instructions implicating the Eighth Amendment, nothing in the United States Supreme Court's decisions implies an actual change in the standard of review applied to any particular issue. Rather, the decisions simply lead to the conclusion that the already applicable standard should be applied and heightened reliability in both the guilt-phase and penalty-phase proceedings must be ensured. See *Brown v. State*, 890 So. 2d 901, 907 (Miss. 2004); *State v. Lord*, 117 Wash. 2d 829, 888, 822 P.2d 177 (1991).

7.3. *Fundamental Failure Occurred*

In analyzing Kleypas' mistrial argument we must first determine whether a fundamental failure occurred in the proceedings. The district court did not make a specific finding on this point, although the State maintains the district court found a fundamental failure in the proceeding.

Despite the fact the district court did not use the words "fundamental failure," we agree with the State that the district court clearly felt those words applied. The district court told the jury that the events were "obviously very inappropriate and it has no place in a Court of law in the United States" and in doing so conveyed that a fundamental failure had occurred. Additionally, the district court proceeded as if there had been a fundamental failure by admonishing the jury to disregard the incident.

Furthermore, there can be little doubt that a fundamental failure occurred in this case. See *State v. Franklin*, 167 Kan. 706, 708-10, 208 P.2d 195 (1949) (recognizing that under certain circumstances outbursts of weeping, fainting, applause, or other emotions could be so prejudicial as to require a new trial). Indeed, the judicial system serves the fundamental purpose of resolving disputes in a civilized and orderly fashion. Aggressive physical conduct in the courtroom undermines this purpose and potentially denies a defendant a fair trial.

The district court obviously and correctly concluded the incident with C.W.'s father was serious and warranted corrective action—*i.e.*, constituted a fundamental failure in the trial.

As to C.W.'s fiancé, Kleypas concedes that "it is not clear whether the jury knew that [C.W.'s fiancé] was the second banished individual," although he speculates the jurors might have reached that conclusion because the fiancé did not remain in the courtroom after he testified. But nothing in the record suggests the jurors would have thought the banished individuals were witnesses—in fact, C.W.'s father did not testify. Further, nothing in the record suggests the jurors heard the noise in the hallway or that

they would have known who was causing it or that the noise related to Kleypas' case. In other words, Kleypas bases his argument on too much supposition and has failed to make the record necessary to show a fundamental failure occurred in regard to the involvement of the fiancé. See *Robinson*, 303 Kan. at 219 ("While K.S.A. 2014 Supp. 21-6619[b] compels our review of all issues briefed on appeal, it does 'not require that we treat the record other than as it is presented to us.' We thus consider this challenge based on the status of the record presented on appeal and mindful of the fact that Robinson, as the party alleging error, bears the burden of demonstrating error.).

We therefore conclude that there was a fundamental failure in the proceedings with respect to the attack on Kleypas but not with respect to conduct of the victim's fiancé.

### 7.4. *No Injustice Occurred*

We turn then to the second step of the mistrial analysis, which requires determining whether it was possible to continue the trial without an injustice. We have directed district courts making this assessment to consider whether "any damage caused by the error can be or was removed or mitigated by admonition, instruction, or other curative action" before granting a mistrial. *Ward*, 292 Kan. at 569-70. Here, the district court acted on this direction by admonishing the jurors and then inquiring about whether the jurors could proceed fairly and impartially. After this inquiry, the district court apparently did not find "prejudicial conduct" that made "it impossible to proceed with the trial without injustice to either the defendant or the prosecution." K.S.A. 22-3423(1)(c).

Kleypas argues the district court erred in this determination, as shown by United States Supreme Court decisions concerning victim impact testimony. To provide context

71

for the discussion of those decisions we must begin with a case that was eventually overruled in part—*Booth v. Maryland*, 482 U.S. 496, 107 S. Ct. 2529, 96 L. Ed. 2d 440 (1987), *overruled in part by Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991).

In *Booth*, the Court identified two types of victim impact testimony:  (1) "the personal characteristics of the victims and the emotional impact of the crimes on the family," and (2) "the family members' opinions and characterizations of the crimes and the defendant." 482 U.S. at 502. According to the *Booth* Court, the Eighth Amendment prohibited the introduction of either type of evidence in capital penalty hearings. 482 U.S. at 501-03. The Court reversed this holding in *Payne*, however, and held the first category of victim impact evidence is admissible. *Payne*, 501 U.S. at 827. The *Payne* Court left intact the prohibition against evidence of "the family members' opinions and characterizations of the crimes and the defendant." 501 U.S. at 827; see *Bosse v. Oklahoma*, No. 15-9173, 2016 WL 5888333 (U.S. October 11, 2016); *Payne*, 501 U.S. at 825-29.

Kleypas now characterizes the courtroom attack as tantamount to the erroneous admission of victim impact evidence—specifically, the unconstitutional admission of "the family members' opinions and characterizations of the crimes and the defendant." See *Booth*, 482 U.S. at 502. In discussing this second category of victim impact evidence, the *Booth* Court described statements from the adult children of a murdered elderly couple. The "son, for example, stated that his parents were 'butchered like animals' and that he 'doesn't think anyone should be able to do something like that and get away with it.'" 482 U.S. at 508. The daughter stated "'that animals wouldn't do this'" and that "'[s]he

doesn't feel that the people who did this could ever be rehabilitated and she doesn't want them to be able to do this again or put another family through this.'" 482 U.S. at 508.

In explaining why this evidence needed to be excluded, the Court stated:

"One can understand the grief and anger of the family caused by the brutal murders in this case, and there is no doubt that jurors generally are aware of these feelings. But the formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant. As we have noted, any decision to impose the death sentence must 'be, and appear to be, based on reason rather than caprice or emotion.' [Citation omitted.] The admission of these emotionally charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decisionmaking we require in capital cases." *Booth*, 482 U.S. at 508-09.

Trying to match what happened in this case with the holding in *Booth*, Kleypas argues that "Mr. W. did not formally testify, but he made his feelings about Mr. Kleypas well known to the jury. He did so in the most emotionally charged way possible, and in such a way that there was no possibility for the defense to respond." We reject this argument for several reasons.

First, Kleypas fails to present any authority establishing that a fight constitutes a victim impact statement. The closest he comes is a case leaving open the possibility of a connection between outbursts by a victim's family member and impermissible victim impact evidence. See *Hardwick v. Dugger*, 648 So. 2d 100 (Fla. 1994).

In *Hardwick*, the Florida Supreme Court stopped short of establishing the connection Kleypas asks us to make; the court never held that anyone crossed the line of

73

impermissible victim impact evidence. 648 So. 2d at 104-05 (describing one verbal outburst when the jury was not present, and an obscene gesture made by the victim's cousin, toward the defendant, which was observed by the jury). The *Hardwick* court removed the disruptive family members from the courtroom but did not address the issue with the jury, and the Florida appellate court concluded the judge responded appropriately and that no reversal was warranted. 648 So. 2d at 104-05. Little can be drawn from this case to support Kleypas' argument.

The remainder of the cases cited by Kleypas are only relevant if we accept his argument that a physical attack constitutes victim impact evidence. But in the Kansas case most similar on the facts to this case, *Franklin*, 167 Kan. at 709, this court rejected a similar argument as being "hardly tenable" and instead concluded that an emotional "outcry could hardly be called 'testimony.'" Hence, we first conclude that Kleypas fails to present caselaw supporting his argument. *Cf. McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, 15, 61 P.3d 68 (2002) ("Simply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority, is akin to failing to brief an issue. 'Where the appellant fails to brief an issue, that issue is waived or abandoned.'").

Second, we reject Kleypas' argument because the district court admonished the jury to disregard the altercation—to treat it as if it never happened. Generally, we presume juries follow a court's instructions. *State v. Williams*, 299 Kan. 509, 560, 324 P.3d 1078 (2014). And Kleypas must come forward in some way with evidence to overcome that presumption. He does not do so. See *State v. Warren*, 302 Kan. 601, 610, 356 P.3d 396 (2015) ("Pointedly, [defense] counsel did not request an individual polling of the jury pool to investigate the existence of any prejudice. In short, there is no

74

evidence of record indicating that the jury pool was, in fact, prejudiced by [the] comments.").

In fact, the record suggests the opposite because the district court followed the admonishment with questions of the jury asking whether the jurors could set aside the incident and consider the case fairly and impartially. The jurors responded affirmatively. See *State v. Rayton*, 268 Kan. 711, 722-23, 1 P.3d 854 (2000) (holding the district court did not abuse its discretion by denying mistrial where jurors assured trial judge of continued impartiality notwithstanding alleged failure of proceeding).

Third, cases cited by the State support the district court's actions in this case. In *State v. Dais*, 22 N.C. App. 379, 206 S.E.2d 759 (1974), a rape victim's father assaulted the defendant within view of some of the jurors. The North Carolina Court of Appeals upheld the denial of a mistrial because the trial court had examined the jurors to determine whether the incident would affect them, and it had removed a juror who admitted the possibility of bias. 22 N.C. App. at 383-84. In *State v. Blackwell*, 238 N.W.2d 131, 139 (Iowa 1976), the Supreme Court of Iowa affirmed the denial of a mistrial based on a hallway brawl in sight of at least some of the jurors because the jurors, upon questioning, assured the court they could remain impartial and the court took steps to ensure the events would not be repeated.

These cases share a common thread, recognizing that a district court faced with a motion for mistrial "is in the best position to observe the demeanor of those present, and to determine whether the accused has sustained substantial prejudice." *State v. Chears*, 231 Kan. 161, 166, 643 P.2d 154 (1982) (holding district court did not abuse discretion

by denying a mistrial based on defendant's claim that he had been prejudiced by child victim's display of emotion).

Caselaw also recognizes that jurors are capable of understanding that emotions frequently run high in criminal trials. See *State v. Foster*, 290 Kan. 696, 721, 233 P.3d 265 (2010) ("'That such outbursts and demonstrations often occur during the trial of homicide cases cannot be denied and they are familiar to the bench and bar of this and every other state.'" [quoting *Franklin*, 167 Kan. at 709]); see also *State v. Bible*, 175 Ariz. 549, 598, 858 P.2d 1152 (1993) (no error in denying mistrial after victim's father ran out of the courtroom and yelled an obscenity directed at defendant in capital murder case where no information was conveyed other than the father's animosity toward the defendant, a feeling that would hardly have surprised the jury, and court excluded the father from remainder of the trial and properly instructed jury to disregard the incident); *People v. Chatman*, 38 Cal. 4th 344, 368, 42 Cal. Rptr. 3d 621, 133 P.3d 534 (2006) (no error in denying penalty phase mistrial based on victim's mother's conduct when trial court intervened to demand appropriate behavior and to cure any impropriety; concluding that any reasonable juror would know that the crime had caused the victim's family anguish); *Messer v. State*, 247 Ga. 316, 324-25, 276 S.E.2d 15 (1981) (no error in denying defendant's motion for mistrial where, after a murder victim's father lunged at defendant, father was immediately removed from the courtroom, trial court sent jury out of courtroom as soon as disturbance began, jurors were instructed on two occasions not to let outburst interfere with their responsibilities as jurors, and, on motion for new trial, each juror was thoroughly questioned as to whether outburst affected his or her decision); *Gilbert v. State*, 291 Ga. App. 898, 901, 663 S.E.2d 299 (2008) ("'[M]any, if not most, trials by jury involve some degree of emotion by at least one party or the other.'").

*Bible* and *Messer*, both death penalty cases, rejected arguments similar to one Kleypas makes before us—that is, that the outcome should be different because this is a capital case. As noted above, the heightened reliability review we employ in a death penalty case does not supplant the legal framework or standard of review ordinarily applied to the denial of a motion for mistrial.

Here, the district court took immediate action by removing the jurors from the courtroom, carefully questioning the jurors regarding whether they could continue to be impartial, and instructing them to disregard the incident and not let it influence their deliberations. All of the jurors indicated they could conform to the court's instructions, and none raised any concern to the contrary. Kleypas has not come forward with any evidence suggesting the jurors failed to follow the district court's admonishment. And the district court sat in the best position to judge the impact of the incident and its attendant emotions on the individual jurors.

Under these circumstances, we conclude the district court did not abuse its discretion by denying the motion for mistrial. Even under the constitutional harmless error standard of *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), we determine, in light of the entire record, the district court did not abuse its discretion; we can declare beyond a reasonable doubt that the altercation in the courtroom had no reasonable possibility of affecting the jurors' weighing of the aggravating and mitigating circumstances and the ultimate penalty phase verdict.

One final consideration arises under the mandate of K.S.A. 2015 Supp. 21-6619, which requires us to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." Again, nothing in the record

shows that the entire proceeding was tainted by the emotion of the moment when C.W.'s father struck out at Kleypas. Nor does the record show prejudice or any other arbitrary factor. The district court's curative actions and the jurors' responses demonstrate the jury was able to—and did—weigh the aggravating and mitigating factors without undue influence caused by passion, prejudice, or any other arbitrary factor.

ISSUE 8:  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED KLEYPAS' MOTION FOR MISTRIAL AFTER THE PROSECUTOR BEGAN A QUESTION WITH THE PHRASE, "IF THE DEFENDANT TESTIFIED."

Kleypas makes another claim of error based on the district court's denial of his second motion for mistrial. This issue arises from an exchange between the prosecutor and Dr. Erik Mitchell, a coroner, who testified about the autopsy he performed on the body of C.W. In general, he testified to the injuries she suffered and illustrated his testimony with photographic exhibits. During this testimony, the following exchange occurred:

"Q.    *And if the defendant had told the police* that he began to strangle [C.W.] as she sat in the chair with his hands, would that explain the injuries to her neck?

"A.    Oh, yes.

"Q.    *If the defendant testified* that she began to struggle as she sat in the chair—

"MR. EVANS [Counsel for Kleypas]:  Judge, objection to the form of the question.

"THE COURT:  What specifically?

78

"MR. EVANS: Can we approach the bench?

"THE COURT: Sure." (Emphases added.)

At the bench, counsel for Kleypas pointed out that the prosecutor had said, "If the defendant testified," and argued that this brought attention to the fact that Kleypas would not be testifying in this hearing.

The district court sustained the objection and asked defense counsel if he wanted an admonition to the jury to disregard the question. Defense counsel insisted the damage had been done and could not be cured by an admonition. The prosecutor offered to correct himself by telling the jury he made a mistake. The district court advised the prosecutor to rephrase the question, but defense counsel continued to insist the damage was done and moved for a mistrial. The court disagreed, saying, "I don't view the error as egregious. I think it was an inadvertent slip of the tongue. It shouldn't have been said but I don't think it is egregious." The court denied the request for a mistrial.

When proceedings resumed, the prosecutor corrected himself by saying, "I said if the defendant testified. I meant to say if the defendant gave a statement to police. You understand that?" Mitchell indicated that he understood, and the testimony continued. At the close of evidence, the district court instructed the jury to draw no inference from the defendant's decision not to testify.

On appeal, Kleypas argues that the district court should have granted his motion for a mistrial.

8.1. *Fundamental Failure Presumed*

As in the earlier mistrial issue, the district court did not affirmatively state whether it felt there had been a fundamental failure in the proceedings. The district court seemed to dismiss any such conclusion, stating it did not think the error was egregious. But the court did offer to admonish the jury and, because of that, the State concedes the court must have found a fundamental failure. While we question whether giving an admonishment necessarily means a fundamental failure occurred (especially given the court's comments), given the State's concession, we will proceed on the assumption the court found a fundamental failure occurred. See *State v. Beebe*, 244 Kan. 48, 53, 766 P.2d 158 (1988) ("A prosecutor in a criminal case may not comment upon an accused's failure to testify."); see also *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1703, 188 L. Ed. 2d 698 (the privilege against self-incrimination applies to the penalty-phase proceeding), *reh'g denied* 134 S. Ct. 2835 (2014); *State v. Rupert*, 247 Kan. 512, 517, 802 P.2d 511 (1990) ("Comments by the prosecutor upon defendant's failure to testify violate the constitutional right against self-incrimination.").

8.2. *No Injustice Occurred*

In evaluating whether an injustice occurred as the result of an improper prosecutorial comment on a defendant's silence or failure to testify, appellate courts consider whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the defendant to testify. *State v. Edwards*, 264 Kan. 177, 196, 955 P.2d 1276 (1998); *State v. Davis*, 255 Kan. 357, 362, 874 P.2d 1156 (1994). Here, a multitude of factors suggest that

the comment was not manifestly intended and that jurors would not have construed the remark to be a comment on Kleypas' failure to testify.

The prosecutor's use of the phrase, "If the defendant testified," was merely an introductory clause rather than the focal point of the prosecutor's question to the witness. The prosecutor uttered the phrase only once, and the entire event transpired quickly. See *Davis*, 255 Kan. at 362-63 (brevity of prosecutor's improper remarks on defendant's silence contributed to finding of harmless error). Though the phrase implicitly presumed the existence of testimony from Kleypas, it did not directly or indirectly give rise to any *adverse* inference regarding Kleypas' decision not to testify in the penalty-phase hearing.

Further, the record clearly indicates the prosecutor's question was simply a misstatement. He phrased his first question, "[I]f the defendant had told the police," followed by the question, "If the defendant testified . . . ." The district court judge, who had the opportunity to observe and hear the question, clearly believed the statement had been a slip of the tongue. Nothing suggests we are presented with a deliberate remark delivered with forethought. See *State v. Kemble*, 291 Kan. 109, 124, 238 P.3d 251 (2010) (suggesting that deliberate remarks regarding defendant's silence prepared with forethought, in contrast to a "spur-of-the-moment comment delivered extemporaneously," more likely to be flagrant and prejudicial). For good reason, the basis of the defendant's objection was stated out of the jury's hearing. And the prosecutor corrected his misstatement to jurors after the district court's ruling.

Independently, any potential prejudice was mitigated when the district court instructed the jury to draw no adverse inference from Kleypas' decision not to testify. See *Davis*, 255 Kan. at 363 ("find[ing] it significant that the court instructed the jury not to

81

consider the fact that the defendant did not testify" in holding prosecutor's indirect remarks on defendant's silence were harmless). We presume the jury follows instructions, and Kleypas points to nothing in the record to persuade us that presumption should not apply here. See *Warren*, 302 Kan. at 610 (defendant's duty to establish record to support claim); *Williams*, 299 Kan. at 560 (discussing presumption that jury follows instructions). Under similar circumstances, this court has found a prosecutor's improper remarks on defendant's silence to be harmless. See *State v. Albright*, 283 Kan. 418, 426-27, 153 P.3d 497 (2007); *Davis*, 255 Kan. at 362-63.

In light of these considerations and our review of the entire record, we conclude the district court did not abuse its discretion when it denied Kleypas' motion for mistrial based on the prosecutor's statement, "If the defendant testified"; we can declare beyond a reasonable doubt that the prosecutor's statement had no reasonable possibility of affecting the jurors' weighing of the aggravating and mitigating circumstances. In addition, we conclude the comment was not of the nature, especially given the court's later instruction, to introduce the "influence of passion, prejudice or any other arbitrary factor." K.S.A. 2015 Supp. 21-6619.

ISSUE 9:   ANY ERROR IN THE ADMISSION OF A KBI AGENT'S TESTIMONY CONCERNING TEST RESULTS OBTAINED BY OTHER AGENTS WAS HARMLESS.

Kleypas phrases his next issue on appeal as one involving his right to confront witnesses, a right guaranteed by the Sixth Amendment to the United States Constitution, and as the erroneous admission of evidence that rendered the death penalty unreliable, an error that violated rights protected by the Eighth and Fourteenth Amendments to the United States Constitution. Kleypas asserts the State did not provide "the district court and defense counsel" with notice of the full range of evidence that was eventually

82

admitted during the penalty-phase proceeding. He argues that as a consequence the evidence was inadmissible under K.S.A. 2015 Supp. 21-6617(c), which provides that "[o]nly such evidence of aggravating circumstances as the state has made known to the defendant prior to the sentencing proceeding shall be admissible." In addition, Kleypas argues this challenge relates to a witness who did not testify, which was a violation of his right to confront a witness. Kleypas further contends this evidence did not accurately reflect the statements of the nontestifying witness, making the evidence unreliable.

We begin by examining the nature of the notice given and the evidence the jury heard. We will then discuss whether error occurred and, finally, whether any error in the admission of the testimony requires us to vacate Kleypas' sentence.

### 9.1. *Notice and Testimony*

The question of notice arose approximately 4 months before the penalty rehearing. At that time, the State alerted the district court and defense counsel that it had failed to list KBI forensic serologist Lisa Villalobos as a witness. Villalobos had testified during the first trial about forensic serology testing she had performed as part of the investigation surrounding C.W.'s murder. Villalobos had given an extensive explanation of the technique she had used, called genetic marker analysis, and had explained that genetic markers "are certain factors in everybody's blood and other body fluids that are different from person to person." She had four known samples—one each from Kleypas, C.W., her fiancé, and a fourth individual. Villalobos had compared those known samples to body fluids found on C.W.'s white sock that had been tied to her leg; C.W.'s legs, ankles, and breasts; a dark blue blanket that had been wrapped around C.W.'s head; and a

mattress pad taken from C.W.'s bed. According to her testimony, of the four possible sources tested, Kleypas was the only possible contributor to each of the stains.

At a motion hearing, the State informed the court and defense counsel that it wanted to present this testimony during the remand sentencing proceeding but had failed to list Villalobos as a witness. The State also explained the relevance of her testimony during the original penalty-phase proceeding:

> "[Prosecutor]: . . . As the court will recall, there was saliva on the victim's body. We felt that would go towards the aggravator.

> "I'm going to notify [defense counsel] and tell him exactly what we wanted to elicit from her, but I didn't bring her up before and I didn't know whether or not the court wanted to just set a date so if there are issues that come up whether we'd have a date set or do you want us to just contact you if that happens?

> "THE COURT: Well, why don't you do this. If you'll advise [defense counsel] formally of that.

> "[Defense counsel], if you have an objection to that witness, please file an objection and we'll address it."

We know nothing about any off-record discussions between the attorneys. So our discussion of notice relates to the few sentences just quoted.

A few weeks before the penalty-phase rehearing, at another motions hearing, the State again addressed Villalobos, and the following exchange occurred:

"[Prosecutor]: Your Honor, we are withdrawing her as a witness and we talked about . . . the DNA[,] that of the defendant[,] that was on the victim's breast, leg and ankles and I believe the defense is okay with us having Tom Williams testify about what Ms. Villalobos found.

"[Defense Counsel]: We are, Judge."

At the penalty-phase rehearing, the State called Tom Williams, who had been the lead KBI field investigator on the crime, as one of its primary witnesses. As it relates to Villalobos' prior testimony, he testified that Villalobos had processed swabs from C.W.'s body, that the swabs taken from C.W.'s left and right ankles contained human saliva, that the swabs from C.W.'s left and right nipples contained saliva, and that the genetic markers in all the saliva samples "matched" or were "consistent" with Kleypas' genetic markers. Next, the State asked Williams if there had been "DNA testing done on certain items that were collected from [C.W.'s] apartment?" Williams responded that he believed testing had been conducted, and the State asked him to summarize what had been collected and the testing results. Williams told the jury that a white sock taken from C.W.'s body was tested by the KBI and the FBI and that "only Mr. Kleypas's genetic markers were found." He testified that the KBI "found only Kleypas's genetic markers" on the foam mattress pad and the FBI had an insufficient sample. Williams further testified "the only genetic markers that [were] found by both the KBI and . . . the FBI [were] Mr. Kleypas's," which were found on a dark blue blanket wrapped around C.W.'s head. Williams testified that other stains found in the apartment only matched C.W.'s sample. He went on as part of this lengthy narrative answer to add that there had been an additional stain found on a second blanket that had been wrapped around C.W. Williams added, "[T]he KBI had a hit for semen. The FBI determined it was consistent with Mr. Kleypas's genetic markers."

85

During Villalobos' testimony during the guilt-phase proceeding, she had not testified to any testing performed by the FBI or any DNA testing.

9.2. *Error*

Kleypas' counsel did not lodge an objection to any of this testimony. But we must comply with the direction in K.S.A. 2015 Supp. 21-6619(b) to consider the "question of sentence as well as any errors asserted in the review and appeal." In light of that provision, we will consider this argument. See *State v. Cheever*, 295 Kan. 229, 241, 284 P.3d 1007 (2012) (*Cheever I*) (this court reviews errors asserted in appeal from imposition of the death penalty; lack of a contemporaneous objection does not necessarily bar review), *vacated and remanded* 571 U.S. ___, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013).

As we understand it, although Williams only referred to genetic markers and did not say "DNA" during his testimony, Kleypas argues the testimony went into DNA evidence. Kleypas notes that FBI agent Thomas Callaghan, not Villalobos, conducted the DNA testing. Thus, according to Kleypas, no notice was given about this evidence and it was inadmissible. The State argues that Kleypas acquiesced to Williams' testimony and that his testimony was consistent with the testimony Villalobos provided during the guilt-phase proceeding. By implication, the State assumes its notice was adequate.

Regarding the notice, the record lacks the clarity Kleypas suggests. But the record also indicates the notice falls short of saying all the State implicitly reads into it. Certainly, the State had given notice it would recapitulate Villalobos' testimony, which

we know covered her serological testing and identification of genetic markers. And the oral notice had also ambiguously contained a reference to DNA. But contrary to the State's suggestion—or at least implication—that reference did not clearly cover all the testimony that came into evidence. The notice only referenced the "DNA[,] that of the defendant[,] that was on the victim's breast, leg and ankles." But the testimony also covered the testing of socks, blankets, and a mattress pad.

The potential for jury confusion about the nature of the evidence came into play when the prosecutor asked Williams if there had been "DNA testing done on certain items that were collected from [C.W.'s] apartment?" We recognize all of Williams' answers about Villalobos' testing—in other words, all of the admitted evidence—related to genetic markers. Nevertheless, the jury could have understood the evidence to relate to DNA because of the prosecutor's question. And the story does not end there because Williams testified to the FBI's testing, which was not part of Villalobos' testimony. So, at a minimum, Williams' testimony about the FBI's testing went beyond the notice the State had given. And, certainly, the prosecutor's questions caused confusion about the nature of genetic markers.

Several interesting legal issues arise regarding whether the admission of this evidence violated Kleypas' constitutional rights and regarding the impact of K.S.A. 2015 Supp. 21-6617(c) ("Any such evidence which the court deems to have probative value may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements."). But we need not sort through the myriad of cases that would be required for a thorough analysis because, even if we assume constitutional error, we have no hesitation in concluding the error was harmless.

9.3. *Harmless Error*

Beginning with the defective notice issue, we note that typically, notice statutes are designed to prevent surprise. See, *e.g.*, *State v. Harris*, 259 Kan. 689, 709, 915 P.2d 758 (1996) (purpose of statute requiring State to provide notice of intent to seek hard-40 sentence is to make defendant aware of hard-40 prospect so as to be in a position to devise his or her strategy); *State v. Walker*, 252 Kan. 117, 134, 843 P.2d 203 (1992) (notice required by rape shield statute not only serves to protect rape victim but also provides protection against surprise to the prosecution); *State v. Bryant*, 227 Kan. 385, 387, 607 P.2d 66 (1980) (purpose of the endorsement requirement is to prevent surprise to the defendant).

Kleypas does not argue he suffered any prejudice from the lack of notice. He does not, for example, argue he was unprepared to cross-examine Williams or other witnesses, unprepared to present contrary evidence, or put in the position of having to alter his theory of defense. The closest Kleypas comes to arguing harm is when he states: "[B]ecause defense counsel was never placed on notice that the defense should be prepared to meet testimony about the DNA evidence through cross-examination, its admission violated Mr. Kleypas' rights under the Sixth Amendment's Confrontation Clause." Kleypas does not explain how the lack of notice led to a Confrontation Clause violation, and we suspect this was a way of saying Kleypas had not waived his right to confront Callaghan as he arguably had done with Villalobos. See *State v. Laturner*, 289 Kan. 727, 739, 218 P.3d 23 (2009) (observing "the right of confrontation 'falls into the class of rights that defense counsel can waive through strategic decisions'").

We conclude the failure of notice had no reasonable possibility of affecting the jurors' weighing of the aggravating and mitigating circumstances.

In arguing prejudice from the questioning and response, Kleypas focuses on points he might have clarified had Callaghan and Villalobos testified about the nature of the evidence—such as, that testing did not definitively establish Kleypas was the contributor of the various stains but only that he could not be eliminated and that Villalobos' testing was not to match DNA but rather genetic markers. Kleypas also stresses that jurors excessively focus on scientific evidence and, consequently, any misinformation about the DNA evidence—either from the misleading question of the prosecutor or inaccurate answers regarding the FBI's or Villalobos' testing—caused prejudice.

Before discussing this argument, we first note that K.S.A. 2015 Supp. 21-6617(c) indicates the district court presiding over a capital case possesses wide discretion to admit evidence "concerning any matter that the court deems relevant to the question of sentence," including any "evidence which the court deems to have probative value . . . regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements." The record lacks the detail necessary to evaluate how the statute might apply here—a failure we do not hold against Kleypas but merely note to explain why we will not discuss the statute's effect.

As to the probative value of the evidence, the significance of Williams' testimony regarding the testing must be put in perspective. The jury knew Kleypas had been found guilty of the crimes, and they heard substantial evidence tying Kleypas to the crime, including his confession. The main probative thrust of this testimony, as the prosecutor

89

stated when giving notice of the State's intent to call Villalobos as a witness, arose because it established the presence of saliva on C.W.'s breasts, legs, and ankles. This evidence was just one of many strands of evidence supporting the heinous, atrocious, and cruel nature of C.W.'s murder. For that purpose, the significance of the testing related to the finding of saliva on different parts of C.W.'s body. In other words, the serological evidence's relevancy largely rested on its circumstantial proof of the nature of the acts, not the already established fact that it was Kleypas who committed the acts.

Williams' account of evidence regarding the FBI's testing of the second blanket did introduce scientific proof of semen. But the presence of semen added little to the weighing of aggravating and mitigating factors. Kleypas had confessed that he had attempted to rape C.W. but had been unable to sustain an erection. And the penalty-phase jurors knew that the guilt-phase jury had found Kleypas guilty of attempted rape.

Further, as we evaluate how much impact Williams' testimony about the testing would have had on the aggravating factors, we must consider the other evidence supporting the State's theory that Kleypas committed C.W.'s murder in a heinous, atrocious, or cruel manner. While the prosecutor mentioned saliva in the closing argument, he primarily stressed other evidence from the coroner's findings—such as C.W.'s widely dilated anus, which suggested she had been sodomized by some object; her lacerated liver; seven stab wounds to her heart that nearly penetrated her body; a broken jaw; and a wound over her right eye caused by a sharp object. The prosecutor reminded the jury of evidence that C.W. had been beaten—not just with fists but with some type of blunt instrument—and choked. The prosecutor also mentioned the "blitzkrieg the defendant made when [C.W.] opened the door"; Kleypas' statement that at that point "all hell broke loose"; the scratches and bite marks on Kleypas' arm and face, suggesting

C.W. fought back; a "little light cut" on C.W.'s nipple; the digital rape; her bargaining with him to let her go; and the evidence of C.W.'s struggle to escape once she had been tied to the chair with her own socks. The prosecutor asked the jury to

> "[r]ecall the sock that he stuffed into her mouth. She couldn't breathe. She couldn't scream and recall the blood foam in her airway. . . . She was alive, she was injured and her body was literally breaking down around her because it couldn't handle what was happening to her anymore.

> "And [the coroner] told you that means—that is consistent with a long, slow death."

In light of that uncontroverted evidence, even if we assume constitutional error in the admission of Williams' testimony concerning the test results, it was harmless beyond a reasonable doubt. Given the compelling nature of the evidence of the heinous, atrocious, and cruel beatings, stabbings, attempted rape, sodomy, restraint, choking, and slow death, we conclude there is no reasonable possibility that the brief mention of DNA testing—or even the circumstantial proof that oral acts and an attempted erection occurred—influenced the juror's assessment of the aggravating factor or its weighing of that factor against the mitigating factors. Nor did it cause the sentence of death to be "imposed under the influence of passion, prejudice or any other arbitrary factor." K.S.A. 2015 Supp. 21-6619(c)(1).

ISSUE 10: THE DISTRICT COURT'S FAILURE TO FOLLOW THIS COURT'S MANDATE IN INSTRUCTING THE JURY AMOUNTED TO HARMLESS ERROR.

In Kleypas' next issue, he argues the district court erred in instructing the jury regarding the weighing of aggravating and mitigating circumstances. He asserts this

91

court's holding in *Kleypas I* prevented the district court from giving this instruction. In making this argument, he focuses on the portion of the aggravating and mitigating circumstances instruction in which the district court, in accord with K.S.A. 21-4624(e), instructed the jury that "[i]f you find unanimously beyond a reasonable doubt that there are one or more aggravating circumstance(s) and that they are not outweighed by any mitigating circumstance(s), then you shall impose a sentence of death."

To explain, it is helpful to review Kleypas' arguments about this instruction in his first appeal, the *Kleypas I* court's holding, the mandate, and the district court's reasons for not following the mandate.

### 10.1.  Kleypas I *Ruling and Other Cases*

In *Kleypas I*, Kleypas argued K.S.A. 21-4624(e) violated the Eighth Amendment because it allowed a death sentence if the jury found the aggravating and mitigating factors to be in equipoise. This court agreed and held:

> "K.S.A. 21-4624(e) is not unconstitutional on its face, but it impermissibly
> mandates the death penalty where the jury finds that the mitigating and aggravating
> circumstances are in equipoise. As such, it denies what the Eighth Amendment requires:
> that the jury is to give effect to the mitigating circumstances that it finds exist." *State v.*
> *Kleypas*, 272 Kan. 894, Syl. ¶ 45, 40 P.3d 139 (2001) (*Kleypas I*), *cert. denied* 537 U.S.
> 834 (2002), *abrogated in part by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L.
> Ed. 2d 429 (2006).

The *Kleypas I* court then discussed the appropriate remedy and concluded:

"By simply invalidating the weighing equation and construing K.S.A. 21-4624(e) to provide that if the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 exists and, further, that such aggravating circumstance or circumstances outweigh any mitigating circumstance found to exist, the defendant shall be sentenced to death, the intent of the legislature is carried out in a constitutional manner. So construed, we hold that K.S.A. 21-4624 does not violate the Eighth Amendment prohibition against cruel and unusual punishment. Our holding requires that this case be remanded for the jury to reconsider imposition of the death penalty.

"We set aside the death sentence for the reasons set out above and remand for resentencing in accordance with K.S.A. 21-4624 as construed herein." *Kleypas I*, 272 Kan. at 1018.

A mandate reflecting that decision issued. However, after the mandate but before the retrial, the United States Supreme Court decided *Kansas v. Marsh*, 548 U.S. 163, 173, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), and abrogated the *Kleypas I* holding regarding K.S.A. 21-4624.

In *Marsh*, the Supreme Court discussed and applied *Boyde v. California*, 494 U.S. 370, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990), and held: "Kansas' death penalty statute, consistent with the Constitution, may direct imposition of the death penalty when the State has proved beyond a reasonable doubt that mitigators do not outweigh aggravators, including where the aggravating circumstances and mitigating circumstances are in equipoise." *Marsh*, 548 U.S. at 173. In other words, the Supreme Court held that K.S.A. 21-4624 could constitutionally be applied as written. This means that an instruction

93

reflecting K.S.A. 21-4624 was legally appropriate and arguably an instruction that varied from the statute would be legally inappropriate.

Consequently, during the remand proceedings in this case, Kleypas sought an alternative route to reach the same result he obtained in *Kleypas I—i.e.*, a ruling that K.S.A. 21-4624 was unconstitutional. He filed a "Motion to Strike K.S.A. 21-4624 as Unconstitutional" under §§ 9 and 18 of the Kansas Constitution Bill of Rights. The district court denied the motion, concluding Kleypas' arguments "have been answered by the *Kleypas* opinion and or the *Marsh* opinion on appeal to the United States Supreme Court." Then, at the jury instructions conference, the district court proposed using the same instruction given in the original penalty trial, consistent with K.S.A. 21-4624(e) as written. Kleypas did not object and did not discuss the mandate or the impact of *Marsh*.

Appealing from those decisions, Kleypas does not renew the argument he made in the district court regarding whether K.S.A. 21-4624 violates the Kansas Constitution Bill of Rights. Instead, he argues the district court committed error when it did not follow the *Kleypas I* mandate and, rather than alter the weighing instruction, used the same instruction as had been used in Kleypas' first penalty proceeding. He makes two arguments in suggesting the instruction was legally inappropriate: The district court (1) infringed on his liberty interest by not applying the mandate and (2) violated the law of the case doctrine and the mandate rule.

94

10.2. *Liberty Interest*

In support of Kleypas' liberty interest argument, he cites *Hicks v. Oklahoma,* 447 U.S. 343, 100 S. Ct. 2227, 65 L. Ed. 2d 175 (1980). We conclude *Hicks* does not support Kleypas' position.

The *Hicks* defendant had been sentenced under an Oklahoma habitual offender statute that required the jury to impose a 40-year sentence on a felon who had previously been convicted of two other felonies. In the absence of the prior felonies, the jury would have been instructed to sentence the *Hicks* defendant to not less than 10 years, with no maximum range specified. After the defendant was sentenced, the Oklahoma Court of Criminal Appeals held in a separate case that the habitual offender sentencing statute was unconstitutional. Nevertheless, the Oklahoma court affirmed the *Hicks* defendant's conviction and sentence, holding that he was not prejudiced by the impact of the invalid statute because his sentence was within the range of punishment that could have been imposed by the jury. 447 U.S. at 344-45.

On appeal, the United States Supreme Court vacated the sentence. The Supreme Court held the defendant's interest in the exercise of the jury's discretion in imposing punishment constituted a liberty interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Supreme Court held that the Oklahoma court's reasoning was merely "frail conjecture that a jury might have imposed a sentence equally as harsh as that mandated by the invalid habitual offender provision. Such an arbitrary disregard of the petitioner's right to liberty is a denial of due process of law." 447 U.S. at 346.

The liberty interest recognized by the *Hicks* Court was the right to have the jury determine a defendant's punishment and to be able to exercise its full discretion. Kleypas essentially attempts to create a liberty interest in having the jury instructed in accord with an overruled interpretation of a provision of law. But that is not the holding in *Hicks*.

Here, Kleypas was sentenced by the jury in accord with the statute applicable to his offense at the time he committed it. See *State v. Keel*, 302 Kan. 560, 586-87, 357 P.3d 251 (2015) (penalty parameters for a crime are fixed on the date the offense was committed), *cert. denied* 136 S. Ct. 865 (2016); see also *Griffith v. Kentucky*, 479 U.S. 314, 327, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987) ("a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final"); *Gaudina v. State*, 278 Kan. 103, 106, 92 P.3d 574 (2004) (Kansas follows "the same rule for finality [for purposes of the retroactive applicability of a new rule] set forth in *Griffith*."). And, according to the holding in *Marsh*, the instruction fulfilled Kleypas' liberty interest in having the jury exercise the full discretion allowed by law.

As a result we conclude the sentencing procedure did not deprive Kleypas of any liberty interest.

10.3. *Mandate Rule and Law of the Case*

We next consider Kleypas' argument that the instruction was not legally appropriate because it violated the mandate rule and the law of the case doctrine. These arguments present issues of law subject to de novo review. See *Gannon v. State*, 303 Kan. 682, 702, 368 P.3d 1024 (2016) ("'Interpretation of an appellate court mandate and

the determination of whether the district court complied with it on remand are both questions of law subject to de novo review.'" [quoting *State v. Morningstar,* 299 Kan. 1236, 1240-41, 329 P.3d 1093 (2014)]).

As Kleypas suggests, a district court considering a case on remand is generally bound by the law of the case as set out in an appellate decision. *State v. Collier*, 263 Kan. 629, 636, 952 P.2d 1326 (1998). And the mandate in *Kleypas I* specifically directed the district court to conduct a new penalty hearing "in accordance with K.S.A. 21-4624 as construed herein." 272 Kan. at 1018. In arguing the district court was obligated to follow this direction, Kleypas cites the mandate rule, which this court has noted "is simply a subspecies of the venerable 'law of the case' doctrine." *Collier*, 263 Kan. at 636 (quoting *Federated Rural Electric Insurance Corp. v. Arkansas Electric Cooperatives, Inc.*, 896 F. Supp. 912, 914 [E.D. Ark. 1995]).

Two statutes address the controlling nature of a mandate. K.S.A. 60-2106(c) provides, in relevant part, that the mandate of this court "shall be controlling in the conduct of any further proceedings necessary in the district court." And K.S.A. 20-108 states that a district court must execute any further proceedings "according to the command of the appellate court made therein." Under the plain language of these statutes, a district court is required to apply the mandate without exception. *Collier*, 263 Kan. at 637. The *Collier* court made this point emphatically, stating: "It is axiomatic that on remand for further proceedings after a decision by an appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal." 263 Kan. 629, Syl. ¶ 4.

Some jurisdictions, notably several federal circuit courts, hold that a trial court may depart from a mandate in order to obey new law without first asking permission from the appellate court. See 18B Wright, Miller, & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4478.3 (2002). While this court has recognized its power to recall, correct, amplify, or modify its own mandate, *e.g.*, *West v. Insurance Co.*, 105 Kan. 414, 415-16, 185 P. 12 (1919), Kansas cases have not recognized the power of a district court to unilaterally depart from the mandate, even when a change in the law has occurred. And neither K.S.A. 60-2106(c) nor K.S.A. 20-108 contemplate such an exception. See *State v. Prine*, 297 Kan. 460, 475, 303 P.3d 662 (2013) (appellate court cannot delete provisions or supply omissions in a statute). Hence, we conclude the district court was duty bound to comply with the mandate as written. K.S.A. 60-2106(c); *Collier*, 263 Kan. 629, Syl. ¶ 4. In making this holding, we do not opine on questions not presented to us, such as whether the parties, or even the district court acting *sua sponte*, had the ability to seek a modification from this court of its mandate.

Rather, given the posture of the mandate in this case, if the district court failed to follow our mandate in *Kleypas I*, it erred. See *Collier*, 263 Kan. at 637 (reversing and remanding for resentencing in accordance with the express direction of the decision); *Chicago, R. I. & P. Rly. Co. v. Nichols*, 133 Kan. 480, 481-82, 300 P. 1064 (1931) (finding reversible error where trial court failed to proceed in conformity with the appellate court's order and judgment). The parties do not dispute the existence of error, and clearly the district court did not follow the mandate of this court.

10.4. *Reversibility*

Having found error, we next conduct a reversibility inquiry. Because this issue raises a violation of state statutes, *i.e.*, K.S.A. 60-2106(c) and K.S.A. 20-108, a question arises about the level of certainty that should be applied in our harmless error inquiry. We will not address that question, since the parties have not, but will apply the most stringent standard since we have no hesitation in declaring the error harmless.

Typically, we have examined reversibility through a retrospective lens, focusing on the possibility of the error "changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances."*Kleypas I*, 272 Kan. at 1087-88. Yet, if we assume Kleypas met that standard here and were to vacate his sentence and order a new proceeding on remand, we would necessarily have to consider that the *Marsh* decision settled the question of the constitutionality of K.S.A. 21-4624(e) and recognize that, to be legally appropriate, the jury instruction given in the remand proceeding would need to reflect the applicable law. Consequently, any remand order by this court could only order the district court to do exactly what it already did—instruct the jury in accordance with the weighing equation as written in K.S.A. 21-4624(e) and as applicable at the time Kleypas committed the crime.

In that circumstance, courts usually view reversibility in light of the futility of remanding a case following a trial court's failure to follow a mandate inconsistent with controlling precedent. As has been noted:

"[I]t seems quite obvious . . . the judgment of the trial court will be affirmed notwithstanding that court's departure from the appellate court's mandate on a former appeal, since it would be futile for the appellate court to reverse the trial court because of

99

its departure from the appellate court's ruling on a former appeal and at the same time to direct the trial court to render the same judgment again after the appellate court has itself corrected its error." Annot., 87 A.L.R.2d 271 § 10.

Kleypas attempts to avoid this dilemma altogether by arguing the mandate was not rendered erroneous by the United States Supreme Court's *Marsh* decision because it did not actually overrule *Kleypas I*. He contends this court treated the construction of the equipoise provision in *Kleypas I* as only a state-law question, which therefore would not be reviewable by the United States Supreme Court. This argument is based on a characterization of *Kleypas I* as a decision to "sever" the equipoise provision from the statute because of its unconstitutionality. See *New Orleans v. Dukes*, 427 U.S. 297, 302, 96 S. Ct. 2513, 49 L. Ed. 2d 511 (1976) (concluding the unconstitutionality of an ordinance as applied to appellee had been definitely and finally adjudicated by the Court of Appeals, and only a state-law question remained to be decided on remand); *Dorchy v. Kansas*, 264 U.S. 286, 291, 244 S. Ct. 323, 68 L. Ed. 686 (1924) (in ruling on claim under the federal law, United States Supreme Court may decide whether unconstitutional section of state statute is severable or may leave that determination to the state court).

Relying on *New Orleans* and *Dorchy*, Kleypas argues the effect of the "severance" is that the *Kleypas I* "holding would have been insufficient to confer jurisdiction in the Supreme Court of the United States." Therefore, according to Kleypas, *Kleypas I* was not overruled by *Marsh*.

Kleypas' argument conflicts with the United States Supreme Court's discussion in *Marsh*. Marsh asserted a severance argument in an attempt to avoid the jurisdiction of the Supreme Court and, in doing so, discussed *Kleypas I*. The Supreme Court explained the argument and its reasons for rejecting the suggestion:

"Marsh maintains that the Kansas Supreme Court's decision was based on the severability of § 21-4624(e) under state law, and not the constitutionality of that provision under federal law, the latter issue having been resolved by the Kansas Supreme Court in *State v. Kleypas*, 272 Kan. 894, 40 P.3d 139 (2001) (*per curiam*). Marsh's argument fails.

"*Kleypas*, itself, rested on federal law. See [272 Kan.] at 899-903, 40 P.3d, at 166-167. In rendering its determination here, the Kansas Supreme Court observed that *Kleypas*, 'held that the weighing equation in K.S.A. 21-4624(e) as written was unconstitutional under the Eighth and Fourteenth Amendments' as applied to cases in which aggravating evidence and mitigating evidence are equally balanced. 278 Kan., at 534, 102 P.3d, at 457. . . . As in *Kleypas*, the Kansas Supreme Court clearly rested its decision here on the Eighth and Fourteenth Amendments to the United States Constitution. We, therefore, have jurisdiction to review its decision." *Kansas v. Marsh*, 548 U.S. 163, 169, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006).

This passage clearly indicates the United States Supreme Court would have read *Kleypas I* to confer jurisdiction had it accepted a petition for certiorari. In essence, Kleypas' characterization of *Kleypas I* as a decision to sever the equipoise provision addresses only the remedy applied in the case and not the underlying holding. See *Kleypas I*, 272 Kan. 894, Syl. ¶ 45. We, therefore, reject Kleypas' attempt to avoid the futility of remand based on an argument that *Marsh* does not control.

Further, there is no question the United States Supreme Court in *Marsh* disagreed with the central holding of *Kleypas I*, which was that the equipoise provision was unconstitutional. Under *Marsh*, no justification exists for judicial alteration of the statute. In other words, the district court applied the correct law even though, procedurally, it erred in doing so. Consequently, the jury in this case was instructed just as a jury would

101

be if we were to remand for another sentencing proceeding. Given these circular circumstances, we recognize the futility of remand and deem the district court's failure to follow our mandate harmless. There is no reasonable possibility that the district court's failure to seek modification of the mandate affected the outcome of the trial.

ISSUE 11:  THE DISTRICT COURT DID NOT COMMIT REVERSIBLE ERROR WHEN IT DECIDED NOT TO LIST MERCY AS ONE OF THE MITIGATORS ASSERTED BY KLEYPAS.

Kleypas' next two arguments are based on Instruction No. 15, the district court's instruction on mitigating circumstances. Before discussing the specifics of his arguments, we will discuss the analytical structure that applies to appellate review of jury instruction issues.

11.1. *Analytical Structure of Jury Instruction Review*

In *State v. Williams*, 295 Kan. 506, 286 P.3d 195 (2012), we clarified how our review of jury instruction issues fit the structure of a typical appellate process. That process follows three steps:

"(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal;
(2) considering the merits of the claim to determine whether error occurred below; and
(3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless." 295 Kan. at 510.

As it relates to jury instructions, the Kansas Legislature has addressed and defined the parameters of the first step, stating:

102

"No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous." K.S.A. 22-3414(3).

In other words, "[u]nder K.S.A. 22-3414(3), the failure to object to an instruction does not prevent appellate review but requires a determination that the instruction is clearly erroneous before relief can be granted." *State v. Waggoner*, 297 Kan. 94, 97, 298 P.3d 333 (2013); see *State v. Cheever*, 304 Kan. 866, 884, 375 P.3d 979 (2016) (*Cheever II*) (recognizing application of K.S.A. 22-3414[3] in death penalty appeal regarding state-law claim relating to penalty-phase instructions). The failure to object to an instruction does have impact, however; it changes our reversibility inquiry at the final stage of the analysis. See *State v. Bolze-Sann*, 302 Kan. 198, 209-10, 352 P.3d 511 (2015).

Thus, K.S.A. 22-3414(3) provides a short-cut through the typical three-stage inquiry of appellate review by answering the preservation question. We have occasionally referred to this short-cut as a "two-part test." See, *e.g.*, *State v. Robinson*, 303 Kan. 11, 282, 363 P.3d 875 (2015), *disapproved of on other grounds by State v. Cheever*, 304 Kan. 866, 375 P.3d 979 (2016); *State v. Herbel*, 296 Kan. 1101, 1121, 299 P.3d 292 (2013). Under the first prong of the test, "the reviewing court must . . . determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record." *Williams*, 295 Kan. 506, Syl. ¶ 4; see *State v. Plummer*, 295 Kan. 156, 160-63, 283 P.3d 202 (2012) (referring to legal appropriateness

and factual appropriateness as separate tests, resulting in a four-part test—preservation, legal appropriateness, factual appropriateness, and reversibility).

Speaking in the most general terms, to be legally appropriate "an instruction must always fairly and accurately state the applicable law." *Plummer*, 295 Kan. at 161. As to factual appropriateness, courts examine whether the instruction is "supported by the particular facts of the case at bar." 295 Kan. at 161.

If error is found, at the second step the reviewing court conducts a reversibility inquiry. The nature of the reversibility inquiry depends both on the type of error and whether an objection had been lodged with the district court. See *Bolze-Sann*, 302 Kan. at 209-10; *State v. Ward*, 292 Kan. 541, 562-66, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). If the party requested a jury instruction not given by the district court or has objected before the district court to an instruction that was given, we test reversibility under the harmless error paradigm set out in *Ward*. Although we previously set out this paradigm in our discussion of Issue 1, for ease of reference we repeat it here:

> "[B]efore a Kansas court can declare an error harmless it must determine the error did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome. The degree of certainty by which the court must be persuaded that the error did not affect the outcome of the trial will vary depending on whether the error implicates a right guaranteed by the United States Constitution. If it does, a Kansas court must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict. If a right guaranteed by the United States Constitution is not implicated, a Kansas court must be persuaded that there is no reasonable probability that the error will or did affect the outcome of the trial." 292 Kan. at 565.

A different test applies if the party failed to request an instruction or to object to an instruction that was given. In that circumstance, "the court assesses whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal." *Williams*, 295 Kan. 506, Syl. ¶ 5; see *Cheever II*, 304 Kan. at 884-85; *Robinson*, 303 Kan. at 282; *Herbel*, 296 Kan. at 1121.

Some modifications to these standards apply in death penalty cases. First, the United States Supreme Court has stated a specific rule within the context of an Eighth Amendment analysis that governs the legal appropriateness of penalty-phase jury instructions regarding aggravating and mitigating circumstances—a question Kleypas raises in this and the next issue. See *Boyde v. California*, 494 U.S. 370, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990).

In *Boyde*, the defendant complained that California's pattern jury instructions impermissibly restricted a jury's consideration of evidence relevant to mitigating factors not related to the nature of the crime, such as the defendant's background and character. In stating the standard to be applied to determine this issue, the Court stated:

> "The claim is that the instruction is ambiguous and therefore subject to an erroneous interpretation. We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." 494 U.S. at 380.

This court has previously recognized this standard but has not fully discussed how it fits within the structure of our jury instruction analysis. See *State v. Carr*, 300 Kan. 1,

305, 331 P.3d 544, 734 (2014) ("We have not previously discussed in detail how that [clearly erroneous] standard [in K.S.A. 22-3414(3)] meshes with the 'constitutional standard' for instruction error set out in United States Supreme Court cases—whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violated the Constitution."), *rev'd and remanded* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016); see also *State v. Gleason*, 299 Kan. 1127, 1191, 329 P.3d 1102 (2014), *rev'd and remanded sub nom. Kansas v. Carr,* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016); *State v. Scott*, 286 Kan. 54, 96-97, 183 P.3d 801 (2008).

The United States Supreme Court provided the necessary guidance in *Calderon v. Coleman*, 525 U.S. 141, 144-47, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998). In that case, a federal circuit court of appeals conducted habeas review of a state court's death penalty judgment. The federal court held that an ambiguous jury instruction could have been read to mean that the state's governor had the sole power to commute a defendant's sentence, which was not accurate. This meant the instruction violated the Eighth and Fourteenth Amendments by giving the jury inaccurate information that diverted the jury's consideration of mitigating evidence. After reaching that conclusion, the federal court of appeals advanced to the reversibility inquiry and, in doing so, applied the *Boyde* standard rather than the traditional harmless error test applied when a federal court conducts habeas review of a state court judgment—*i.e.*, the standard in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). In habeas actions related to a state judgment, reversibility is judged by whether the error had a "'substantial and injurious effect or influence'" on the verdict. *Brecht,* 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 90 L. Ed. 1557 [1946]).

The United States Supreme Court held the federal circuit court of appeals erred by applying the *Boyde* test in place of the harmless error analysis mandated by *Brecht*. The Court explained the *Boyde* test "is not a harmless-error test at all. It is, rather, the test for determining, in the first instance, whether constitutional error occurred when the jury was given an ambiguous instruction that it might have interpreted to prevent consideration of constitutionally relevant evidence." *Calderon*, 525 U.S. at 146. The Supreme Court contrasted the two steps of analysis by saying that *Boyde* did not set a standard for measuring the "actual effect of the error on the jury's verdict," which is the role of the harmless error test; "it merely asks whether constitutional error has occurred." 525 U.S. at 147.

The Supreme Court then explained the steps of analysis. First, the reviewing court must determine if the possibility existed that the jury instruction could be read to suggest that the governor alone had the power to commute the defendant's sentence—*i.e.*, whether the instruction was ambiguous and whether the ambiguity opened the possibility of misleading the jury. Second, the reviewing court would apply the *Boyde* test to determine if *more* than a possibility existed, *i.e.*, whether "there was a reasonable likelihood that the jury understood the instruction as stating the Governor had that power." *Calderon*, 525 U.S. at 147. Third, "[i]f the court found that possibility to be a reasonable one, it would determine then whether the instruction, so understood, was unconstitutional as applied to the defendant." 525 U.S. at 147. In the context of Kansas' jury instruction rubric this analysis would fit as part of the determination of the legal appropriateness of the standard. See *Williams*, 295 Kan. 506, Syl. ¶ 4.

But the inquiry would not end with the declaration of unconstitutionality because "some constitutional errors do not entitle the defendant to relief, particularly habeas

107

relief." 525 U.S. at 147. And so, in the final step of the analysis, "[t]he court must find that the error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict"—*i.e.*, it must apply the *Brecht/Kotteakos* harmless error test. *Calderon*, 525 U.S. at 146-47.

Of course, in applying that analysis to our case, we would not use the *Brecht/Kotteakos* habeas harmless error test. But we are mindful that *Brecht/Kotteakos* instructs us that, when using a harmless error test, we must reach different levels of certainty when asking whether a claimed error affected the outcome of a proceeding:

> "Under the United States Supreme Court's analysis, although relief for any type of error—*i.e.*, constitutional, harmless, or plain—is based on the same benchmark, effect on the outcome, the analysis for each type of error is formulated differently to set a higher or lower threshold or level of certainty as to whether the error affected the outcome. In other words, the standard of proof varies by the degree of certainty by which a court must be persuaded that the error did not affect the outcome. See [*United States v. Dominguez Benitez*, 542 U.S. 74, 86, 124 S. Ct. 2333, 159 L. Ed. 2d 157 (2004)] (Scalia, J., dissenting) (the Court has created too many gradations in the 'standards of probability relating to the assessment of whether the outcome of the trial would have been different' if the error had not occurred); *Brecht v. Abrahamson*, 507 U.S. 619, 653-56, 113 S. Ct. 1710, 123 L. Ed. 2d 353, *reh. denied* 508 U.S. 968 (1993) (O'Connor, J., dissenting) (harmless error requires the reviewing court to determine whether it has 'sufficient confidence that the verdict would have remained unchanged even if the error had not occurred'; only difference between *Chapman* and the *Kotteakos*/Fed. R. Crim. Proc. 52 standard 'is the degree of confidence' the reviewing court must have that the error did not affect the outcome)." *Ward*, 292 Kan. at 563-64.

Under our caselaw, when a death penalty defendant makes a jury instruction objection, we apply the standard of review requiring the highest level of certainty—the

standard of *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). See *State v. Kleypas*, 272 Kan. 894, 1084, 40 P.3d 139 (2001) (*Kleypas I*) (stating the harmless error test in penalty-phase trial as being whether an error had "little, if any, likelihood" of affecting the outcome of the jury's weighing of aggravating and mitigating circumstances and noting this language, while "somewhat different" from that used in *Chapman*, "is essentially the same"), *cert. denied* 537 U.S. 834 (2002), *abrogated in part by Kansas v. Marsh*, 548 U.S. 163; see also *Ward*, 292 Kan. at 558-59 (discussing standard and the equivalency of the little, if any, likelihood standard and the no reasonable possibility standard of *Chapman*).

But if a death penalty defendant fails to request or object to an instruction, we apply the clearly erroneous standard and determine "whether [we are] firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal." *Carr*, 300 Kan. at 150-51 (quoting *State v. Williams*, 295 Kan. 506, Syl. ¶¶ 4-5). Although we applied this standard to a guilt-phase claim of error in *Carr*, the clearly erroneous standard applies equally to claims of instructional error arising from the penalty phase.

11.2. *Additional Factual and Legal Background*

In this and the following issue, Kleypas complains about Instruction No. 15 given by the trial court to the jury:

"Mitigating circumstances are those which in fairness may be considered as extenuating or reducing the degree of moral culpability or blame or which justify a sentence of less than death, even though they do not justify or excuse the offense.

109

"The appropriateness of exercising mercy can itself be a mitigating factor in determining whether the State has proved beyond a reasonable doubt that the death penalty should be imposed.

"The determination of what are mitigating circumstances is for you as jurors to decide under the facts and circumstances of this case. Mitigating circumstances need to be proved only to the satisfaction of the individual juror in that juror's sentencing decision and need not be proved beyond a reasonable doubt. Mitigating circumstances do not need to be found by all members of the jury in order to be considered in an individual juror's sentencing decision.

"The defendant contends that mitigating circumstances include, but are not limited to, the following:

"[Here the court set out a list of 16 out of 17 mitigating factors that had been requested by Kleypas, including such factors as that he had a long history of mental illness, maladjustment, and behavioral control problems and that the crime was committed while he was under the influence of extreme mental or emotional disturbance.]

"You may further consider as a mitigating circumstance any other aspect of the defendant's character, background or record, and any other aspect of the offense which was presented which you find may serve as a basis for imposing a sentence less than death.

"Each of you must consider every mitigating circumstance that he or she individually finds to exist."

This instruction followed PIK Crim. 3d 56.00-D. It deviated from the instruction requested by Kleypas in that Kleypas' requested instruction also listed "mercy" in his

110

enumerated list of possible mitigating circumstances. The State had not objected to Kleypas' requested instruction; nevertheless, the district court decided *sua sponte* to remove mercy from the enumerated list in the fourth paragraph because it was already mentioned in the second paragraph of the instruction. See PIK Crim. 3d 56.00-D ("The appropriateness of exercising mercy can itself be a mitigating circumstance . . . ."). The district court also added a sentence informing the jury the defendant had no burden to prove any mitigating circumstance.

Kleypas contends, as he did before the district court, that there is a difference between merely mentioning mercy as a possible mitigator in the second paragraph of the instruction and telling the jury that he was relying on mercy as a mitigator. Kleypas' argument rests on principles we recognized in *Kleypas I*, when we said:

> "[T]he United States Supreme Court has held that the Eighth Amendment requires two things of a death sentence:  (1) The sentencer must not have unbridled discretion in determining the fate of the defendant, and (2) the defendant must be allowed to introduce any relevant mitigating evidence of his character or record or circumstances of the offense." 272 Kan. at 1036 (citing *California v. Brown*, 479 U.S. 538, 541, 107 S. Ct. 837, 93 L. Ed. 2d 934 [1987]).

See *Mills v. Maryland,* 486 U.S. 367, 374-75, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988) (same); *Lockett v. Ohio*, 438 U.S. 586, 604, 606-09, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) (stating same rule in context of statute alleged to have limited consideration of mitigating circumstances); see also *State v. Cheever*, 295 Kan. 229, 269, 284 P.3d 1007 (2012) (*Cheever I*) (discussing *Mills*, *Lockett*, and other caselaw), *vacated and remanded* 571 U.S. ___, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013).

111

Under this caselaw, we must ask: Was the jury permitted to give mercy meaningful, mitigating effect in imposing the ultimate sentence? See *Lockett*, 438 U.S. at 604; see also *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007); *Penry v. Lynaugh,* 492 U.S. 302, 321-22, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), *abrogated on other grounds by Atkins v. Virginia,* 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002); *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982).

Kleypas maintains that the structure of the mitigating circumstances instruction— which left mercy out of the enumerated list of mitigating circumstances—barred the jury's consideration of mercy as a mitigating circumstance. He argues that *Kleypas I* suggests the listing of mercy in the instruction allows the jury to consider mercy as a mitigating factor and, as a corollary, that failing to list it prevents its consideration. The *Kleypas I* court did not affirmatively endorse the concept of mercy as a mitigator, but it did conclude that "Kleypas fails to show how the instruction was not adequate to inform the jury of its option to exercise mercy or how the trial court otherwise failed to permit the jury to exercise mercy." 272 Kan. at 1036. Kleypas seems to read more into this statement than may have been intended.

The State makes this point by relying on another statement in *Kleypas I*: "A mercy instruction per se is simply not required as part of this equation by federal or state law, nor is a specific type of mercy instruction." 272 Kan. at 1036. The State argues this statement ends our inquiry because Kleypas cannot claim error if not entitled to an instruction on the topic. But if a court gives an instruction on a topic, it cannot misstate the law or mislead the jury. And Kleypas argues the instruction misled the jury. Consequently, we examine his arguments.

112

### 11.3. Boyde *Determination*

By arguing the instruction misled the jury and, through its ambiguity, diverted the jury's consideration of a mitigator, Kleypas raises a question that falls squarely within the scope of the test in *Boyde*, 494 U.S. 370. Under that test, even if an ambiguity exists, Kleypas must establish a reasonable likelihood that the jury applied the challenged instruction in a way that prevented the consideration of mercy. See *Calderon* 525 U.S. at 146-47; *Boyde*, 494 U.S. at 380. Kleypas fails to convince us of a reasonable likelihood that the jury was misled to believe that Kleypas was not asking it to consider mercy and also fails to convince us of a reasonable likelihood that the jury would believe it could not consider mercy. This means we find no error for the reasons we more fully explain.

First, the language of the instructions does not support Kleypas' suggestion. The district court specifically instructed the jury that it could consider the appropriateness of exercising mercy and that mercy could be a mitigating factor. While mercy was not enumerated in the defendant's list, the jury was told that the defendant's list was not exclusive. Further, the jury was instructed that the determination of what constituted a mitigating circumstance was a decision for each individual juror to make, that mitigating circumstances need be proved only to the satisfaction of that individual juror, and that mitigating circumstances need not be proved beyond a reasonable doubt. The jurors were instructed that each juror must consider every mitigating circumstance that he or she individually found to exist. And the district court further clarified that Kleypas bore no burden to prove any mitigating circumstance. Thus, Kleypas' argument that a juror reading the second paragraph of the instruction "would not know that he or she could consider mercy as a mitigating circumstance . . . when two paragraphs down . . . mercy

113

was absent as an enumerated mitigating circumstance" is not supported by all the other information the jury was given about its ability to consider mercy and mitigators. See *Boyde*, 494 U.S. at 378 (complained-of language in jury charge "'may not be judged in artificial isolation, but must be viewed in the context of the overall charge'").

In addition, the State discussed the concept of mercy in its closing argument. While some of the State's comments regarding mercy drew objections and are the subject of a later claim of error in this appeal, which we reject, the State's comments clearly conveyed to the jury that it had the ability to consider whether granting mercy was appropriate. The prosecutor told the jury, "The instructions tell you that you can consider the appropriateness of exercising mercy and that can be a mitigating factor." Moreover, Kleypas' counsel stressed the ability of the individual jurors to choose a life sentence and characterized that choice as a heroic one. And in his final summation, Kleypas' counsel responded to the State's argument that jurors were bound to follow the law and the instructions, by arguing:

> "You decide how these things are weighed. You decide how much to weigh [Kleypas'] mental illness. The law does not mandate you to weigh it one way or another. It doesn't mandate how much weight you give it. It doesn't say that you can only give him so much mercy. If you want to go back there and stand for life, you can, legally. There is nothing illegal about that. You can do it. Somebody do it. Thank you."

Thus, the district judge, the prosecutor, and defense counsel told the jury it could consider mercy. And the last comments of the defense counsel stressed the exercise of mercy. Given those circumstances, language used in *Boyde* (with mercy substituted for the circumstance at issue in that case) rings true here as well: "Even were the language of the instruction less clear than we think, the context of the proceedings would have led

114

reasonable jurors to believe that [mercy] could be considered in mitigation." 494 U.S. at 383. "[W]e think it unlikely that reasonable jurors would believe" these attorney's arguments transformed "all of this 'favorable testimony into a virtual charade,'" especially when the court had instructed it could be considered. 494 U.S. at 383 (quoting *California v. Brown*, 479 U.S. 538, 542, 107 S. Ct. 837, 93 L. Ed. 2d 934 [1987]). And recently, the United States Supreme Court stated: "In the last analysis, jurors will accord mercy if they deem it appropriate, and withhold mercy if they do not, which is what our case law is designed to achieve." *Kansas v. Carr*, 577 U.S. ___, 136 S. Ct. 633, 642, 193 L. Ed. 2d 535 (2016).

In other words, Kleypas fails to meet the *Boyde* test, which means he has failed to establish error. Without error, the instruction obviously cannot be clearly erroneous. See *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 286 P.3d 195 (2012).

ISSUE 12:  THE DISTRICT COURT DID NOT COMMIT ERROR BY INSTRUCTING THE JURY IT COULD DETERMINE WHAT CONSTITUTED A MITIGATING CIRCUMSTANCE UNDER THE FACTS OF THE CASE.

Next, Kleypas focuses on the first sentence of the third paragraph of the mitigating circumstances instruction, which states: "The determination of what are mitigating circumstances is for you as jurors to decide under the facts and circumstances of this case." He argues this sentence misstates the law concerning mitigating circumstances and misleads the jury. At trial, he did not raise this specific objection to the instruction. See K.S.A. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict *stating distinctly the matter to which the party objects and the grounds of the*

115

*objection* unless the instruction or the failure to give an instruction is clearly erroneous." [Emphasis added.]).

In raising this issue on appeal, Kleypas renews an argument he made in *Kleypas I* regarding the same language in an instruction given in his first penalty hearing. *Kleypas I*, 272 Kan. at 1074 (quoting an instruction that read: "The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstance of this case."). In that first proceeding, this court denied his claim of error and held the instruction "properly and fairly stated the law and provide[d] no basis for a claimed constitutional deprivation." 272 Kan. at 1075.

Kleypas concedes that the law of the case doctrine comes into play in our deciding this issue. But he urges us to conclude the decision on this point in *Kleypas I* was clearly erroneous because the *Kleypas I* court applied the wrong standard of review when it stated:

> "As we have noted previously when reviewing challenges to jury instructions, this court is required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case and a jury could not reasonably be misled by them, the instructions do not constitute reversible error even if they are in some way erroneous." *Kleypas I*, 272 Kan. at 1074.

Instead of this standard, Kleypas asserts that the *Kleypas I* court should have applied the test stated in *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990). While Kleypas has a valid point that *Boyde* provided the controlling test, he does not explain how the *Boyde* test (that is, "whether there is a

116

reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence") differs from the test applied in *Kleypas I* (that is, whether the jury could "reasonably be misled" by the instruction). Assuming there is a nuanced difference, he fails to establish that a *Boyde* analysis would have led to the conclusion the court erred, especially since the *Kleypas I* court based its decision on a United States Supreme Court decision that utilized the *Boyde* test—*Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S. Ct. 757, 139 L. Ed. 2d 702 (1998). *Kleypas I*, 272 Kan. at 1075.

In *Angelone*, as in *Kleypas I*, the United States Supreme Court focused on whether the instruction misstated the law. The Court held:

> "[T]he state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence. [Citations omitted.] Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence. Thus, in *Boyde v. California*, 494 U.S. 370 (1990), we held that the standard for determining whether jury instructions satisfy these principles was 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.' [494 U.S.] at 380. [Citations omitted.]

> "But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And indeed, our decisions suggest that complete jury discretion is constitutionally permissible." *Angelone*, 522 U.S. at 276.

Consistent with *Angelone*, the *Kleypas I* court noted that nothing in the cases under consideration "require[s] that a jury consider all possible mitigating circumstances;

117

rather, they simply preclude the State from foreclosing such consideration." *Kleypas I*, 272 Kan. at 1074-75; see *Blystone v. Pennsylvania*, 494 U.S. 299, 307, 110 S. Ct. 1078, 108 L. Ed. 2d 255 (1990) ("The requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence."). Further, "the sentencer is free to conclude that some circumstances claimed to be mitigating are not mitigating circumstances." *Kleypas I*, 272 Kan. at 1075; see *State v. Cheever*, 295 Kan. 229, 269, 284 P.3d 1007 (2012) (*Cheever I*) (Eighth Amendment does not prohibit a capital sentencing jury from assessing the weight of mitigating evidence and finding it wanting as a matter of fact), *vacated and remanded on other grounds* 571 U.S. ___, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013).

More recently, in *Kansas v. Marsh*, 548 U.S. 163, 175, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), the United States Supreme Court summarized its caselaw on this point by noting: "In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here." Then, before quoting the Kansas pattern instruction given here, the Court concluded: "Consonant with the individualized sentencing requirement, a Kansas jury is permitted to consider *any* evidence relating to *any* mitigating circumstance in determining the appropriate sentence for a capital defendant, so long as that evidence is relevant." 548 U.S. at 176.

In summary, contrary to Kleypas' contention, the jury is free to "evaluate the evidence in mitigation and find it wanting as a matter of fact." See *Eddings v. Oklahoma*, 455 U.S. 104, 113, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982). The jurors may not exclude mitigating evidence from their consideration. But they may determine the weight to be

118

given relevant mitigating evidence, including no weight at all, after consideration. 455 U.S. at 114-15. That is all the challenged instruction does, and it fairly and accurately imparted that applicable law to the jury and, therefore, is legally appropriate. We find no error in the *Kleypas I* court's reasoning on this point or in the district court's instruction on remand and conclude the law of the case doctrine applies.

ISSUE 13:  NEITHER THE PROSECUTOR'S CLOSING ARGUMENT REGARDING MERCY NOR HIS CROSS-EXAMINATION OF A DEFENSE EXPERT RESULTED IN REVERSIBLE ERROR.

Kleypas complains the prosecutor engaged in misconduct by making remarks in closing argument that improperly equated mercy with failing to do justice and by intentionally violating a court order not to ask Kleypas' experts whether they had brought their notes to court. The parties argue these claims under the framework of *State v. Tosh,* 278 Kan. 83, 91 P.3d 1204 (2004). Recently, in *State v. Sherman*, 305 Kan. ___, 378 P.3d 1060 (2016), we overruled portions of *Tosh* and adopted a new framework for analysis. As we have discussed, changes in the law generally apply to cases not yet final. *Gaudina v. State*, 278 Kan. 103, 106, 92 P.3d 574 (2004). Yet, the parties have not had an opportunity to argue how *Sherman* would apply to the facts of this case. Consequently, we will discuss the analysis under both *Tosh* and *Sherman*. Kleypas does not establish reversible error under either.

13.1.  Tosh *and* Sherman

Under *Tosh*, appellate review of allegations of prosecutorial misconduct requires a two-step process. First, an appellate court determines whether there was misconduct, *i.e.,* whether the prosecutor's comments were outside the wide latitude allowed in discussing

119

the evidence. Second, if misconduct is found, the appellate court determines whether those comments compel reversal, *i.e.,* whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *Tosh,* 278 Kan. at 85, 97.

In applying the second step and determining whether the defendant was denied a fair trial, an appellate court considers three factors: (1) whether the misconduct was gross and flagrant, (2) whether it was motivated by prosecutorial ill will, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. No one factor is controlling. *Tosh,* 278 Kan. at 93.

The *Tosh* court, in using the phrase "likely [had] little weight in the minds of jurors," observed that the phrase "echo[ed] the federal harmless error rule declared in *Chapman*" and also noted that the language "sound[ed] most like the harmlessness examination now required by K.S.A. 60-261." *Tosh*, 278 Kan. at 96 (citing *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967]). The *Tosh* court also held that an appellate court must be able to say that the State can meet the harmlessness tests of both K.S.A. 60-261 and *Chapman*. 278 Kan. at 97. This means that "ultimately an appellate court must determine whether there is a reasonable possibility that the verdict was affected by the prosecutor's misconduct." *State v. Crawford*, 300 Kan. 740, 746, 334 P.3d 311 (2014).

When a prosecutorial misconduct claim arises from a prosecutor's conduct during the penalty phase of a death penalty case, we have recognized a prosecutor's "heightened duty" to refrain from misconduct "[b]ecause of the life and death nature of the proceedings." *State v. Kleypas*, 272 Kan. 894, 1084, 40 P.3d 139 (2001) (*Kleypas I*), *cert.*

120

*denied* 537 U.S. 834 (2002), *abrogated in part by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). The *Kleypas I* court followed this statement with a discussion of the appropriate standard of review identifying "subtle differences" in the standard from that applied in the guilt-phase trial and in non-death cases. 272 Kan. at 1084-88. The court discussed the challenges and difficulty of conducting a harmless error analysis in the penalty phase, which we have previously set forth above. In addition, the *Kleypas I* court determined it was necessary to analyze the cumulative effect of multiple instances of prosecutorial misconduct. "For a cumulative error analysis, the focus is on the net prejudicial effect the total prosecutorial misconduct had on the jury's ultimate verdict." 272 Kan. at 1088. "The question is whether the total effect of the cumulative misconduct found to exist, viewed in light of the record as a whole, had little, if any, likelihood [or any reasonable possibility] of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances." 272 Kan. at 1088; see *State v. Cheever*, 304 Kan. 866, 901-02, 375 P.3d 979 (2016) (*Cheever II*).

In *Sherman*, we jettisoned the term "prosecutorial misconduct" in favor of the term "prosecutorial error." 305 Kan. ___, Syl. ¶ 5. In analyzing claims of prosecutorial error, appellate courts will employ a two-step process, first determining whether error occurred and, if it did, then determining whether prejudice resulted. 305 Kan. ___, Syl. ¶ 6. Under the first step, we will continue to analyze whether the prosecutor's statements "fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 305 Kan. ___, Syl. ¶ 7. At the second stage of the analysis, rather than step through the three *Tosh* factors, the prejudice analysis will focus on whether the error prejudiced the defendant's due process rights to a fair trial; if a due process violation occurs, prejudice will be assessed by applying the *Chapman* constitutional error standard.

305 Kan. ___, Syl. ¶ 8. Under that standard, "[p]rosecutorial error is harmless if the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." 305 Kan. ___, Syl. ¶ 8.

We now apply these tests to Kleypas' claims of prosecutorial misconduct/prosecutorial error.

13.2. *Closing Argument*

Prior to the penalty rehearing, Kleypas filed a "Motion in Limine to Prohibit Prosecutorial Misconduct." The district court addressed the motion at a pretrial hearing. In lieu of argument, the State assured the court that it was familiar with the *Kleypas I* decision, which addressed allegations of misconduct by the prosecutor in the original trial. Many of these allegations related to the State's arguments regarding mercy, and the State assured the court that it intended to fully comply with the decision.

After some additional discussion, the district court granted Kleypas' motion and said, "I really think perhaps the best thing to do is just to review the [*Kleypas I*] opinion." And at the penalty hearing itself, in a conference prior to the giving of instructions and closing arguments, the court actually reviewed the major points on prosecutorial misconduct from the *Kleypas I* decision with counsel. It is clear from this discussion that the State was making an effort to find the line between proper and improper argument on mercy. In turn, the court was clear that "[y]ou can argue that the defendant does not deserve [mercy] based upon his actions but you cannot indicate to the jury that they are prohibited from granting mercy to him because he didn't show any to the victim."

122

In presenting the State's closing argument, the prosecutor reminded the jurors of their obligation to follow the law, repeated the three aggravators, and discussed the evidence applying to the aggravators. The prosecutor then turned to the topic of mercy:

"[Prosecutor]:  I want to talk to you for a moment about mercy. The instructions tell you that you can consider the appropriateness of exercising mercy and that can be a mitigating factor and we talked in jury selection with all the panels about mercy and everyone agreed that mercy—that the concept of mercy is something that is not earned. It is something that is given but, ladies and gentlemen, that doesn't mean mercy should be given in each and every circumstance.

"The instructions themselves tell you that you should consider whether it is appropriate to give mercy. You should not simply just abolish justice and substitute mercy if it is not appropriate.

"If mercy is simply handed out like a free pass each time someone does something, then people can and will do anything without ever having to face the consequences of their actions."

The defendant objected, and the district court sustained the objection. The prosecutor continued:

"[Prosecutor]:  Your Honor—I mean, I'm sorry, ladies and gentlemen, mercy is something that is bestowed. It is something that is given but not earned but it should only be given out in appropriate circumstances."

Later in his remarks, the prosecutor added:  "Ladies and gentlemen, you can look at the circumstances of [C.W.'s] death and determine whether it is appropriate to give

123

mercy and that's what I'm asking you to do. To look at the circumstances of her death." The prosecutor continued by arguing that [C.W.] died a long, slow death, reminding the jury of the details of the crimes, the humiliation she must have suffered, and the mental anguish caused by the uncertainty of her fate. He asked the jury to review the photographs of her injuries and then said: "After you have thought about his actions, after you have held those photographs, then and only then should you answer the question is mercy appropriate."

The prosecutor again referenced doing "justice" later in his closing when he urged the jury to "speak the words of justice, that you have examined the aggravating circumstances, you've also examined those items claimed to be mitigating. You've given weight to each. And that—I would ask that you find that in this case the aggravating circumstances far outweigh any claimed mitigation."

Kleypas now argues the prosecutor misstated the law by telling the jury that mercy and justice were mutually exclusive concepts. But that is not what the prosecutor said. He said "mercy *if it is not appropriate*" is not justice. And the context of the argument reinforces the prosecutor's message that the jury could consider mercy but that the State was asking the jurors to also consider the evidence of the aggravating factors and weigh whether mercy was appropriate given the evidence—a message that is consistent with the holdings of this court.

In *Kleypas I*, the court considered a claim of prosecutorial misconduct in closing argument based on the prosecutor's comments on mercy. Kleypas "claim[ed] the prosecutor's comments denigrated the concept of mercy by urging the jury to show the same mercy to Kleypas that he showed to the victim." *Kleypas I*, 272 Kan. at 1110.

124

Specifically, the court considered the prosecutor's statements: "'Look at these pictures. Do you see any leniency in these pictures[?] Do you see any mercy at all in these pictures?'" 272 Kan. at 1110. Noting that there was some dispute over whether it is improper for a prosecutor to argue to a sentencing jury that they should show a defendant the same mercy that the defendant gave to the victim, the *Kleypas I* court said:

> "In a capital case, it is important for the jury to be able to evaluate whether a defendant is deserving of mercy. As part of the same concept, however, it is clearly proper for a prosecutor to argue against the granting of mercy. We hold that it is proper for the prosecutor to argue that the defendant is not deserving of the jury's mercy because of the defendant's actions, as long as the prosecutor does not improperly state the law by arguing to the jury that it is prohibited from granting mercy to the defendant because the defendant showed none to the victim." 272 Kan. at 1110-11.

A prosecutor's statements indicating the jury could not consider mercy would also stand in contrast to those considered in *State v. Scott*, 286 Kan. 54, 183 P.3d 801 (2008), which had been filed prior to the rehearing in this case. The *Scott* court considered a comment by the prosecution in closing to the effect that the defendant had "no earthly right" to ask for mercy:

> "'Mercy. They're asking that you have mercy on this killer. They're asking you to exercise that act of grace which never entered the killer's mind on September 13th, 1996. They're asking you to spare him for no reason other than that.

> "'Let's talk about another term that we've heard, though. Moral culpability. This is a term that's in your instructions as well. And, when you are considering this plea for mercy, this plea that the State suggests he has no earthly right to ask for after his offense, consider moral culpability also.'" 286 Kan. at 115.

125

After quoting the holding from *Kleypas I*, the court found these comments were not improper:

> "Despite Scott's contention, the prosecutor's comments in this case were clearly aimed at arguing Scott did not deserve mercy. At no time did the prosecutor argue the jury was prohibited from showing Scott mercy. Rather, the prosecutor explicitly told the jury that granting mercy would be an 'act of grace.' Further, the prosecutor requested that when the jurors were considering Scott's plea for mercy, they also consider moral culpability. As a result, these comments were not improper." *Scott*, 286 Kan. at 116.

In context, the prosecutor's argument in this case also focused on the theme that Kleypas did not deserve mercy because of his actions and the circumstances of the crimes. He never argued that the jury was prohibited from considering mercy. In fact, he specifically told them at least two times that they could consider the appropriateness of granting mercy. There is nothing improper about such an argument. See *Gentry v. State*, 689 So. 2d 894, 905-06 (Ala. Crim. App. 1994) (finding no misconduct where prosecutor argued circumstances surrounding the victim's murder justified death sentence; argument was a proper appeal to justice), *rev'd on other grounds* 689 So. 2d 916 (Ala. 1996). Contrary to Kleypas' arguments, the statement neither misstated the law nor attempted to convince the jury they were prohibited from considering mercy.

While the prosecutor's argument was at times dramatic, "[t]he wide latitude permitted a prosecutor in discussing the evidence during closing argument in a criminal case includes at least limited room for rhetoric and persuasion, even for eloquence and modest spectacle. It is not opening statement; it is not confined to a dry recitation of the evidence presented." *State v. Carr*, 300 Kan. 1, 250, 331 P.3d 544 (2014), *rev'd and remanded* 136 S. Ct. 633 (2016). In addition, it is clear from the record that, although

inclined toward the dramatic, the prosecutor was making a concerted effort to determine where his boundaries were and stay within them. He used arguments similar to that approved in *Kleypas I*, and he sought clarification from the court during his argument.

We hold the prosecutor's comments did not exceed the wide latitude allowed prosecutors, even under the heightened standard applicable to death-sentence proceedings as referenced in *Kleypas I*.

### 13.3. *Cross-examination*

Prior to trial, the State specifically requested copies of notes of Kleypas' expert witnesses and, in particular, of Dr. Marilyn Hutchinson, the defense mitigation witness. The defense protested that the State was not entitled to the notes. The district court agreed, ruling that the State was not entitled to "the personal impressions and the diagnostic notes and things of that nature" but would be entitled to empirical tests and data.

At trial, in anticipation of the defense calling their expert witnesses, the State requested the court order all experts to bring "their notes, testing, any material that they have used in forming their opinions" with them to court. The defense pointed out that the discovery statute and the court's previous order did not require the production of notes. The prosecutor persisted, clarifying that he was not asking for discovery of those items, rather he was asking for an order that the witnesses have the material with them. The prosecutor pointed out that it was possible during cross-examination that he might ask to see notes that the witnesses referred to during their testimony. The district court pointed to its prior ruling that the State did not have a right to review personal notes of the experts

and ruled the State could not mention the experts' failure to bring notes: "They are not discoverable. If they are not discoverable, then the State should not be allowed to allow the jury to derive some negative inference from that fact."

As the prosecutor predicted, the issue of notes surfaced during the State's cross-examination of defense psychologist Dr. Hutchinson. The State asked Hutchinson about her review of Kleypas' medical records. On direct examination, she testified to reviewing the records of at least seven psychologists and psychiatrists. During the cross-examination, the State effectively cast doubt on the accuracy of Hutchinson's review of these records. For example, the State raised the suspicion that Hutchinson had created a nonexistent doctor by conflating the name of one of the doctors whose report she had reviewed. She reported findings from both Dr. Zaki Ajans and from a "Dr. Zalkajan." The State not only made the point that it appeared the two purported individuals were the same person, it also made the point that Hutchinson's report of their findings differed. When asked if she had reviewed a report from someone of the name Zalkajan, she said: "That would have been something that I would have reviewed in 2002 and I don't have those records to confirm that. That is somebody that I have notes of my review of it, yes." The prosecutor did not mention notes during this exchange.

Later, as the State's cross-examination continued on various findings by other doctors included in Hutchinson's review, the following exchange occurred:

"Q. [Prosecutor:] You stated that there is a Dr. Gentry that examined [Kleypas] in either 1977 or 1991.
"A. [Hutchinson:] I—I think it was either '77 or '81.
"Q. '81. Well, do you have a report, because I don't have anything on that individual.

128

"A.     I have my notes of reading it but I don't have the original with me as we've discussed.

"Q.     So you don't have anything to prove to this jury that that person actually exists either, do you, with you today?

"A.     Not with me, no.

"Q.     Okay. I can't find any report from a Dr. Gentry in '77 or '81. And so I just don't know what to ask you about that. If you had something, I would ask you. Do you have any notes I could look at today to assist you?

"A.     Not here. Those are [in] boxes at home."

The defense made no objection to any of the references to notes. Kleypas now argues the reference to Hutchinson's notes regarding Gentry's report undermined the purpose of the order in limine and constituted misconduct.

The State cites the contemporaneous objection rule of K.S.A. 60-404 and cases applying that rule and maintains Kleypas failed to preserve the issue for our review and, as a result, has waived the issue. But, as we have discussed, this court has repeatedly held that K.S.A. 2015 Supp. 21-6619(b) "imposes a mandatory exception in death penalty appeals to the various statutes and rules barring consideration of unpreserved issues." *State v. Cheever*, 295 Kan. 229, 241, 284 P.3d 1007 (2012) (*Cheever I*) (discussing K.S.A. 21-4627[b], now codified at K.S.A. 2015 Supp. 21-6619[b]), *vacated on other grounds and remanded*, 571 U.S. ___, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013).

We note that in each series of questions (one regarding "Zalkajan" and the other Gentry) the prosecutor initially asked about *reports*. Hutchinson, not the prosecutor, then raised the prospect of notes. Nevertheless, eventually the prosecutor did ask about notes relating to Gentry. Given that Hutchinson had already told the jury about her notes and indicated she did not have the reports with her, the prosecutor's question essentially

129

suggested nothing more than what the witness had already said. In this context, we conclude the comments did not exceed the wide latitude allowed.

The prosecutor's comments concerning Gentry's report itself are more troubling. Gentry testified in the first penalty hearing, and the parties had discussed his report during the proceedings following remand. There's little doubt that the prosecutor knew who Gentry was as well as the substance of his report (and prior testimony). See *State v. Kleypas*, 272 Kan. 894, 985, 1091-92, 40 P.3d 139 (2001) (*Kleypas I*), *cert. denied* 537 U.S. 834 (2002), *abrogated in part by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). Clearly, the prosecutor was taking advantage of Hutchinson's response to further discredit her and to imply that Gentry, like Zalkajan, did not exist—a fact the prosecutor knew to be untrue. While there may have been some question about the date of the report, the prosecutor asked, "Well, do you have a report, because I don't have anything on that individual." Then, the prosecutor specifically asked about notes. In doing so, the prosecutor exceeded allowable bounds. "A prosecutor's questions must be relevant and supported by a good-faith basis for believing the asserted matter to be true." *State v. Robinson*, 303 Kan. 11, 318-19, 363 P.3d 875 (2015), *disapproved of on other grounds by State v. Cheever*, 304 Kan. 866, 375 P.3d 979 (2016); see *State v. Akins*, 298 Kan. 592, 601-02, 315 P.3d 868 (2014) (prosecutor may not reference facts not in evidence or express personal view); *State v. Gleason*, 277 Kan. 624, 640-41, 88 P.3d 218 (2004) (discussing misconduct based on violation of order in limine).

In applying the *Tosh* factors, we conclude the prosecutor's statement about not having information about Gentry—in essence, an act of the prosecutor testifying during the examination of a witness—and the implication of something that did not have a basis in fact evidences prosecutorial ill will. The fact that the prosecutor then followed that

130

comment with a reference to notes, a topic the State had been instructed to stay away from, further indicates ill will. Plus, in light of the judge's order not to mention notes and the prosecutor's violation of the well-known rule that a prosecutor's questions must be supported by a good-faith basis for believing the asserted matter to be true, we conclude the prosecutor's comments were gross and flagrant misconduct.

Turning to the harmless error test (*Tosh*'s final prong and *Sherman*'s prejudice step), we conclude, however, that the prosecutor's ill will and gross and flagrant conduct would not require reversal in light of the record as a whole. No single *Tosh* factor is controlling. *State v. Armstrong*, 299 Kan. 405, 416, 324 P.3d 1052 (2014). And the prejudice, if any, caused by the questions is minimal. Hutchinson's recordkeeping (and arguably her credibility) had been undermined by the confusion over Dr. Zaki Ajans versus "Dr. Zalkajan" and by other discrepancies the prosecutor effectively pointed out through questioning, exchanges which involved no prosecutorial misconduct/errors. The State's suggestion of poor notetaking regarding Gentry added little. Further, the substance of the questioning—the exact count of Kleypas' prior mental evaluations—carried little import. Even the State's witnesses established that Kleypas had a long history of mental illness.

Furthermore, the impact on the mitigators makes little difference to our analysis because, given *Kleypas I*'s direction, we must give full credit to all the mitigators. *Kleypas I*, 272 Kan. at 1087 (because an appellate court cannot know which mitigators were considered by individual jurors, the court must assume that all of the mitigating circumstances claimed by a defendant exist). With that in mind, the question is whether we can say the evidence that the aggravating circumstances outweigh the mitigating

circumstances is so overwhelming that the misconduct had no reasonable possibility of changing the jury's verdict. See 272 Kan. at 1087.

Here, the evidence of the aggravators was essentially uncontroverted. As to the first aggravator, the uncontroverted evidence established that Kleypas had a previous murder conviction. With regard to the aggravator of avoiding detection and prosecution, Kleypas told investigating officers that C.W. had recognized him. He also described his plans to flee and his attempts to dispose of evidence. All of these circumstances suggest Kleypas committed the murder with the motivation of concealing his crime. And an even stronger consideration is that there was overwhelming evidence of a heinous, atrocious, and cruel murder. C.W. clearly struggled and fought back. Forensic evidence showed she suffered grievous and painful injuries before death. Evidence suggested Kleypas taunted her. And he brutally stabbed her.

In light of this overwhelming evidence, we conclude beyond a reasonable doubt that the prosecutor's exchange with Hutchinson regarding Gentry, viewed in the light of the record as a whole, had no reasonable possibility of changing the jury's conclusion regarding the weight of the aggravating and mitigating circumstances and, therefore, was harmless. See *State v. Adams*, 292 Kan. 60, 71, 253 P.3d 5 (2011) (prosecutor's improper references to victim were made in passing and were not emphasized, and in light of strong evidence supporting the State's theory, "the misconduct would likely have had little weight in the minds of the jurors").

Finding only a single instance of prosecutorial misconduct, analysis of any cumulative effect of prosecutorial misconduct is inapplicable. We reject Kleypas' claim that prosecutorial misconduct requires reversal.

ISSUE 14:  THE DISTRICT COURT DID NOT ERR IN ADMITTING EVIDENCE OF KLEYPAS'
1977 MISSOURI CONVICTION.

For his next issue, Kleypas maintains the district court should not have admitted evidence of his 1977 Missouri murder conviction because the conviction was unconstitutionally obtained.

Some additional facts provide context for Kleypas' arguments. In the *Kleypas I* proceedings, the State had given notice of the aggravating circumstances on which it would rely, including Kleypas' 1977 murder conviction. See K.S.A. 21-4625(1) (providing as an aggravating circumstance that the defendant had been previously convicted of felony in which defendant inflicted great bodily harm, disfigurement, dismemberment, or death on another is an aggravating circumstance). Kleypas responded by filing a "Motion to Bar Evidence of 1977 Conviction for Constitutional Defect." He argued the Missouri conviction was constitutionally invalid because he had not "knowingly, competently, intelligently waive[d] his right to trial by jury in that case and the Court did not make an adequate inquiry into his competence to make the waiver." In a memorandum supporting the motion, Kleypas specifically said:  "This motion constitutes the collateral attack upon the prior conviction" relied on by the State.

The district court issued a memorandum decision on the motion before the *Kleypas I* trial. Relying on *Custis v. United States*, 511 U.S. 485, 114 S. Ct. 1732, 128 L. Ed. 2d 517 (1994), the district court declined to allow a collateral attack by the defendant on the Missouri conviction.

Following this court's *Kleypas I* decision and its order of remand for resentencing, Kleypas filed a new motion attacking the Missouri conviction. The renewed motion asked the court "to determine the admissibility of" the prior conviction and "to strike the K.S.A. 21-4625(1) aggravator of prior conviction as evidence secured in violation of the 6th, 8th, and 14th Amendments to the United States Constitution and the correlating Kansas Bill of Rights and pursuant to K.S.A. 21-4624(c)." The motion also asked the court to exclude all evidence regarding the 1977 conviction because it was the product of ineffective assistance of counsel; Kleypas was incompetent to proceed at the time of trial and legally insane at the time of the alleged offense; Kleypas' waiver of trial by jury was not knowing, voluntary, and intelligent; and the evidentiary basis for the conviction was invalid.

Finally, Kleypas' motion argued the district court was obligated to determine the validity of the Missouri conviction before allowing its use in evidence as an aggravating factor for the Kansas capital murder case. To support this argument, Kleypas cited the need for heightened reliability in a death penalty proceeding. He also noted that K.S.A. 21-4624(c) specifically states that "no evidence secured in violation of the constitution of the United States or of the state of Kansas shall be admissible" in the penalty-phase proceeding.

Kleypas attached approximately 110 pages of materials to his motion, most of which consisted of testimony from the 1977 trial transcripts. The transcript included the testimony of Dr. Joe Leggett who, as a young resident staff psychiatrist at Fulton State Hospital in Missouri, had performed a psychiatric evaluation of Kleypas following the murder and who had been called by the State of Missouri to rebut Kleypas' mental disease defense. Kleypas argued that Leggett's testimony was essential evidence that

134

contributed to his conviction because it refuted Kleypas' mental disease defense. Kleypas also argued that Leggett's testimony would have supported Kleypas' defense if his trial counsel would have provided Leggett with information from Kleypas' own expert's report.

In response, the State argued that the motion amounted to a collateral attack on a judgment from a sister state, which the district court had already ruled in the original trial would not be allowed.

Kleypas' counsel urged the district court to recognize a distinction between a collateral attack and the exercise of the court's duty under K.S.A. 21-4624(c) to assure that "no evidence secured in violation of the constitution of the United States or of the state of Kansas" was admitted in the penalty-phase proceeding. See *Carr*, 300 Kan. at 286-87 (under K.S.A. 21-4624[c], a district judge "continues to fill an inherent role as 'gatekeeper of constitutionally permissible evidence'"). Counsel argued several constitutional violations had occurred during the Missouri trial, including ineffective assistance of counsel, which raised concern about the reliability of the conviction.

The district court dismissed Kleypas' contention that the motion was not a collateral attack, particularly noting that Kleypas had labeled it as such in his earlier motion. It found that a collateral attack was not allowed under *Custis*, 511 U.S. 485, but it also found no merit in Kleypas' arguments about the defects in the Missouri trial.

On appeal from that decision, Kleypas argues the district court erred when it decided that evidence of Kleypas' 1977 conviction could be introduced to support the State's aggravating factor that he had previously been convicted of a felony in which he

135

inflicted great bodily harm, disfigurement, dismemberment, or death on another. K.S.A. 21-4625(1). But Kleypas does not address the district court's decision that *Custis* bars his attack on the constitutionality of the 1977 conviction. That ruling by the district court presents a legal question, which we review de novo. *Bellamy v. State*, 285 Kan. 346, 354, 172 P.3d 10 (2007) (reviewing de novo the legal conclusion as to whether there has been such a denial or infringement of the constitutional rights as to render a judgment vulnerable to collateral attack).

Briefly summarized, in *Custis* the United States Supreme Court determined whether a state conviction had been obtained (1) in violation of a criminal defendant's right to effective assistance of counsel, and (2) pursuant to a guilty plea that was not a knowing and intelligent waiver of the defendant's rights. The Court acknowledged the right to collaterally attack prior convictions used for sentence enhancement when there had been a violation of the right to have counsel appointed for those convictions—*i.e.*, when the prior convictions violated rights recognized in *Gideon v. Wainwright,* 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963). But the Court refused to extend the right of collateral attack beyond a *Gideon* violation. *Custis*, 511 U.S. at 496.

This court adopted the rule and rationale of *Custis* in *State v. Delacruz*, 258 Kan. 129, 139, 899 P.2d 1042 (1995). And subsequently, this court has reiterated that the only appropriate mechanisms for attacking a conviction are direct appeal from the original conviction or a habeas corpus proceeding. *State v. Chiles*, 260 Kan. 75, 80-81, 917 P.2d 866 (1996). Because Kleypas does not allege a *Gideon* violation in his prior conviction, *Custis* dictates that he may not collaterally challenge the validity of the 1977 Missouri conviction during the sentencing phase for his current capital murder conviction.

We are not persuaded to the contrary by Kleypas' citation to *Johnson v. Mississippi*, 486 U.S. 578, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988). In *Johnson*, the United States Supreme Court held that the defendant's Mississippi death sentence was invalid because it rested in part on a New York felony conviction that had since been reversed by New York courts. 486 U.S. at 583-84. Kleypas argues this holding suggests that a death sentence based in part on a conviction that has been vacated because of constitutional flaws must itself be vacated. Yet, *Johnson* says nothing about allowing collateral attacks on out-of-state convictions. Rather, it illustrates the effect of a reversal of a New York conviction by a New York court; it does not suggest the Mississippi court could review a New York conviction. True, if Kleypas had achieved relief in Missouri on direct appeal or through a habeas action, as had the *Johnson* defendant, the district court could not have allowed evidence of that conviction to be admitted. But this has simply not occurred.

We hold as a matter of law that the district court did not err in determining that Kleypas was precluded from attacking the Missouri conviction under the rationale of *Custis* and *Delacruz*. Furthermore, in light of *Custis* and *Delacruz*, the evidence did not violate Kleypas' constitutional rights, and the district court discharged its duty under K.S.A. 21-4624(c).

ISSUE 15:  THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION DOES NOT CATEGORICALLY PROHIBIT THE EXECUTION OF OFFENDERS WHO ARE SEVERELY MENTALLY ILL AT THE TIME OF THEIR CRIME.

Kleypas argues the death penalty is a categorically disproportionate punishment under the Eighth Amendment to the United States Constitution for offenders who, like him, suffered from severe mental illness at the time of their crime. He presented this issue

to the district court and asked the court to extend the reasoning of *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), which determined that the executions of "mentally retarded" criminals are cruel and unusual punishments prohibited by the Eighth Amendment.

In Kleypas' motion, he also made several factual allegations, asserting that he

"does not have, and never has had, an intact and normal brain function. He cannot think the way other people think; he cannot experience and interact with the world the way other people do; he cannot conform his behavior to the norms of society or the requirements of the law the way other people can; he cannot act in his own best interest in a rational manner; and he cannot do anything about any of this."

At a hearing before the district court, Kleypas asked the court to extend the *Atkins* rationale to the seriously mentally ill under the Eighth Amendment or its "equivalent" under the Kansas Constitution. Defense counsel did not ever specifically refer to § 9 of the Kansas Constitution Bill of Rights.

The district court observed that a "trial within a trial" would be necessary to determine whether someone was mentally ill and, further, that the law allowed the execution of the mentally ill. It denied Kleypas' motion.

On appeal, Kleypas has narrowed his claim to an Eighth Amendment categorical proportionality challenge, proposing a categorical rule prohibiting the death penalty for offenders who were severely mentally ill at the time of their crimes. In other words, his proposal focuses on the characteristics of the offender at the time of the offense. See *State v. Williams*, 298 Kan. 1075, 1086, 319 P.3d 528 (2014) (recognizing that the United

138

States Supreme Court identifies three subcategories of categorical proportionality challenges that are distinguished based on whether the focus is on: [1] the nature of the offense, [2] the characteristics of the offender, or [3] a particular type of sentence as it applies to an entire class of offenders who have committed a range of crimes).

The State argues Kleypas has failed to define a category for analysis and that he fails to meet the two-part test regarding categorical proportionality attacks based on the characteristics of the offender. We next address these arguments.

### 15.1. *Preliminary Arguments Regarding Definition of Category*

The State, in arguing that Kleypas has failed to define his category of severely mentally ill, also asserts the category is incapable of definition. However, both Kleypas' motion before the district court and his argument on appeal point to a definition supplied by American Bar Association Recommendation Number 122A, adopted by the House of Delegates on August 7-8, 2006. *Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, 30 Mental & Physical Disability L. Rep. 668 (2006) (hereinafter ABA Recommendation Number 122A). In relevant part, the recommendation provides:

> "Defendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law. A disorder manifested primarily by repeated criminal conduct or attributable solely to the acute effects of voluntary use of alcohol or other drugs does not, standing alone, constitute a mental disorder or disability for purposes of this provision." ABA Recommendation Number 122A at 668.

This recommendation had previously been adopted by the American Psychiatric Association, the American Psychological Association, and the National Alliance of the Mentally Ill. ABA Recommendation Number 122A.

The comments to the recommendation observe that the definition contains two predicates for excluding a mentally ill offender from capital punishment. First is the requirement that the offender have a "severe" disorder,

> "which is meant to signify a disorder that is roughly equivalent to disorders that mental health professionals would consider the most serious [American Psychiatric Association, Diagnostic and Statistical Manual, 25-26 (text rev. 4th ed. 2000)] 'Axis I diagnoses.' These disorders include schizophrenia and other psychotic disorders, mania, major depressive disorder, and dissociative disorders—with schizophrenia being by far the most common disorder seen in capital defendants. In their acute state, all of these disorders are typically associated with delusions (fixed, clearly false beliefs), hallucinations (clearly erroneous perceptions of reality), extremely disorganized thinking, or very significant disruption of consciousness, memory and perception of the environment." ABA Recommendation 122A at 670.

The second predicate in the definition is the "significant impairment" requirement, which is set out in three specific types. These subtypes, in turn, essentially encompass those conditions or characteristics which the United States Supreme Court relied on to find the mentally retarded and juveniles less culpable for their crimes, *i.e.*, the offender lacked the ability to appreciate the nature, consequences, or wrongfulness of his or her conduct; to exercise rational judgment in relation to conduct; or to conform his or her conduct to the requirements of the law. See *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (juveniles); *Atkins*, 536 U.S. 304 ("mentally retarded").

140

We conclude these standards set out a specific enough category to allow consideration of Kleypas' arguments. We also conclude that the State's additional argument—that Kleypas' failure to define the category means he has failed to show standing to raise this issue—is countered by extensive testimony in the record by the various mental health professionals who examined him. Several of these experts diagnosed Kleypas with schizophrenia and dissociative disorders.

15.2. *Kleypas Fails to Meet the Categorical Test*

Next the State argues that Kleypas' categorical challenge fails to satisfy scrutiny under the applicable two-part test for challenges based on the characteristics of the offender:

> "The Court first considers 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue. [Citation omitted.] Next, guided by 'the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose,' [citation omitted], the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution." *Graham v. Florida*, 560 U.S. 48, 61, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

"A categorical proportionality challenge under the Eighth Amendment implicates questions of law, and this court has unlimited review." *State v. Dull*, 302 Kan. 32, 40, 351 P.3d 641 (2015).

141

### 15.2(a). *No National Consensus*

The United States Supreme Court has placed considerable reliance on legislative action as evidence of society's standard of decency. For example, in *Atkins*, when called upon to reconsider its previous decision in *Penry v. Lynaugh*, 492 U.S. 302, 335, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), which held the Eighth Amendment permitted the execution of the "mentally retarded," the Court observed:

> "'The [Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' [*Trop v. Dulles,* 356 U.S. 86, 100-101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958)].

> "Proportionality review under those evolving standards should be informed by '"objective factors to the maximum possible extent"' [citation omitted]. We have pinpointed that the 'clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures.' [Citation omitted.]" *Atkins*, 536 U.S. at 311-12.

The Court recounted that only two state statutes prohibited executions of the "mentally retarded" at the time *Penry* was decided. Subsequently, 18 states had adopted legislation prohibiting such executions. But the Court also noted that the number adopting such measures was not as significant as the trend—*i.e.*, the consistency of the change in direction which it demonstrated. This trend, in the Court's view, meant that societal views had evolved to view the "mentally retarded" offender as categorically less culpable than the average criminal. *Atkins*, 536 U.S. at 313-16. The Court also noted that even in the states that allowed the execution of "mentally retarded" offenders, the practice had become uncommon. All this demonstrated a national consensus against the practice. Likewise, in *Roper*, the Court noted similar numbers of states prohibiting the juvenile

142

death penalty and the infrequency of the actual practice even in states permitting it. 543 U.S. at 564-67.

In contrast, as Kleypas observes, only one state, Connecticut, has ever passed legislation expressly prohibiting the death penalty for individuals who were mentally ill at the time of the crime. The legislation (Conn. Stat. § 53a-46a[h][3] [2009]) exempted a capital defendant from execution if his or her "mental capacity was significantly impaired or [his or her] ability to conform [his or her] conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution." However, Connecticut abolished the death penalty altogether for future offenses in 2012.

Other states have attempted to pass legislation and failed. Kleypas cites relatively recent bills introduced in the legislatures of Kentucky, North Carolina, Indiana, and Tennessee as evidence that the states are moving in the direction of barring the execution of those who were mentally ill at the time of their offense. However, none of these states actually passed legislation and all of them still retain the death penalty.

Legal commentators have acknowledged the absence of any legislative trend toward abolishing the death penalty for this category of offenders:

> "In both *Atkins* and *Roper*, the Court stressed the trend of statutory change in the direction of abolishing the death penalty for those with mental retardation or who were juveniles at the time of the offense. This echoed the Court's similar reliance on legislative action in its earlier determinations that the death penalty could not be imposed for such offenses as the rape of an adult woman where death of the victim did not result, or felony murder where the defendant himself neither took the life of the victim nor intended that a

143

homicide occur. And the Court followed this approach in its recent decision in [*Kennedy v. Louisiana*, 554 U.S. 407, 423-25, 128 S. Ct. 2641, 171 L. Ed. 2d 525, concluding that the death penalty could not be available for the rape of a child whose death did not occur, noting that forty-four of the fifty states do not impose capital punishment for this offense. *There simply is no comparable legislative trend toward abolishing the death penalty for those with severe mental illness.*" (Emphasis added.) Winick, *The Supreme Court's Evolving Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier*, 50 B.C. L. Rev. 785, 790-91 (2009).

This lack of legislative direction has also led courts who have considered the issue to decline to extend the *Atkins* and *Roper* rationale to the mentally ill. See *Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014) (noting that no Supreme Court case has "created a rule of constitutional law making the execution of mentally ill persons unconstitutional"); *Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir. 2012) (noting absence of caselaw extending *Atkins* to prohibit the execution of those with mental illnesses); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006) (rejecting claim that *Atkins* and *Roper* created a new rule making the execution of mentally ill persons unconstitutional and holding that a defendant's mental illness does not prevent imposition of a capital sentence); *People v. Castaneda*, 51 Cal. 4th 1292, 1345, 254 P.3d 249 (2011) (rejecting claim that execution of defendant with an antisocial personality disorder constitutionally prohibited); *Simmons v. State*, 105 So. 3d 475, 511 (Fla. 2012) (recognizing the Florida Supreme Court has "repeatedly rejected" claim that mental disorders constitutionally bar defendant's execution); *Lewis v. State*, 279 Ga. 756, 764, 620 S.E.2d 778 (2005) (refusing to extend *Atkins* rationale to a defendant who is competent but mentally ill); *State v. Dunlap*, 155 Idaho 345, 380, 313 P.3d 1 (2013) ("It appears that every court that has considered this issue ha[s] refused to extend *Atkins* and hold that the Eighth Amendment categorically prohibits execution of the mentally ill."), *cert. denied* 135 S. Ct. 355 (2014); *Matheney v. State*, 833 N.E.2d 454, 458 (Ind. 2005)

144

(Supreme Court has not held that mentally ill persons are not subject to the death penalty); *Dunlap v. Com.*, 435 S.W.3d 537, 616 (Ky. 2013) ("We are not prepared to hold that mentally ill persons are categorically ineligible for the death penalty."), *cert. denied Dunlap v. Kentucky*, 135 S. Ct. 87 (2014); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. 2006) ("federal and state courts have refused to extend *Atkins* to mental illness situations"); *State v. Mammone*, 139 Ohio St. 3d 467, 504, 13 N.E.3d 1051 (2014) (Eighth Amendment does not bar the execution of the seriously mentally ill and defendant failed to show he suffered from a "serious mental illness"), *cert. denied* 135 S. Ct. 959 (2015); *Malone v. State*, 2013 OK CR 1, ¶ 67, 293 P.3d 198 ("We expressly reject that the *Atkins* rule or rationale applies to the mentally ill."), *cert. denied* 134 S. Ct. 172 (2013); *Pike v. State*, Case No. E2009–00016–CCA–R3–PD, 2011 WL 1544207, at *67-68 (Tenn. Crim. App. 2011) (unpublished opinion) (no consensus in state legislation supporting a categorical exclusion for the mentally ill); *Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. 2010) (noting absence of authority to extend *Atkins* rationale to the mentally ill and absence of trend among state legislatures to "categorically prohibit the imposition of capital punishment" for this category of offenders); see also *United States v. Akbar*, 74 M.J. 364, 406 (C.A.A.F. 2015) (courts have uniformly determined that there is no constitutional impediment to imposing a capital sentence where a criminal defendant suffers from a mental illness).

Kleypas cites other "evidence" of a growing trend supporting his position, consisting of policy statements of national mental health organizations and a 2003 Gallup poll. Nonetheless, he fails to demonstrate the kind of legislative consensus on which the Supreme Court has relied.

15.2(b).  *The Court's Exercise of Independent Judgment*

As to the second-prong of the test, we explained in *Williams* that "community consensus is entitled to great weight but it is not determinative." 298 Kan. at 1087. And in *State v. Mossman*, 294 Kan. 901, 281 P.3d 153 (2012), we observed:

> "'In accordance with the constitutional design, "the task of interpreting the Eighth Amendment remains [the Court's] responsibility." [Citation omitted.] The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question. [Citations omitted.] In this inquiry the Court also considers whether the challenged sentencing practice serves legitimate penological goals. [Citations omitted.]'" *Mossman,* 294 Kan. at 929 (quoting *Graham,* 560 U.S. at 67-68).

*Atkins* and *Roper* both identify retribution and deterrence as the "legitimate penological goals" served by the imposition of the death penalty on those who commit the worst crimes. See *Roper*, 543 U.S. at 571; *Atkins*, 536 U.S. at 319. Both conclude that the characteristics of juveniles and the mentally retarded, respectively, make offenders in those categories less culpable than the "average murderer." *Atkins*, 536 U.S. at 319. And being less culpable and less amenable to deterrence, the death penalty is inappropriate for their crimes.

In support of his argument, Kleypas simply states "[t]he culpability of the severely mentally ill is diminished in the same manner as juveniles and the mentally retarded." He cites language quoted from the ABA recommendation report to illustrate that some severe disorders result in hallucinations or delusions. But the ABA report itself recognizes that diagnosis alone is not a sensible basis for the exemption and, consequently, a

146

case-by-case determination will be required. The report recognizes that *Atkins* left the definition of "mental retardation" to the states. See 536 U.S. at 317. The report continues:

> "*Atkins* held the death penalty excessive for *every* person with mental retardation, and the Supreme Court therefore dispensed with a case-by-case assessment of responsibility. However, for the disorders covered by this . . . part of the Recommendation, preclusion of a death sentence based on diagnosis alone would not be sensible, because the symptoms of these disorders are much more variable than those associated with retardation or the other disabilities covered by the Recommendation's first paragraph." ABA Recommendation Number 122A, at 671.

In contrast, in *Roper*, the United States Supreme Court noted that "[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability." 543 U.S. at 572-73. And in *Atkins*, the Court noted that clinical definitions of mental retardation shared common features which ultimately bore on the determination of culpability. See 536 U.S. at 317-18.

Mental illnesses present less discernable common characteristics than age or mental retardation. Caselaw relating to the implementation of *Ford v. Wainwright*, 477 U.S. 399, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986), and *Panetti v. Quarterman,* 551 U.S. 930, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007), illustrates the difficulty in defining a discernable standard relating to mental illness. See *Panetti v. Quarterman*, 2008 WL 2338498 (W.D. Tex. 2008). As the ABA standard recognizes, case-by-case evaluations would be necessary; it follows that the level of culpability will vary on a case-by-case basis. While we recognize that some mental illnesses may make a defendant

less culpable and less likely to be deterred by the death penalty, often such illnesses can be treated and may not manifest in criminal behavior.

We also note the protections already in place, which protect the incompetent from trial and the "insane" from execution. See K.S.A. 2015 Supp. 22-3302 (competency); *Ford*, 477 U.S. at 410 (Eighth Amendment prohibits executing those who are "insane" at the time the sentence is carried out). In addition, a defendant may present a defense to the crimes based on a lack of capacity. K.S.A. 2015 Supp. 21-5209. Finally, as Kleypas did here, mental illness can be asserted as a mitigator. While we recognize a distinction between disqualification and mitigation, we also recognize that presenting mental illness as a mitigator allows the jury to consider culpability.

Given these variables and considerations, in the exercise of our independent judgment, we reject a categorical prohibition based on the broad classification of mental illness, even as defined by the ABA standard, in favor of individualized assessments through the sentencing proceeding. See *Graham*, 560 U.S. at 58-61. We have confidence that Kansas juries can weigh a defendant's mental state at the time of the crime as a mitigating factor for consideration in the decision of whether to return a death penalty verdict.

We conclude that Kleypas fails to make the showing necessary under either prong of the two-part categorical proportionality analysis. We, therefore, deny his Eighth Amendment categorical proportionality challenge and conclude the Eighth Amendment does not categorically prohibit the execution of offenders who are severely mentally ill at the time of their crimes.

148

ISSUE 16:  KLEYPAS FAILS TO ESTABLISH THE BASIS FOR PROPORTIONALITY REVIEW UNDER § 9 OF THE KANSAS CONSTITUTION BILL OF RIGHTS.

Kleypas also argues that this court should undertake an independent categorical proportionality review of his death sentence under § 9 of the Kansas Constitution Bill of Rights, which prohibits the State from inflicting "cruel or unusual punishment." Kleypas did not raise this issue before the district court.

Kleypas argues that *State v. Gomez*, 290 Kan. 858, 235 P.3d 1203 (2010), authorized a § 9 proportionality review of a noncapital sentence and that this court left the door open for such a review of the death sentence of Gavin Scott. *State v. Scott*, 286 Kan. 54, 94, 183 P.3d 801 (2008) ("Our decision today should not be construed to preclude future interpretation of § 9 when considering the proportionality of a criminal sentence."). He also urges this court to exert review over his sentence pursuant to K.S.A. 2015 Supp. 21-6619(b), which requires this court to consider the question of sentence as well as any errors asserted in a death penalty appeal. Finally, he argues that an independent proportionality review of his death sentence is justified by the difference in language between the Eighth Amendment (prohibiting "cruel *and* unusual" punishments) and § 9 (prohibiting "cruel *or* unusual" punishments).

Kleypas' challenge is unavailing. In *Gomez*, as Kleypas argues, this court recognized the continued viability of proportionality challenges. But this court also recognized that in Kansas those challenges had been limited to claims that *a term-of-years sentence* was disproportionate. See 290 Kan. at 867-68; *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978) (setting out proportionality test). We repeated that statement in *Mossman*, 294 Kan. at 909 (explaining *Freeman* test will not apply where challenge goes to method of punishment, rather than length of sentence).

149

Consistent with these cases, in *Kleypas I*, this court specifically rejected the suggestion that it should undertake a "proportionality" review of a death sentence. *State v. Kleypas*, 272 Kan. 894, 1033, 40 P.3d 139 (2001) (*Kleypas I*) ("We hold that neither the Kansas Constitution, the Kansas death penalty statutes, nor Kansas case law requires that a defendant's sentence be subjected to a proportionality review which compares the defendant's sentence with those imposed on other Kansas defendants for the same or similar crimes."), *cert. denied* 537 U.S. 834 (2002), *abrogated in part by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). The *Kleypas I* court also noted that in an appeal brought by Clifford Scott, *State v. Scott,* 265 Kan. 1, 961 P.2d 667 (1998), this court also had "severely limited" the application of the *Freeman* factors "to instances where the *length* of a sentence was challenged." *Kleypas I*, 272 Kan. at 1032-33.

Subsequent to the *Kleypas I* decision, another defendant, Gavin Scott, argued that the court should interpret § 9 to find the weighing equation in K.S.A. 21-4624(e) unconstitutional despite the United States Supreme Court's decision that the statute does not violate the Eighth Amendment. See *Scott*, 286 Kan. at 87-99 (citing *Kansas v. Marsh,* 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 [2006]). In considering this argument the *Scott* court concluded:

> "[Scott's] argument does not go to the proportionality of the sentence imposed, but to the process in determining against whom the death penalty should be imposed. Regardless of whether the set of punishments encompassed by the term 'cruel or unusual' is larger than the set which could be described as both 'cruel and unusual,' the process itself used to arrive at the decision is not implicated. Scott's argument must fail.

150

> "Our decision today should not be construed to preclude future interpretation of § 9 when considering the proportionality of a criminal sentence. In such a circumstance, we are free to further consider the historical record and decide whether § 9 should be interpreted in a manner which deviates from that given to the Eighth Amendment by the United States Supreme Court." *Scott*, 286 Kan. at 94.

In context, the statement on which Kleypas relies—"[o]ur decision today should not be construed to preclude future interpretation of § 9"—was nothing more than a reservation of this court's right to interpret the Kansas Constitution independently of the Eighth Amendment. It does not mean the long-standing caselaw limiting proportionality review to term-of-years sentences should be set aside.

Kleypas also argues that the difference in language between the Eighth Amendment and § 9 justifies a separate proportionality review. But this court has consistently declined to interpret § 9 more broadly than the Eighth Amendment. *Scott*, 286 Kan. at 93; *Kleypas I,* 272 Kan. at 1051; *State v. Spain,* 269 Kan. 54, 59-60, 4 P.3d 621 (2000); *Scott,* 265 Kan. at 5. Kleypas supplies no reason why we should now.

Further, even if the difference between the two provisions supplied a reason to undertake an independent analysis, it does not supply the analytical framework of such an analysis, and Kleypas does not suggest one. In fact, counterintuitively, he simply incorporates his Eighth Amendment arguments. And a test is not set out in our caselaw. As we have frequently noted, while the *Freeman* test includes aspects of a categorical challenge, other aspects are fact specific. "Because of the factual inquiries involved, we . . . have refused to consider an argument that a sentence is cruel and unusual for the first time on appeal." *Gomez*, 290 Kan. at 867-68. Kleypas has not presented a sufficient record for application of the factors. See *Robinson*, 303 Kan. at 219 ("While K.S.A. 2014

151

Supp. 21-6619[b] compels our review of all issues briefed on appeal, it does 'not require that we treat the record other than as it is presented to us.' . . . We thus consider this challenge based on the status of the record presented on appeal and mindful of the fact that Robinson, as the party alleging error, bears the burden of demonstrating error.").

In summary, while Kleypas argues the court has opened the door to a § 9 categorical proportionality challenge to his death sentence, we have not developed an analytical framework for such a challenge, and Kleypas does not suggest one. And he has not submitted a sufficient argument under *Freeman*. His argument under § 9 fails.

ISSUE 17: THE DISTRICT COURT DID NOT ERR IN ADMITTING REBUTTAL TESTIMONY OF THE STATE'S EXPERT.

Kleypas next complains about the admission of Logan's rebuttal testimony. Kleypas first argues the testimony, which was aimed at countering the testimony of Hutchinson, was improper rebuttal testimony and was a ruse designed to convince the jury that Kleypas' actions were clearly premeditated and intentionally carried out. Second, he argues a portion of the testimony in which Logan talked about the availability of drugs and alcohol in prison constituted hearsay and was inflammatory and prejudicial.

Kleypas did not object to this testimony during the hearing. Nevertheless, we will consider the issue under K.S.A. 2015 Supp. 21-6619(b) (The court "shall consider . . . any errors asserted in the review and appeal.").

152

17.1. *Proper Rebuttal*

We first consider whether Logan's testimony fell within the boundaries of proper rebuttal evidence. We have determined that "[t]he use and extent of rebuttal and surrebuttal rests in the sound discretion of the district judge, and his or her ruling will not be reversed unless the discretion has been abused to a party's prejudice." *State v. Carr*, 300 Kan. 1, 297, 331 P.3d 544 (2014), *rev'd and remanded* 136 S. Ct. 633 (2016). K.S.A. 2015 Supp. 21-6617(c) bestows the district court presiding over a capital case with wide discretion to admit evidence "concerning any matter that the court deems relevant to the question of sentence," including any "evidence which the court deems to have probative value . . . regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements."

With this discretion in mind, we consider the generally recognized parameters for rebuttal testimony:

> "'Rebuttal evidence is that which contradicts evidence introduced by an opposing party. It may tend to corroborate evidence of a party who first presented evidence on the particular issue, or it may refute or deny some affirmative fact which an opposing party has attempted to prove. It may be used to explain, repel, counteract, or disprove testimony or facts introduced by or on behalf of the adverse party. Such evidence includes not only testimony which contradicts witnesses on the opposite side, but also corroborates previous testimony.' *State v. Willis,* 240 Kan. 580, 583, 731 P.2d 287 (1987)." *State v. Sitlington*, 291 Kan. 458, 464, 241 P.3d 1003 (2010).

Here, Hutchinson concluded that Kleypas' mental state at the time of the crime was severely deteriorated. Among other things, Hutchinson testified that Kleypas had a global assessment of functioning (GAF) of 1 at the time of the crime, and "there was

153

something very disturbed in his processing at that time." Kleypas relied on this testimony to support his mitigator that his mental status at the time of the crime was severely deteriorated.

Logan directly responded to Hutchinson's conclusions and specifically disagreed with her GAF scoring. While Hutchinson based it on her assessment that Kleypas was a danger to himself and others, Logan disputed whether Kleypas met the scoring criteria for a score of 1. Logan told the jury that Kleypas' actions on the night of the crime demonstrated he had been functioning at a much higher level than a score of 1 would suggest. In Logan's opinion, Kleypas acted purposefully, in an organized manner, and was in control of his behavior. These circumstances were certainly probative of premeditation and intent, but these are guilt, not penalty, phase issues that have little bearing on the weighing of aggravating and mitigating factors. In addition, these circumstances directly rebutted Hutchinson's opinion that Kleypas had a severely deteriorated mental state at the time of the crime. And because one of the mitigators on which Kleypas relied was his compromised mental state, Logan's testimony was relevant, probative, and directly responsive to Hutchinson's testimony.

Logan also testified that much of Kleypas' model behavior while he was in prison contradicted Hutchinson's conclusions that he was suffering from various types of mental illness. The fact that this testimony also tended to establish that Kleypas premeditated C.W.'s murder and intentionally carried out the crime does not negate the fact it was directly responsive to Hutchinson's picture of a delusional and decompensating individual.

We conclude the district court did not abuse its discretion in allowing this proper rebuttal testimony.

### 17.2. *Not Unduly Inflammatory*

Kleypas also complains of a particular response by Logan on cross-examination. While Kleypas' counsel was attempting to have Logan validate the defense theory that Kleypas did well in prison, in part because of the absence of drugs and alcohol, the following exchange occurred:

"Q.     But the point is, Doctor, the stressors that troubled him on the street aren't present in prison to a large extent.

"A.     Can you be specific?

"Q.     Well, there is no alcohol in prison. I hope there is not. I don't think there is.

"A.     Oh, boy, is there alcohol in prison.

"Q.     There is [*sic*] no drugs.

"A.     There is [*sic*] plenty of drugs in prison, including, you know, officers who are let go regularly for smuggling into inmates, you know, it is not a pristine environment.

"Q.     Then why does he do so well there?

"A.     It is very structured, I think, and he's given a job and he does not have to worry about anything financial. He doesn't have to worry about anything sexual. He doesn't have to worry about being rejected. In fact, he gets a lot of praise for working the jobs that he does. He gets a lot of positive reinforcement."

Kleypas argues that Logan's testimony that drugs and alcohol are available in prison was highly inflammatory and was impermissible hearsay. But the remarks were in direct response to counsel's question. A party may not invite error and then complain of that error on appeal. *State v. Robinson*, 303 Kan. 11, 152-53, 363 P.3d 875 (2015) (heightened reliability standard does not bar application of invited error doctrine in death penalty appeals). Kleypas cannot now complain that he did not get the answer he wanted and that the district court should have saved him *sua sponte* from the one he did not want. Moreover, Logan's testimony ultimately supported defense counsel's efforts to show Kleypas did well in prison.

The record also does not support Kleypas' allegation that Logan's remarks about the availability of drugs and alcohol were hearsay that he had no opportunity to rebut and therefore were inadmissible. See K.S.A. 2015 Supp. 21-6617(c). Logan testified he had extensive experience working in and around prisons. There was no indication his remarks were based upon anything but personal experience.

Logan's testimony fell within both the boundaries of proper rebuttal and the boundaries of K.S.A. 2015 Supp. 21-6617(c). The district court did not abuse its discretion in admitting the testimony.

ISSUE 18:  THE HEINOUS, ATROCIOUS, OR CRUEL AGGRAVATING FACTOR IS NOT UNCONSTITUTIONALLY VAGUE AND OVERBROAD.

In this next issue, Kleypas argues that the heinous, atrocious, or cruel aggravating factor on which the State relied to secure the death penalty is unconstitutionally vague and overbroad in violation of the Eighth and Fourteenth Amendments to the United States Constitution. This court considered the same argument in *Kleypas I*. Kleypas attempts to avoid the law of the case doctrine by arguing the *Kleypas I* decision was clearly erroneous. We disagree.

Kleypas presents nothing new to persuade us the *Kleypas I* analysis failed to consider any controlling caselaw or that it misapplied any of the relevant cases. And, if anything, our subsequent caselaw supports the *Kleypas I* analysis. See *Carr*, 300 Kan. at 283 (especially heinous, atrocious, or cruel statutory aggravator adequately channels jurors' discretion).

Nothing in the arguments presented by Kleypas in his current appeal requires our review or reconsideration of this court's conclusions in *Kleypas I*.

ISSUE 19:  THE DISTRICT COURT DID NOT ERR IN EMPANELING A NEW JURY ON REMAND.

Kleypas argues that the district court was bound by K.S.A. 21-4624(b) to attempt to reassemble the original trial jury to hear his penalty-phase retrial on remand and therefore lacked statutory authority to empanel a second jury.

Typically, when we conduct our de novo review of statutes, we begin with the most fundamental rule of statutory construction:  The intent of the legislature governs.

*State v. Williams*, 298 Kan. 1075, 1079, 319 P.3d 528 (2014). Reliance on the plain and unambiguous language of a statute is "the best and only safe rule for determining the intent of the creators of a written law." *Merryfield v. Sullivan*, 301 Kan. 397, 399, 343 P.3d 515 (2015). Consequently, we first examine the wording of K.S.A. 21-4624(b), which states:

"(b) [U]pon conviction of a defendant of capital murder, the court, upon motion of the county or district attorney, shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable. If any person who served on the trial jury is unable to serve on the jury for the sentencing proceeding, the court shall substitute an alternate juror who has been impaneled for the trial jury. If there are insufficient alternate jurors to replace trial jurors who are unable to serve at the sentencing proceeding, the trial judge may summon a special jury of 12 persons which shall determine the question of whether a sentence of death shall be imposed. Jury selection procedures, qualifications of jurors and grounds for exemption or challenge of prospective jurors in criminal trials shall be applicable to the selection of such special jury. The jury at the sentencing proceeding may be waived in the manner provided by K.S.A. 22-3403 and amendments thereto for waiver of a trial jury. If the jury at the sentencing proceeding has been waived or the trial jury has been waived, the sentencing proceeding shall be conducted by the court." K.S.A. 21-4624.

Kleypas argues the statute required the district court to make a specific determination that it could not recall enough of the original trial jurors to seat a jury of 12 before it could begin the process of selecting a new jury for the penalty trial on remand. But, as the State points out, there is nothing in the record to substantiate Kleypas' claim that "the district court made no pretense of complying with the statute." The State cites authority for the proposition that Kleypas "has the burden to designate a record affirmatively showing error[,] and, without such a record, an appellate court presumes the

158

action of the district court was proper." *State v. Valladarez*, 288 Kan. 671, 686, 206 P.3d 879 (2009); see *State v. Paul,* 285 Kan. 658, 670, 175 P.3d 840 (2008) (appellant failed in duty to designate record sufficient to establish claimed error by failing to cite to any portion of record that would support claim; claim of alleged error fails without adequate record). In addition, K.S.A. 22-3407 requires any objection to the manner in which a jury panel has been selected or drawn to be raised by a motion to discharge the jury panel made in writing and stating facts which show that the jury panel was improperly selected or drawn.

These principles apply to the penalty phase of a capital case. As we stated in *Robinson*:

> "While K.S.A. 2014 Supp. 21-6619(b) compels our review of all issues briefed on appeal, it does 'not require that we treat the record other than as it is presented to us.' . . . We thus consider this challenge based on the status of the record presented on appeal and mindful of the fact that Robinson, as the party alleging error, bears the burden of demonstrating error." 303 Kan. at 219.

We, therefore, conclude that Kleypas has failed to establish error, even under his reading of the statute.

Issue 20: CUMULATIVE ERROR DOES NOT REQUIRE REVERSAL OF KLEYPAS' CAPITAL MURDER CONVICTION OR DEATH SENTENCE.

We next consider cumulative error in the guilt and penalty phases.

159

20.1. *Guilt Phase*

We have identified two guilt-phase trial errors that required amendment of our original decision in *Kleypas I*. Kleypas does not raise a guilt-phase cumulative error argument in this appeal, but, nevertheless, we consider whether the cumulative effect of those two errors and the errors found in *Kleypas I* require reversal of Kleypas' remaining convictions and, thus, the reversal of his death sentence. See K.S.A. 2015 Supp. 21-6619(b).

"Cumulative trial errors, when considered collectively, may require reversal of the defendant's conviction when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial." *State v. Waller*, 299 Kan. 707, 727-28, 328 P.3d 1111 (2014).

In *Kleypas I*, this court found only minor errors in the guilt phase which we were confident, under the totality of the circumstances, did not substantially prejudice Kleypas or deny him a fair trial. *State v. Kleypas*, 272 Kan. 894, 1001, 40 P.3d 139 (2001) (*Kleypas I*), *cert. denied* 537 U.S. 834 (2002), *abrogated in part by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). We are equally confident that nothing in our new analysis would have changed the jury's verdict given the overwhelming evidence of guilt. See *Carr*, 300 Kan. at 254 (weighing cumulative errors from the trial against overwhelming evidence of defendant's guilt). We have cured the error created by the multiplicitous conviction by reversing it. And the isolated nature of the erroneously admitted evidence about the blood stain on the shower curtain and Logan's reliance on that evidence did not combine with any other error previously

160

identified to increase the risk of substantial prejudice. Cumulative error does not require reversal of the guilt phase.

20.2. *Penalty Phase*

The analysis of cumulative error in the penalty phase differs somewhat from the analysis in the guilt phase. First, we must consider whether the errors of the guilt-phase proceedings must be considered in conjunction with penalty-phase errors. See *State v. Cheever*, 304 Kan. 866, 902, 375 P.3d 979 (2016) (*Cheever II*). But here, because a different jury heard the penalty phase, no basis exists for accumulating the errors arising in the separate phases.

Second, as we recently stated:

"We hold that when considering a claim that cumulative error infected the penalty-phase proceeding, our test is whether we are able to find that the total cumulative effect of the errors, viewed in the light of the record as a whole, had little, if any, likelihood [or no reasonable possibility] of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. See *Kleypas* [*I*], 272 Kan. at 1087. . . . The overwhelming nature of the evidence is a factor to be considered, but its impact is limited. As with the prosecutorial-misconduct analysis, the question before this court is not what effect the error might generally be expected to have upon a reasonable jury but, rather, what effect it had upon the actual sentencing determination in the case on review. See *Kleypas* [*I*], 272 Kan. at 1088." *Cheever II*, 304 Kan. at 902.

As to errors in the penalty phase, we have found several but concluded none individually require us to vacate the penalty verdict. We have found that the corrective

action taken by the district court judge to address the outburst caused by C.W.'s father cured any fundamental failure in the proceedings. The same is true of the corrective action taken by the district court following the prosecutor's inadvertent reference to the defendant having testified. We have also noted the lack of record to establish that Tom Williams' testimony went beyond that covered by the State's notice but concluded that, even if a notice violation occurred, no prejudice resulted. As to the next error, the failure of the district court judge to instruct the jury in accordance with the mandate of *Kleypas I* had essentially no effect on the outcome of the penalty phase, because the jury was correctly instructed under the applicable law. And the prosecutor's suggestion that Dr. Gentry was fictitious was gross and flagrant misconduct and evidenced ill will, but it was ultimately harmless.

Turning to the cumulative effect of these errors, none of these incidents were related, so none had the effect of intensifying another. And while the overwhelming evidence to support the aggravating factors asserted by the State does not determine the question, it is a factor to consider in assessing penalty-phase cumulative error. See *Cheever II*, 304 Kan. at 902. And the evidence supporting the aggravating factors found to exist was substantial. Thus, while we assume the jury found all of Kleypas' proffered mitigating circumstances apply, we are able to determine beyond a reasonable doubt that any cumulative effect of error in the penalty phase had no reasonable possibility of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. Cumulative error does not require this court to vacate Kleypas' death sentence.

Finally, we must consider the mandate of K.S.A. 2015 Supp. 21-6619(c), which provides:

162

"(c) With regard to the sentence, the court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

(2) whether the evidence supports the findings that an aggravating circumstance or circumstances existed and that any mitigating circumstances were insufficient to outweigh the aggravating circumstances."

Considering the errors we have found singularly and cumulatively, we hold that Kleypas' sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor and that evidence supports the findings that aggravating circumstances existed and that the mitigating circumstances were insufficient to outweigh the aggravating circumstances.

CONCLUSION

For the foregoing reasons, we affirm Kleypas' capital murder conviction and the death sentence, reverse the conviction for attempted rape and vacate that sentence, and remand to the district court for resentencing on the aggravated burglary charge under the Kansas Sentencing Guidelines.

Affirmed in part, reversed in part, sentence vacated in part, and remanded with directions.

\* \* \*

JOHNSON, J., dissenting: I dissent from the majority's affirmance of Gary Kleypas' death sentence in the first instance because I view the death penalty as a cruel or unusual punishment proscribed by § 9 of the Kansas Constitution Bill of Rights. See *State v. Robinson*, 303 Kan. 11, 351, 363 P.3d 875 (2015) (Johnson J., dissenting), *cert. denied* ___ U.S. ___ (October 3, 2016), *disapproved of by State v. Cheever*, 304 Kan. 866, 375 P.3d 979 (2016). In *Robinson*, I adopted the criticisms of the death penalty expressed by Justices Breyer and Ginsburg in *Glossip v. Gross,* 576 U.S. ___, 135 S. Ct. 2726, 2755-77, 192 L. Ed. 2d 761 (2015) (Breyer, J., joined by Ginsburg, J., dissenting). 303 Kan. at 351. The systemic flaws in that final, irreversible disposition still exist, "[n]otwithstanding the egregious nature of the crimes and the compelling evidence of guilt presented in this particular case." *Robinson*, 303 Kan. at 351.

Given my view that the death penalty is categorically unconstitutional for every person convicted of murder in this State, I see no reason for a detailed discussion of all the other holdings by the majority with which I disagree. But I do take the liberty of briefly mentioning two objections.

First, one has to ruminate on the absurdity of affirming Kleypas' death sentence for the off-grid offense of capital murder and then remanding for resentencing on the consecutively imposed guidelines sentence for aggravated burglary. Statutorily, Kleypas "shall not begin to serve the on-grid sentence until paroled from the off-grid sentence." K.S.A. 2015 Supp. 21-6819(b)(2). When Kleypas' death sentence is fully executed, he will not be paroled; he will be buried. Thus, he can never begin whatever consecutive on-grid sentence the district court might want to impose in theory. Granted, K.S.A. 2015 Supp. 21-6819(b)(5) directs an appellate court to remand for resentencing when a conviction designated as the primary crime is reversed. See *State v. Brooks*, 298 Kan.

164

672, 685, 317 P.3d 54 (2014) (appellate court should not speculate about legislative intent when statute is plain and unambiguous). But that section of the statute should be read in harmony with the aforementioned subsection (b)(2) to avoid a meaningless and absurd result in death penalty cases. See *State v. Coman*, 294 Kan. 84, 93, 273 P.3d 701 (2012) (appellate courts must consider various provisions of an act in pari materia with a view of reconciling and bringing the provisions into workable harmony if possible); *State v. Frierson*, 298 Kan. 1005, 1013, 319 P.3d 515 (2014) (courts must construe statutes to avoid unreasonable or absurd results and presume the legislature does not intend to enact meaningless legislation). Given that we have scant resources to perform the necessary judicial functions in this State, I would hold that a resentencing for the on-grid crime is currently a moot issue in this case, unnecessary unless a federal court subsequently sets aside the death sentence, at which point a resentencing would be meaningful.

Finally, while the majority gives lip service to the rule that a heightened degree of reliability is required to impose a death sentence, it does not appear to actually exercise any heightened scrutiny of the prejudicial effect of the fundamental failure of the proceedings. It cites to *State v. Warren*, 302 Kan. 601, 610, 356 P.3d 396 (2015), to support its suggestion that Kleypas' failure to request an individual polling of the jury is fatal to his mistrial claim. But *Warren* was not a capital case where heightened scrutiny is required and the alleged fundamental failure in that proceeding occurred during jury selection, not during the evidentiary portion of the trial in front of a sitting jury.

The majority also cites to *State v. Rayton*, 268 Kan. 711, 722-23, 1 P.3d 854 (2000), which involved felony murder, not a death penalty, and, more importantly, involved more effort on the part of the trial court, to-wit:

"A review of the record indicates the jurors assured the judge that they were able to objectively consider the evidence and render a verdict unbiased by the perceived threats. The judge had an opportunity to observe the demeanor of the jurors. When the judge denied Rayton's motion for a mistrial, he stated:

> 'Well, I guess the decision I make is based, at least in part, on my assessment of [the jurors'] demeanor in talking to them and . . . the way they responded to my questions and the—the forthrightness with which they answered and their—their overall attitude, which was a low level of concern about the entire incident or series of incidents, and that it wasn't something that would affect a decision, and they were very convincing about that. And maybe from the print, you know, on the paper in the record, that doesn't come off that way but that's the way I assess it. And I am very interested in Mr. Rayton having a fair trial and I thought—'

"In view of the judge's assessment of the lack of actual intimidation felt by the jurors, the judge did not abuse his discretion in denying Rayton's motion for a mistrial." *Rayton,* 268 Kan. at 722-23.

In my view, simply presuming that the jury will heed the trial judge's admonition to ignore the fundamental failure in the proceedings is insufficient to reach the requisite level of reliability required in a death penalty case. A heightened degree of reliability as to a lack of prejudice to the defendant should require something like the trial judge making an individual and sequestered inquiry of each juror as to whether the incident would affect his or her judgment, with the judge personally observing each juror's responses and assessing the credibility of the negative responses. Even in *Rayton*, where a death sentence was not a possibility, the trial judge made the finding that the jurors were "'very convincing'" in their assertion that the fundamental failure in the proceedings

166

"'wasn't something that would affect [their] decision.'" 268 Kan. at 722. I believe we should require no less here.